# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DIVISION

MIGUEL ORTEGA and BENJAMIN
ORTEGA,



            Plaintiffs,

vs.                    Case No.: C 07-02659 JCS (ADR)

CITY OF OAKLAND, OAKLAND
POLICE DEPARTMENT, WAYNE
TUCKER, In His Capacity As The
Police Chief Of The City Of
Oakland, RAMON J. ALCANTAR,
Individually And In His
Capacity As A Police Officer
For The City Of Oakland, B.
ORTIZ Individually And In His
Capacity As A Police Officer
For The City Of Oakland, Does
 through 200,
            Defendants.
_____/


DEPOSITION OF BERNARD ORTIZ
Thursday, January 3, 2008


REPORTER'S TRANSCRIPT OF PROCEEDINGS
BY APRIL DAWN HEVEROH, CSR NO. 8759


CLARK REPORTING
2161 SHATTUCK AVENUE, SUITE 201
BERKELEY, CA  94704
(510) 486-0700

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 6

1  were testifying in court.
2      Do you understand that?
3      A.  Yes.
4      Q.  Everything that we say today on the record,
5  all of my questions and all your answers and anything
6  that either of the attorneys here will say is being
7  taken down by the court reporter seated to your left.
8  She can only take down one person at a time, so it's
9  important that you wait for me to finish my question
10 before you answer, and it's equally important for me to
11 wait for you to finish your answer before I jump in with
12 my next question.
13     So will you do that?
14     A.  Yes.
15     Q.  The next thing is, as I said, she's taking it
16 all down, but she can only write down words.  So if you
17 wish to say, for example, yes or no, you have to use
18 those words rather than a nod or shake of a head or
19 saying "uh-huh" or "uh-uh" which can't be distinguished
20 on the written page.
21     Also, if you use gestures to respond, that can
22 be taken down.  So it's important that you make your
23 responses in words out loud, okay?
24     A.  Yes.
25     Q.  If at any time you wish to take a break to

Page 7

1  talk to your attorney or for any other reason, just let
2  us know and we'll go off the record and you can speak in
3  private.  And if you're not sure of an answer or you
4  don't know or you can't remember, please tell us that.
5  Don't try to guess at an answer.  I'm sure your attorney
6  doesn't want you to guess and we don't want you to
7  guess.  We would rather just know what you know, and if
8  you don't know, just tell us that, all right?
9      A.  Correct.
10     Q.  Same thing with my questions.  If you don't
11 understand my questions, just let me know and I'll try
12 to rephrase them.  If you answer the question, we'll
13 assume you understood it.
14     Is that fair?
15     A.  Yes.
16     Q.  Okay.  So as I said, we're here to talk about
17 an incident that occurred on May 7th, 2006.
18     Do you remember what day of the week that was?
19     A.  I do not.
20     Q.  Okay.  Do you remember anything about the
21 incident?
22     A.  Which one?
23     Q.  Okay.  How many incidents were you involved in
24 on that date?
25     A.  I was working a whole shift that day.  I had a

Page 8

1  lot of different things I did that day.
2      Q.  All right.  Well, I'm talking about the
3  incident involving the plaintiffs in this case, Benjamin
4  and Miguel Ortega.  It happened on 62nd Avenue near East
5  14th or International Boulevard.
6      Do you recall that?
7      A.  Yes.
8      Q.  Okay.  Have you reviewed any documents to
9  refresh your memory of that incident?
10     A.  No.
11     Q.  Have you listened to any tapes?
12     A.  No.
13     Q.  Have you looked at any photographs?
14     A.  No.
15     Q.  Were you, at the time, assigned to Officer
16 Alcantar as a partner?
17     A.  Yes.
18     Q.  Are you still his partner?
19     A.  No.
20     Q.  How long were you Officer Alcantar's partner?
21     A.  I would say a couple months.  I don't know
22 exactly how long we were.
23     Q.  And that included the date of the incident?
24     A.  Yes.
25     Q.  Do you know how long after the date of this

Page 9

1  incident, May 7th, 2006, you were no longer partners
2  with Officer Alcantar?
3      A.  No.  I don't remember the exact date we
4  weren't partners anymore.
5      Q.  Is that common in the Oakland Police
6  Department, to be assigned to a partner for such a short
7  period of time?
8      A.  Yes.
9      Q.  Was there any reason you stopped being
10 partners?
11     A.  No.
12     Q.  Do you know why either of you was reassigned?
13     A.  We weren't reassigned; we were in a squad, and
14 with our specialized unit, we change partners
15 periodically.
16     Q.  Okay.  And what is the nature of your
17 specialized unit?
18     A.  We were the CRT, crime response team.  We were
19 the crime response team.
20     Q.  Okay.  And what does that mean?
21     A.  We handled crime trends in the district we
22 were assigned to, we handled street-level narcotics, all
23 the way to Part 1 felonies that occurred in our
24 district.
25     Q.  Okay.  And how is that different from an

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 10

1  ordinary patrol officer in your district?
2      A.  The patrol guys answer calls for service, for
3  the most part.  We were specifically tasked with
4  handling drug dealing at this location.  That would be
5  our assignment for the day.  Or this individual is
6  wanted; we would be assigned to find this individual and
7  arrest them.  That was our day-to-day task.
8      Q.  I see.  You are a sergeant?
9      A.  Yes.
10     Q.  And were you a sergeant on May 7th, 2006?
11     A.  No.
12     Q.  When did you become a sergeant?
13     A.  February of 2007.
14     Q.  And what was your rank on May 7th, 2006?
15     A.  Police officer.
16     Q.  So Sergeant is one step up from what you were
17  at that time?
18     A.  Yes.
19     Q.  Comparing your build with Officer Alcantar's,
20  who is the larger build of the two?
21     A.  I am.
22     Q.  Now, your last name is Ortiz.  It appears to
23  be of Hispanic origin.
24         Do you speak Spanish?
25     A.  No.

Page 11

1      Q.  Do you understand any Spanish?
2      A.  No.
3      Q.  Now, on the morning of May 7th, 2006, did you
4  attend a dedicated lineup?
5      A.  Yes.
6      Q.  And tell me, what is a dedicated lineup?
7      A.  Well, on that day, specifically, it was for
8  Cinco de Mayo, so it was actually a huge lineup that we
9  had.  It wasn't for our individual squad.  It was a big
10 operation, and we had it at the Eastmont -- the command
11 at the time was Captain Kozicki briefed all the officers
12 on our responsibilities for the day.
13     Q.  Now, Cinco de Mayo means May 5th, correct?
14     A.  I believe so.
15     Q.  Okay.  This occurred on May 7th.
16     A.  That I don't remember the exact gist of the
17 history of that day.
18     Q.  Okay.  Was there to be a festival for Cinco de
19 Mayo on May 7th?
20     A.  I do know there was a festival, but I don't
21 know the whole -- when it was occurring.  I just knew
22 that day, that's what we were working.
23     Q.  Was this festival put on by the City of
24 Oakland?
25     A.  I don't know.

Page 12

1      Q.  Do you know if it was sanctioned or permitted
2  by the City of Oakland?
3      A.  Again, I don't know.
4      Q.  What was the role of the police in the
5  festival?
6      A.  It depended on what you were assigned to that
7  day.
8      Q.  Okay.  And specifically, your assignment was
9  what?
10     A.  We were to patrol the outskirts of the
11 festival, make sure that no large crowds were building
12 up on the street corners, and to enforce the laws.
13     Q.  And did each pair of officers -- well, strike
14 that.
15         You were together in one car with Officer
16 Alcantar?
17     A.  Yes.
18     Q.  And is he a sergeant?
19     A.  No.
20     Q.  Was he at the time?
21     A.  No.
22     Q.  So he's still an ordinary police officer?
23     A.  Yes.
24     Q.  Was each pair of officers assigned to a
25 particular area?

Page 13

1      A.  We were assigned to squads, and each squad, if
2  I remember correctly, were assigned to an area.
3      Q.  Were you part of the Blue Delta team?
4      A.  I don't remember what team I was assigned to.
5      Q.  Let me show you a document that's been
6  produced by your attorney.
7      A.  Yes, it says I was part of the Blue Delta
8  team.
9      Q.  Okay.  And what does that show as the area to
10 which you were assigned?
11     A.  Foothill at Bancroft, High to 73rd.
12     Q.  So your area of patrol, that is, yours and
13 Officer Alcantar's, was to be along Foothill Boulevard
14 and Bancroft Avenue from High Street out to 73rd Avenue?
15     A.  Correct.
16     Q.  And High Street is at approximately 41st or
17 42nd Avenue?
18     A.  Something like that, if I remember correctly.
19 It's like -- 44th would be -- it's right after 44th.
20 Yeah, it's right in that -- 'cause you have 47th --
21 yeah.
22     Q.  Okay.  And did you, in fact, patrol that area,
23 the area to which you were assigned to Foothill and
24 Bancroft?
25     A.  For the beginning of the shift, yes.

4 (Pages 10 to 13)

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 14

1   Q.  And at some point that changed?
2   A.  Yes.
3   Q.  Why?
4   A.  I believe we were asked to go down and help
5   and change our locations.  We were flexible.  If people
6   asked for help, we would go and help them.
7   Q.  Did you change your area of patrol in response
8   to a request for backup from other officers, or was
9   dispatch the one that changed your assignment?
10  A.  I'm sorry.  I don't remember exactly what were
11  the reasons that put us down there.
12  Q.  At what point in your shift were you changed
13  from Foothill/Bancroft down to International?
14  A.  Again, I think you're listing it like it's an
15  official change or the change in the detail.  We are
16  movable as to where we need to be.  If someone asks for
17  something on the radio, we would go and answer, we would
18  go and help, and it was no official, "You are to move
19  here."  It's you have to listen to the radio and go to
20  where you need to be.
21  Q.  Okay.  Do you remember any radio call asking
22  you to go down, to leave your area of patrol on Foothill
23  and Bancroft to go down to International Boulevard?
24  A.  No.
25  Q.  But at some point you and Officer Alcantar did

Page 15

1   leave your area, assigned area of patrol and went down
2   to International Boulevard?
3   A.  Yes.
4   Q.  And you left the area between High Street and
5   73rd Avenue and went farther west of High Street,
6   correct?
7   A.  I think you're mistaking the -- if you went
8   where Foothill is, if you went south, you would hit
9   International between High and 73rd.
10  Q.  Right.
11  A.  So basically, we went -- well, I guess it is
12  west because Oakland directions are different.  So we
13  went just down from that street.
14  Q.  Well, you went south from Foothill/Bancroft to
15  International Boulevard.
16  A.  Yes.
17  Q.  And then you extended your area, apparently,
18  because your area had been from High Street to 73rd
19  Avenue, correct?
20  A.  Correct.
21  Q.  And where did this incident take place?
22  A.  62nd Avenue and International.
23  Q.  Okay.  I'm sorry.  I was thinking of the other
24  incident.
25      So you were still within your east/west

Page 16

1   boundaries?
2   A.  Yes.
3   Q.  Okay.  Do you remember -- well, what was your
4   shift that day?
5   A.  We were assigned to Cinco de Mayo.
6   Q.  I mean what time did you work?
7   A.  I do not remember what time we started that
8   day.
9   Q.  Do you remember what time you got off?
10  A.  No.
11  Q.  The lineup that you attended in the morning
12  was at 7:30, correct?
13  A.  I don't believe I attended the 7:30 one.  I
14  could have.  I don't remember.  I'm sorry.
15  Q.  What lineup do you believe you attended?
16  A.  I don't remember.
17  Q.  What time did the incident occur?
18  A.  Again, I don't remember.
19  Q.  Do you remember if it was morning or
20  afternoon?
21  A.  It was the afternoon.
22  Q.  Was it still light out?
23  A.  Yes.
24  Q.  Was the festival still ongoing?
25  A.  No.  If I remember correctly, this was right

Page 17

1   when the festival ended and we were now assigned to
2   making sure everyone was gone home and we were getting
3   ready to call it a day.
4   Q.  What time did the festival end?
5   A.  I do not remember.
6   Q.  When you say you were getting ready to call it
7   a day, does that mean you were ready to wrap up your own
8   shift?
9   A.  I think I had heard a dispatch over the radio
10  from the captain saying that make sure all the corners
11  are cleared.  The traffic was -- if everything is secure
12  and we're able to go, it was going to be the end of the
13  day.
14  Q.  Meaning that you could go home?
15  A.  Correct.
16  Q.  What did they mean, if you understand that --
17  or strike that.
18      What did you understand them to mean when they
19  told you, "Make sure all the corners are clear"?
20  A.  Well, again, part of our responsibility is to
21  make sure that we don't have huge crowds on the corners,
22  and we then started looking to make sure we had no huge
23  crowds on the corner.
24  Q.  How huge a crowd is allowed to be on the
25  corner?

5 (Pages 14 to 17)

DEPOSITION OF BERNARD ORTIZ

Page 18

1    A.  It's not so much allowed; it's is it something
2  we need to watch and observe, or is it something that we
3  need to pay attention to?  If you had a crowd of 100
4  people, we're not going to secure the police if they're
5  all in one corner.  We would monitor.
6    Q.  What do you mean, "We're not going to secure
7  the police"?
8    A.  You wouldn't send people home for that.  Our
9  job is to monitor what's going on with the festival.
10  Now we have to go and see what is going on, why there
11  are 100 people on this corner.
12    Q.  At some point you passed by the corner of 62nd
13  Avenue and International Boulevard?
14    A.  Correct.
15    Q.  And if I slip and say "East 14th Street",
16  you'll know I mean International Boulevard, correct?
17    A.  Correct.
18    Q.  How many people were in this crowd?
19    A.  It was a good-sized crowd.  I want to say it
20  was more like 20.
21    Q.  Okay.  And they were all on one particular
22  corner?
23    A.  They were starting on -- it would be the
24  Oakland -- southeast corner, but they were going across
25  International.  The crowd would go across International

Page 19

1  to the north side and then cross 62nd Ave. to the east
2  side or the west side.  I'm sorry.
3    Q.  And was this crowd of 15 to 20 people acting
4  as a unit, or were just certain people doing different
5  things?
6    MR. VERBER:  Let me just interpose an
7  objection.  I think when you say "a crowd of 15 to 20
8  people," it misstates his prior testimony.  I don't
9  believe he used the word "15".
10    MR. JACOBSEN:  Q.  Okay.  You said about 20
11  people?
12    A.  Correct.
13    Q.  Okay.  My apologies.
14    Was everybody in this crowd of approximately
15  20 people doing -- acting as a unit, crossing the street
16  all at once, or were individuals of this group of 20
17  doing different things at different places at different
18  times?
19    A.  What the crowd was doing is as a group, they
20  would cross the street at one time.
21    Q.  So this was what you observed?
22    A.  Correct.
23    Q.  Okay.  And is that intersection controlled by
24  traffic signals?
25    A.  No.

Page 20

1    Q.  Is it controlled by stop signs?
2    A.  No.
3    Q.  It's an uncontrolled intersection?
4    A.  If I remember correctly, yes.
5    Q.  So there are no stop signs even on 62nd
6  Avenue?
7    A.  You know what, there might be.  You know, I
8  never really looked at it.  I'm just pretty sure there's
9  no light on the International side.  I don't remember if
10  there are stop signs or not.
11    Q.  Are there marked crosswalks there?
12    A.  There is.
13    Q.  On all four signs of the intersection is there
14  a painted, marked crosswalk?
15    A.  I do not know that.
16    Q.  At least there are unmarked crosswalks on all
17  four sides of the intersection, correct?
18    A.  Again, I don't know.  Because there's marked,
19  you can't have an unmarked on the other side because
20  there was marked on one side.  So I don't know.
21    Q.  Is it legal to cross the street at any of the
22  four sides of the intersection there at 62nd Avenue and
23  International Boulevard?
24    A.  You know, I don't know.
25    Q.  Well, from your perspective as a police

Page 21

1  officer, if you see someone crossing the street, either
2  International Boulevard or 62nd Avenue at that
3  intersection, do you perceive the person as doing
4  anything illegal?
5    A.  It really just depends on how they're crossing
6  the street.
7    Q.  Just the act of crossing the street itself is
8  what I'm asking about.
9    A.  I would ask: Traffic?  How many cars are
10  coming, the speed of the traffic, when they left the
11  curb, I mean, there's -- it's an open-ended.  I can't
12  answer specifically.
13    Q.  Okay.  What I'm asking you is:  Is there
14  anything, absent any other violation of the Vehicle
15  Code, which makes it illegal or, in your mind, improper
16  for someone to cross the street at that intersection?
17    A.  If you're saying that there are no cars
18  coming, no traffic, no anything, no outside factor but
19  just crossing the street, then no.
20    Q.  Okay.  Where were you when you observed this
21  group of approximately 20 people crossing the street
22  there at that intersection?
23    A.  We were on International, we seen the crowd,
24  we pulled into the -- I want to say it's the Quick Way
25  Mart now, parking lot.  It's on the southeast corner of

6 (Pages 18 to 21)

CLARK REPORTING (510) 486-0700

Page 22

1  62nd Avenue and International, and parked our vehicle
2  and watched.
3      Q.  What was it at the time?  You said it was a
4  Quickie Mart now.  What was it then?
5      A.  I think they were building it.  I think it was
6  under construction at the time.
7      Q.  So you pulled into this lot where the building
8  is under construction and you just began to watch the
9  people?
10     A.  Correct.
11     Q.  And you observed the people crossing the
12  street?
13     A.  Yes.
14     Q.  And they were crossing all of them together as
15  a group?
16     A.  Yes.
17     Q.  Were there any other people on any of the
18  four corners, other than this group of approximately 20
19  people?
20     A.  You know, I don't recall.
21     Q.  Other than the fact that this group was
22  crossing the street, did anything call your attention to
23  the street?
24     A.  You're simplifying crossing the street.  It
25  was a group of 20 with a Mexican flag, and they were

Page 23

1  crossing the street all the time to where -- I mean,
2  you're talking cars are coming, the crowd would move and
3  people were literally hitting their brakes not to hit
4  the crowd.  If that's what you're asking, was there more
5  going on, yes.  They were crossing from Oakland north to
6  south and then east to west at different times while we
7  were watching.
8      Q.  Were they walking around the entire four sides
9  of the intersection?
10     A.  No.  They would go across International, turn
11  around, come back across International, then they would
12  go across 62nd Avenue, turn around and come back across
13  62nd Avenue.
14     Q.  Okay.  And cars were having to stop for them
15  to cross the street?
16     A.  No, cars were basically having the right of
17  way coming, and they would start to cross, and to avoid
18  causing an accident they were stopping or swerving.
19     Q.  So some of the cars were driving around the
20  group of people and some of them were stopping?
21     A.  Correct.
22     Q.  Was there an accident?
23     A.  No.
24     Q.  How many cars did you see either have to stop
25  or drive around the group of people?

Page 24

1      A.  I think it was after noticing the first
2  one hitting his brakes was when we decided it was time
3  to act.
4      Q.  Okay.  And how long had you observed the
5  group?
6      A.  Five.  I don't have a watch.  I would say
7  five to ten minutes.  I mean, time is kind of hard to
8  judge when you're not looking at your clock.
9      Q.  But that's your best estimate?
10     A.  Yes.
11     Q.  Okay.  And during this time you were parked,
12  you were seated in the car in the lot where they were
13  constructing a mini mart?
14     A.  Yes.
15     Q.  Were you driving, or was Officer Alcantar?
16     A.  I don't remember.
17     Q.  Who is senior, or who was, at the time, the
18  senior officer?
19     A.  I am.
20     Q.  So when you decided it was time to act, what
21  did you intend to do?
22     A.  Cite individuals that were carrying a flag, I
23  was going to cite that person, and there was -- I think
24  it was just the flag person that we were going to cite
25  at the time, or in my head, what I was going to do was

Page 25

1  cite the person with the flag.
2      Q.  Did you discuss this at all with Officer
3  Alcantar?
4      A.  No.
5      Q.  You didn't say, "Let's go do" such-and-such,
6  or "Let's get that guy", or anything like that?
7      A.  I don't remember saying anything specific to
8  that nature.
9      Q.  Did you and Officer Alcantar decide at the
10  same time that it was time to do something?
11     A.  You know, I don't remember if it was the same
12  time decision.  I just knew that I was acting.
13     Q.  Did you have any discussion at all with
14  Officer Alcantar during the time that you were sitting
15  in the car observing the group of people?
16     A.  I don't believe so.
17     Q.  What, if anything, did either of you say to
18  alert the other that it was time to act?
19     A.  I don't think we said anything.  I think I
20  just started acting.
21     Q.  And what did you do to start acting?
22     A.  Walking towards the crowd, trying to disperse
23  the crowd, going towards the person carrying the flag at
24  the time.
25     Q.  So you got out of the car?

7 (Pages 22 to 25)

CLARK REPORTING (510) 486-0700

Page 26

1    A.   Correct.
2    Q.   You left the car in the lot on the corner?
3    A.   Yes.
4    Q.   Was there anything between where your car was
5    parked and the actual corner of 62nd and East 14th or
6    International?
7    A.   I don't remember if there was or not.
8    Q.   Who was the person carrying the flag?
9    A.   That individual right there.  I don't know his
10   name offhand.
11   Q.   Okay.  Can you describe what he looked like at
12   the time?
13   A.   He was a young male Hispanic, he was wearing a
14   white T-shirt, if I remember correctly.
15   Q.   Okay.  The weather was nice that day?
16   A.   Yes.
17   Q.   The sun was out?
18   A.   Yes.
19   Q.   Any problems with visibility?
20   A.   No.
21   Q.   Was the roadway dry?
22   A.   Yes.
23   Q.   And the person you pointed to, for the record,
24   is Benjamin Ortega.  How old was Benjamin Ortega at the
25   time that you noticed him when you say he was carrying a

Page 27

1    flag?
2    A.   At that time I did not know how old he was.
3    Q.   Okay.  Did you have an idea?
4    A.   No, I wouldn't make assumptions on someone's
5    age.
6    Q.   And he was the only person carrying the flag?
7    A.   I believe at the time when we were acting he
8    had had it at the time.
9    Q.   And during the entire time you were observing
10   this group of approximately 20 people, did he always
11   have the flag?
12   A.   I can't remember if they had passed it off or
13   not.
14   Q.   Okay.  So you got out of the car?
15   A.   Correct.
16   Q.   As you think back to getting out of the car,
17   do you remember getting out of the passenger side or the
18   driver's side?
19   A.   I don't remember.  It was a long time ago.
20   Q.   And you started walking toward the
21   intersection?
22   A.   Correct.
23   Q.   And where was your car at that point?
24   A.   We would have been on the southeast corner in
25   that lot.

Page 28

1    Q.   Still in the lot?
2    A.   Correct.
3    Q.   Okay.  Do you remember which direction the car
4    was facing?
5    A.   I do not.
6    Q.   Okay.  And did Officer Alcantar exit the
7    vehicle at the same time?
8    A.   I don't know if it was at the same time, but
9    he did exit the vehicle.
10   Q.   Do you remember if he did first or you did
11   first?
12   A.   I don't remember.
13   Q.   So you began to walk toward the intersection.
14   A.   Correct.
15   Q.   Were you heading toward any particular corner?
16   A.   We were -- I was heading towards the
17   individual carrying the flag.
18   Q.   And where was that individual at that time?
19   A.   When we exited and started walking, everyone
20   started running.  So if I remember correctly, he was
21   going southbound, or it would be Oakland south, down
22   International.  I mean not down International; down 62nd
23   Ave.  I'm sorry.
24   Q.   Okay.  Where was he at the time you got out of
25   the car?

Page 29

1    A.   I don't know if he was in the middle of the
2    road or just had started crossing again when we got out
3    of the car.
4    Q.   Okay.  Started crossing from where to where?
5    A.   I can't remember exactly from where.  I just
6    remember they were able to get down 62nd Ave. relatively
7    quick.
8    Q.   How far was your car from the southeast corner
9    of 62nd and International?
10   A.   I couldn't tell you.
11   Q.   Do you have an estimate?
12   A.   No, because I can't remember exactly where we
13   had parked.
14   Q.   Do you remember whether or not the person
15   carrying the flag was on the sidewalk or on the street
16   at the time you got out of the car?
17   A.   Again, I can't remember exactly because as we
18   got out of the car, everyone started running.  So you
19   would lose track of where people are.
20   Q.   And everyone started running south on 62nd
21   Avenue?
22   A.   The majority of the group, yes.  There was
23   others that went different directions.
24   Q.   Okay.  And what did you do at that point?
25   A.   Started going down 62nd Avenue.

8 (Pages 26 to 29)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 30

1    Q.   On foot?
2    A.   Yes.
3    Q.   Was Officer Alcantar also on foot with you?
4    A.   I believe so.  I don't remember.
5    Q.   When you got out of the car, did you say
6    anything to anyone in the group?
7    A.   I don't believe so, not at that time.
8    Q.   Did Officer Alcantar say anything?
9    A.   You know, I don't know.
10   Q.   Did anyone in the group say anything to either
11   of you?
12   A.   I know I was getting cussed at, and I was
13   called a coconut at one point.
14   Q.   What does that mean?
15   A.   Brown on the outside, white on the inside.
16   Q.   So is that referring to your ethnicity?
17   A.   Yes.
18   Q.   Anything else anyone said to you?
19   A.   People were yelling at us.  I don't remember
20   the specifics.
21   Q.   So people in this group were yelling at you
22   and Officer Alcantar?
23   A.   Yes.
24   Q.   You don't remember what they said, other than
25   "coconut"?

Page 31

1    A.   I remember that because it was distinct, and
2    that's the first time I had ever been called that.  They
3    were yelling a whole bunch of stuff at the time.
4    Q.   And you hadn't said, either one of you, either
5    you or Officer Alcantar, you hadn't said anything to
6    anyone in this group prior to that?
7        MR. VOSE:  I'm going to object to that.  I
8    don't think that was his testimony.  I think that his
9    answer was that he didn't remember saying anything.  I
10   didn't know if Officer Alcantar had said anything.
11       MR. JACOBSEN:  Q.  That's what I'm asking.
12       MR. VOSE:  I'm going to object to the
13   question.  You'll have to rephrase it.
14       MR. JACOBSEN:  Q.  Did either you or Officer
15   Alcantar say anything to anyone in this group before
16   anyone in the group said anything to you?
17   A.   I personally didn't say anything yet.  I don't
18   know about Officer Alcantar.
19   Q.   He could have said things, you just don't
20   remember one way or the other; is that correct?
21   A.   Again, I wasn't paying attention to what
22   Officer Alcantar was doing.  I don't know exactly what
23   he was doing.
24   Q.   But he was within earshot of you, correct?  I
25   A.   I don't remember exactly where he was at.  I

Page 32

1    don't believe he was standing next to me at the time.
2    Yeah, he wasn't.
3    Q.   Was he closer to you than the members of the
4    group?
5    A.   You know, I was -- again, just for officer
6    safety, I'm not paying attention to what Ramon's doing;
7    I'm paying attention to the crowd.
8    Q.   "Ramon" being Officer Alcantar?
9    A.   Yes.
10   Q.   So the crowd directed some words at you and
11   Officer Alcantar?
12   A.   Correct.
13   Q.   Was the phrase or the term "coconut" directed
14   at you or Officer Alcantar?
15   A.   I thought it was directed at me, but it could
16   have been both of us.  We're both Hispanic.
17   Q.   Does Officer Alcantar speak Spanish, to your
18   knowledge?
19   A.   Yes, he does.
20   Q.   Is he fluent?
21   A.   I do not know.
22   Q.   Is being a coconut a bad thing?
23   A.   I don't know.
24   Q.   So it wasn't insulting to you individually,
25   then?

Page 33

1    A.   My personal thought is it's the first time
2    anybody ever called me that, so I really didn't make a
3    basis of whether it was insulting or not.
4    Q.   Did you, at some point, say anything to anyone
5    in the group?
6    A.   I think we were trying -- at one point I'm
7    trying to tell the individual with the flag to come to
8    us or to stop, but that's about it.
9    Q.   And what, exactly, did you say to that person?
10   A.   You know, I can't remember the exact words.
11   It was a long time ago.
12   Q.   Can you remember the gist of what you said?
13   A.   No.  I do not know the exact words.  I
14   wouldn't even try to say what I could have said.
15   Q.   Do you remember anything that Officer Alcantar
16   said to anyone that day?
17   A.   No.
18   Q.   Do you remember anything that you said to
19   anyone during the course of this incident before you and
20   Officer Alcantar eventually left the area?
21   A.   I remember talking to an individual, that
22   individual there.  I remember the gist of my
23   conversation with him, and that's about it.
24   Q.   Okay.  Well, we'll get to that part.  But
25   that's the only thing you remember?

9 (Pages 30 to 33)

863fbee3-c91b-4d8b-b549-f617f40ba1c2

Page 34

1  A. For communication-wise?
2  Q. Yes.
3  A. I could have gotten on the radio and advised
4  that we had had a crowd at one point. That's about all
5  I remember then.
6  Q. Okay. So whatever else may have been said by
7  anyone you don't remember, other than your conversation
8  with the other plaintiff that you referred to at this
9  point?
10  A. Yeah, I mean, I could -- I know that I was
11  talking. I just don't remember what all that was said,
12  how it was said. It was a long time ago. I don't
13  remember the exact words and what we were trying to do.
14  I don't remember exactly.
15  Q. Okay. So when everybody started running, what
16  did you do?
17  A. I started going down to where everyone was
18  running to.
19  Q. Now, by "where everyone was running to", do
20  you mean where the majority of the group had run to?
21  A. Actually, I was going to where the flag
22  carrier was running to, to be more specific. He was
23  running that way, the majority of the group was running
24  that way, and I was coming up on them.
25  Q. Why did you focus on the flag carrier?

Page 35

1  A. In my eyes, the flag carrier was the leader
2  that led the group. So when the flag carrier went into
3  the middle of the road and everyone's hitting their
4  brakes to stop, that is the individual that started it.
5  That's the individual I was going to deal with.
6  Q. And was the flag carrier, by his actions that
7  you just described, doing anything illegal, as far as
8  you know?
9  A. What I was going to cite him for was
10  pedestrian suddenly stepping from the curb. Basically, it's
11  failure to -- oncoming traffic has the right of way if
12  they're approaching the intersection and you can stop
13  and wait for them to pass by. If you immediately step
14  out causing them to have to hit their brakes and slam on
15  their brakes, you're the one that's at fault for it.
16  Even if you're in the crosswalk and have the right
17  of way, you can't intentionally start a collision or
18  create a collision because you want to go through the
19  crosswalk. And I know there's a lot more details in it,
20  but that's the gist of what I was trained on.
21  Q. And describe for me the ages of the people in
22  the crowd.
23  A. It was a younger crowd. We didn't have a lot
24  of older adults, but I would put in their 20s to -- all
25  of them in their early 20s is what I was assuming the

Page 36

1  crowd was.
2  Q. Men and women?
3  A. I don't remember if there was any girls in the
4  crowd. There was a lot of guys.
5  Q. Were they primarily Hispanic?
6  A. You know, I don't recall. I know the -- yeah,
7  for the majority of the part were Hispanic, but I don't
8  know if there was anybody else in the crowd.
9  Q. And so these were all young adults somewhere
10  in their 20s?
11  A. Yes.
12  Q. Except for the person carrying the flag?
13  A. Again, I even assumed that the person carrying
14  the flag was in their 20s.
15  Q. As you look at Benjamin Ortega today, do you
16  have an estimate of his age?
17  A. From what I know?
18  Q. From what you're looking at today.
19  A. I couldn't make that assumption because I
20  already knew -- now I know how old he is. I mean, I
21  wouldn't try to guesstimate his age.
22  Q. Part of your training as a police officer is
23  to be able to describe individuals, including height,
24  weight, approximate age, racial characteristics, that
25  type of thing.

Page 37

1  A. Correct.
2  Q. When you arrived at the intersection of 62nd
3  Avenue and International, was that the first time you
4  passed through that intersection that day?
5  A. You know, I don't remember. But the odds are
6  probably not. But again, I don't remember if I had been
7  through there before earlier that day or not.
8  Q. In any case, when you decided to park -- you
9  or Officer Alcantar decided to park your car on the lot
10  on the corner where they were building a mini mart, that
11  was the first time you observed the group of
12  approximately 20 people on the corner or in the
13  environment of the intersection, correct?
14  A. Correct.
15  Q. Whose idea was it to pull over and park
16  at that intersection?
17  A. You know, I don't remember whose idea. I
18  mean, it was a crowd, and that was our responsibility,
19  to deal with crowds. It could have been either one of
20  us.
21  Q. Was the crowd doing anything, other than what
22  you've already told us, as far as crossing the street
23  and the way they were crossing the street?
24  A. No.
25  Q. Other than possibly violating the "pedestrian

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

Page 38

1  moving suddenly into the street" statute or ordinance
2  that you mentioned, was the crowd doing anything else
3  that you felt was illegal at the time?
4      A.  No, I don't believe so.
5      Q.  Did you have any reason to believe that any of
6  the activity that you observed was gang-related?
7      A.  No.
8      Q.  Okay.  So you begin going down 62nd Avenue
9  toward where the flag carrier is moving, correct?
10     A.  Correct.
11     Q.  And you're on foot?
12     A.  Yes.
13     Q.  Were you walking or running?
14     A.  I think I was kind of -- like a brisk walk.
15  I'm not running in a full sprint, but I am moving rather
16  quickly towards where they're going.
17     Q.  And how was the crowd moving?  Was it walking
18  or running?
19     A.  It was run, slow down, and then -- because the
20  house is right there.  After a short distance, then
21  there's that yellow house they went into, that yard
22  right there.
23     Q.  And approximately how many of this group of
24  approximately 20 people went toward the yellow house
25  that you referred to?

Page 39

1      A.  I would say the majority of the group, but
2  then inside that yard was more people.  So there was
3  more there than from the original crowd.
4      Q.  How many more people?
5      A.  I couldn't even tell you.  I just knew there
6  was more because I had seen people that were on the
7  porch, and I realized that there was more people.
8      Q.  All right.  Were they other Hispanic males, or
9  were there males and females?
10     A.  There were males and females, but I really
11  wasn't paying attention to what race they were at the
12  time.
13     Q.  And you don't have an idea of how many more
14  people you saw at the time?
15     A.  I just know that it was more people in the
16  yard.
17     Q.  Describe the yard for me.  What was the
18  surface of the yard?
19     A.  If you're, like, talking grass or --
20     Q.  Is it grass, brick, cement, cactus garden?
21     A.  Yeah, there's grass, there's like a sidewalk
22  that went through the center, if I remember correctly,
23  and then there was grass.  But I couldn't tell you if
24  there was trees.  I wasn't paying attention to that.
25     Q.  So there's a paved walkway or a cement walkway

Page 40

1  that goes from the city sidewalk to the porch?
2      A.  I believe so.
3      Q.  And then there's grass on either side of that
4  walkway?
5      A.  I wouldn't even say it was grass.  There's
6  ground there.
7      Q.  Okay.  And was the yard fenced?
8      A.  Yes.
9      Q.  Was there a gate on it?
10     A.  I don't know if there was a gate on it at the
11  time.
12     Q.  Did you enter the yard?
13     A.  Yes.
14     Q.  Did you stop outside the fence before
15  entering?
16     A.  I don't believe so.
17     Q.  On what basis did you enter the private
18  property?
19     A.  Officer Alcantar was now dealing with the
20  individual with the flag.
21     Q.  Where?
22     A.  Inside the yard.
23     Q.  So Officer Alcantar entered the yard first?
24     A.  Yes.
25     Q.  How did Officer Alcantar get from the car to

Page 41

1  the house on 62nd Avenue?  Did he walk or did he drive
2  the car?
3      A.  I believe he walked.
4      Q.  Okay.  So the car was still back on the
5  corner?
6      A.  Yes.
7      Q.  And he entered the yard before you did?
8      A.  Yes.
9      Q.  Did he stop before entering the yard?
10     A.  You know, I don't know.
11     Q.  What was -- do you have any idea what his
12  legal basis was for entering the yard?
13         MR. VOSE:  I'm going to object to the use of
14  the term "legal basis".  I mean, if you want to rephrase
15  the question, I think that's -- "legal basis" is asking
16  him to make a legal conclusion.  He can say what his
17  probable cause was, he can say a number of different
18  things, but I'm going to object.
19         MR. VERBER:  And I'd like to join the
20  objection that it calls for speculation because the
21  officer has already indicated that he was not present at
22  the moment when Officer Alcantar entered the yard.
23         MR. JACOBSEN:  Right.  But I'm entitled to ask
24  him what he knows and how he found out.
25         MR. VERBER:  I'm just stating my objection for

11 (Pages 38 to 41)

CLARK REPORTING (510) 486-0700

Page 42

1  the record, Counsel.
2      MR. JACOBSEN: Sure.
3      Q. Let me put it this way: Do you, as a police
4  officer, to your understanding, have the right under any
5  circumstances to enter private property?
6      A. Yes.
7      Q. Are there circumstances under which you may
8  not enter private property?
9      A. Yes.
10     Q. And so there has to be some justification for
11  entering private property as a police officer, correct?
12     A. Yes.
13     Q. And when Officer Alcantar entered the private
14  property, do you know what his justification was?
15     MR. VERBER: Objection. Calls for speculation
16  as this officer wasn't present at the time Officer
17  Alcantar entered the property.
18     THE WITNESS: Can I answer?
19     MR. VOSE: No. He can rephrase the question.
20     MR. JACOBSEN: That's not ground for
21  instructing the witness not to answer.
22     MR. VOSE: You're asking him to speculate as
23  to Alcantar's basis for entering the property.
24     MR. JACOBSEN: No, I'm asking him to tell me
25  if he knows what it was. That's a simple yes-or-no

Page 43

1  answer.
2      MR. VOSE: Okay. You can answer if you know.
3      THE WITNESS: If you're asking me what Officer
4  Alcantar was thinking at the time he entered the yard,
5  is that what you're asking?
6      MR. JACOBSEN: Q. I'm asking you if anyone
7  has told you, other than your attorney, what Officer
8  Alcantar's justification was or his basis for entering
9  the property at the time that he entered.
10     A. I'm sorry. I'm confused of the question
11  because if you're asking me as he's walking in right
12  then and there, do I know the answer to that question --
13     Q. No, I'm asking you today, do you know the
14  answer to that question?
15     A. Yes.
16     Q. Okay. And what was his justification for
17  entering the private property?
18     A. It's the 148, delaying or obstructing a police
19  officer in the line of duty.
20     Q. Okay. So was it Officer Alcantar's
21  contention, to your understanding, that someone in that
22  property had delayed or obstructed a police officer?
23     A. Well --
24     MR. VERBER: Well, let me just object again.
25  I think it calls for speculation.

Page 44

1      MR. VOSE: If you're asking him if he knows
2  today what that is, as before, that's fine. If you're
3  asking him if he knew at the moment he entered the yard,
4  as we have already objected to, that calls for
5  speculation.
6      MR. JACOBSEN: Q. No, I'm not asking you to
7  guess as to what Officer Alcantar may have been thinking
8  at the time. I want you to tell us what you know, and
9  if you know something today, even if you didn't know it
10  at that moment, you can answer it with what you know
11  today.
12     A. Well, I can tell you my own personal mindset
13  was the flag carrier leaving from his spot where we were
14  trying to issue a citation and fleeing to the house is
15  148, and my mindset was he was delaying or obstructing a
16  police officer in the line of his duties, if that makes
17  it any -- if you can understand what I'm saying on that.
18     Q. Okay. Did the flag carrier have any way of
19  knowing that either you or Officer Alcantar wanted to
20  issue a citation to him?
21     MR. VERBER: Objection. Calls for
22  speculation.
23     MR. JACOBSEN: Q. As far as you know.
24     A. I thought I said earlier that I was trying to
25  get his attention to stop, but I can't remember the

Page 45

1  exact wording that I had said for him to stop.
2      Q. Do you know whether or not you succeeded in
3  getting the attention of the flag carrier at that time?
4      A. I can't remember if he looked back at me or
5  not.
6      Q. Have you and Officer Alcantar ever discussed
7  what his basis was for entering the yard at that time?
8      A. Actually, no.
9      Q. Have you discussed with anyone, other than
10  with your attorney, Officer Alcantar's basis for
11  entering the yard at that time?
12     A. No.
13     Q. Where were you when Officer Alcantar entered
14  the yard?
15     A. When Ramon entered, I was maybe three people
16  behind him. If you want to measure in people, I was
17  right behind him when he entered.
18     Q. So you saw him enter?
19     A. Yes.
20     Q. And did you follow immediately after him?
21     A. Oh, yes. I'm not going to let my partner go
22  into the yard by himself.
23     Q. Well, when Officer Alcantar got into the yard,
24  what did he do?
25     A. He confronted the flag carrier.

12 (Pages 42 to 45)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 46

1    Q.   Okay.  And did you observe that confrontation?
2    A.   What I observed was Officer Alcantar
3  confronting the flag carrier, and then my attention was
4  immediately diverted from that to an individual who was
5  coming off the porch to come at Officer Alcantar.
6    Q.   All right.  When you say that Officer Alcantar
7  confronted the flag carrier, what do you mean by
8  "confronted"?
9    A.   The last I remember seeing Ramon do is he's
10  dealing with the flag carrier, so he's right next to the
11  flag carrier, and the next thing I hear is someone
12  coming off of the porch, and I immediately have to
13  address that.
14    Q.   Was there any physical contact between Officer
15  Alcantar and the flag carrier?
16    A.   That, I do not know.
17    Q.   You can't say one way or the other?
18    A.   No, because I had my situation now that I had
19  to deal with.
20    Q.   And you saw someone coming off the porch.
21    A.   Yes.
22    Q.   Towards where Officer Alcantar and the flag
23  carrier were in the yard.
24    A.   Yes.
25    Q.   Did you ever see any physical contact between

Page 47

1  Officer Alcantar and the flag carrier?
2    A.   No.
3    Q.   Can you say one way or another whether there
4  was any physical contact between Officer Alcantar and
5  the flag carrier?
6    A.   No.
7    Q.   So you saw someone coming off the porch.  What
8  did you do?
9    A.   It was that individual right there, and he was
10  focusing on Officer Alcantar and what was going on over
11  there, and immediately I stepped in the middle of that
12  and detained that individual.
13    Q.   Okay.  "That individual" being Miguel Ortega?
14    A.   Yes.
15    Q.   All right.  How did you go about detaining
16  Miguel Ortega?
17    A.   I think I grabbed him, and it was -- at that
18  time I grabbed him, spun him around and handcuffed him
19  and took him out of the yard.
20    Q.   Grabbed what part of his body?
21    A.   I don't remember if I grabbed the front of his
22  arm or the back.  It was enough to spin him around.
23    Q.   And so you spun him around and did what?
24    A.   Handcuffed him.
25    Q.   Did he resist?

Page 48

1    A.   No.
2    Q.   And so once you handcuffed him, did you have
3  to put him down on the ground to do that?
4    A.   I don't believe we put him down on the ground.
5  I think we were up against the porch area.  I don't
6  think I had to put him on the ground to do it.
7    Q.   Is this a raised porch that we're talking
8  about?
9    A.   I remember he had to come down the steps.  I
10  don't remember the exact details of the porch.  But you
11  do have to come down steps.
12    Q.   So it is some number of steps up off the
13  ground, whether it's one or two or more?
14    A.   I don't know.
15    Q.   Okay.  And at this point you had Miguel Ortega
16  up against the side of that porch?
17    A.   Miguel -- I was dealing with him -- it's
18  Miguel?
19    Q.   Yes.
20    A.   Yes.
21    Q.   Okay.  Did you accomplish the detention and
22  handcuffing of Mr. Ortega by yourself?
23    A.   I believe so, but I don't remember.  I know
24  that at the time more people were showing up.
25    Q.   By "more people", you mean other police

Page 49

1  officers?
2    A.   Yes.
3    Q.   And at this point when you and Officer
4  Alcantar entered the yard, give me your best estimate as
5  to how many people were in and around the yard at that
6  time, excluding police officers.
7    A.   You know, I couldn't even give you that
8  because, again, what I'm focusing on is now officer
9  safety.  I'm not counting going, "There's people here,
10  there's people here."  I just know that I'm in a yard,
11  I'm dealing with an individual, now I'm trying to make
12  sure I'm safe, the individual I have detained is now
13  safe.  So I'm not really -- I know there's more people
14  than me in the yard, than officers, but I couldn't tell
15  you exactly how many people were in that yard.
16    Q.   In any case, is it your best estimate that
17  there were more people, total, in the yard than there
18  had been originally at the corner where there were
19  approximately 20 people?
20    A.   Again, I couldn't even tell you.
21    Q.   What drew your attention to Miguel Ortega?
22    A.   When he was coming off the porch I do remember
23  him saying, "That's my brother", and I know that Ramon
24  was dealing with him, and the way he was coming off the
25  porch, I'm perceiving him as a threat to Officer

13 (Pages 46 to 49)

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 50

1  Alcantar at the time.
2  Q.  You mean that Officer Alcantar was dealing
3  with Miguel Ortega's brother, the flag carrier?
4  A.  Correct.
5  Q.  All right.  Once you had handcuffed Miguel
6  Ortega, what did you do?
7  A.  I placed him in the back of a police vehicle.
8  Q.  And whose?
9  A.  There was one on the sidewalk.  I couldn't
10  tell you whose car it was that I had him sit in.
11  Q.  How many police vehicles were there, total, on
12  scene at any point?
13  A.  I couldn't tell you.  I just know there was
14  cop cars there.
15  Q.  Several?
16  A.  Yes.
17  Q.  Was there anything other than a regular
18  four-door sedan?
19  A.  I don't believe so.
20  Q.  Any SUVs?
21  A.  Again, I don't believe so.
22  Q.  Can you say one way or another?
23  A.  No.
24  Q.  Other than saying, "Hey, that's my brother,"
25  do you remember anything else Miguel Ortega said before

Page 51

1  being handcuffed?
2  A.  Said?  No.
3  Q.  Anything else that he did, other than what
4  you've already told us?
5  A.  It would be the actions of his response to
6  that being his brother, the aggressively coming off the
7  stairs, the targeting in to where I know Officer
8  Alcantar is at, this is what led me to believe that he
9  was going to confront Officer Alcantar where I had to
10  intervene.
11  Q.  And at this point you didn't see what Officer
12  Alcantar was doing; is that correct?
13  A.  No, I was more busy making sure that he was
14  safe from individuals in the crowd.
15  Q.  So it's correct that you did not see that?
16  A.  Correct.
17  Q.  At any time from the time that you first
18  contacted Miguel Ortega until the time he was placed in
19  a police car, did he resist?
20  A.  No.
21  Q.  Did you place him in the car yourself?
22  A.  Yes.
23  Q.  Was anyone else in the police car when you
24  placed Miguel Ortega into the police car?
25  A.  No.

Page 52

1  Q.  And you used, you said, two sets of handcuffs
2  to handcuff Miguel Ortega?
3  A.  I didn't say it, but I probably did because
4  he's a bigger guy.
5  Q.  Do you carry two sets yourself?
6  A.  I carry three.
7  Q.  So both sets were yours?
8  A.  I believe so.
9  Q.  Once you placed Miguel Ortega into the police
10  car, what did you do?
11  A.  I believe after I placed him in the car I went
12  back to make sure the scene was secured, everybody was
13  safe.
14  Q.  All right.  And so when you turned around and
15  starting heading back, did you observe Officer Alcantar
16  at that point?
17  A.  No, I didn't.
18  Q.  Do you know where he was at that point?
19  A.  Not at that point I didn't know.
20  Q.  Okay.  Did you ever find out where he was at
21  that point?
22  A.  Yes.
23  Q.  Where was he?
24  A.  He had placed the flag carrier into the back
25  of another police car and was talking to that

Page 53

1  individual.
2  Q.  Okay.  Was he alone in the police car with the
3  flag carrier?
4  A.  When I saw him, yes.
5  Q.  The flag carrier, I assume, was in the back
6  seat?
7  A.  Yes.
8  Q.  And Officer Alcantar was where?
9  A.  Was he at the door?
10  I believe he was still at the door talking to
11  him.
12  Q.  Did you speak with Miguel Ortega at all when
13  you placed him into the back-of-the-car seat?
14  A.  I talked to him later on -- I actually did
15  talk to him, yes.
16  Q.  But up to the point that you placed him in the
17  car and then returned to the scene, you hadn't spoken to
18  him; is that correct?
19  A.  I may have said -- I may have talked to him,
20  yeah, saying things to him, but I don't remember exactly
21  what was said.
22  Q.  Do you remember anything he said?
23  A.  No.
24  Q.  Did you run a wants-and-warrants check on
25  either Benjamin or Miguel Ortega?

14 (Pages 50 to 53)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

Page 54

1    A.   I believe I ran it on Miguel.
2    Q.   Is there a special term for running a
3  wants-and-warrants check?
4    A.   Wants and warrants.
5    Q.   You call it a 6A --
6    A.   If you're doing it over the radio you would
7  ask for a 6A.  If you're just running it on your
8  computer screen, we would say, "Do a warrant check".
9    Q.   And you did that on Miguel Ortega.
10   A.   Yes.
11   Q.   And how did that come back?
12   A.   Clear.
13   Q.   Meaning there were no warrants or --
14   A.   Wants.
15   Q.   Wants.
16        Did you ever see any other officer speaking
17  with Miguel Ortega?
18   A.   No.
19   Q.   So you go back toward the scene, you don't see
20  Officer Alcantar at that point.  What did you do?
21   A.   I, again, made sure everyone was safe.
22  There's other officers now on scene, and then I went
23  back to deal with Mr. Ortega, the individual I had
24  detained.
25   Q.   Okay.  Miguel Ortega.

Page 55

1    A.   Correct.
2    Q.   Okay.  Back to the car that was parked on the
3  sidewalk outside the house?
4    A.   I don't believe it was exactly in front.  We
5  were a few car lengths down.
6    Q.   Okay.  And at that point did you have a
7  conversation with Miguel Ortega?
8    A.   Yes.
9    Q.   Okay.  Tell me what -- tell me about the
10  conversation.
11   A.   The initial conversation was to calm him down.
12  I don't -- he didn't understand exactly what was going
13  on.  I was trying to explain the situation to him, why
14  we were there, what had happened.
15   Q.   What did you say to him?
16   A.   I couldn't tell you exact words that I used,
17  but it was to, "We were trying to stop what was going on
18  up on the street.  Your brother, who I didn't know was
19  your brother at the time, ran here."  It's just a
20  continuation of this, that type of information I was
21  providing, why we were there, letting him know.
22   Q.   And all of your conversation with Miguel
23  Ortega was in English?
24   A.   Yes.
25   Q.   Okay.  Did he respond to you in English?

Page 56

1    A.   Yes.
2    Q.   Okay.  So initially, you told him why you were
3  there.  What else?
4    A.   And that was about the gist of the story of me
5  explaining why we were there for this part of the
6  conversation.  We talked later where I'm explaining
7  we're not trying to ruin anybody's holiday and their
8  festival; you know, basically, "We're going to let you
9  guys go.  We have explained the whole situation.  We're
10  not trying to wreck your celebration here, but this is
11  dangerous.  This is unacceptable behavior.  Can you
12  please stop your brother from doing this?"  This type of
13  conversation.  I couldn't tell you the words I said, but
14  that was the words I was trying to get across.
15   Q.   Was anyone present during any conversation you
16  had with Miguel Ortega?
17   A.   There could have been.  I wasn't paying
18  attention.  I believe I was sitting in the patrol car
19  with him with the door open, but I don't know.  People
20  could have walked by.
21   Q.   No one else was in the car with you at any
22  time?
23   A.   No.
24   Q.   Did you ask Miguel Ortega for any
25  identification?

Page 57

1    A.   I'm sure at one point I did.
2    Q.   Did he show you identification?
3    A.   You know, I don't remember if he showed me or
4  I just took it down.
5    Q.   Did Officer Alcantar ever speak with Miguel
6  Ortega, to your knowledge?
7    A.   You know, I don't know if Ramon did or not.
8    Q.   At any time did you get the impression that
9  Miguel Ortega was under the influence of any kind of
10  intoxicating beverage or drug?
11   A.   No.  I mean, he could have had the smell of
12  alcohol on him, but not to the point where I thought he
13  was so intoxicated that he needed to go to jail for
14  being too intoxicated.
15   Q.   Do you remember whether or not he had the
16  smell of alcohol on him?
17   A.   I do not, and I didn't do the test for that.
18   Q.   Did you notice whether or not anyone else at
19  the scene appeared to be intoxicated or under the
20  influence of anything?
21   A.   I wasn't doing that kind of investigation.  I
22  wasn't trying to look for that.
23   Q.   Okay.  Was there any evidence at the scene of
24  drinking or drug use?
25   A.   Again, there was nothing of what we were

15 (Pages 54 to 57)

CLARK REPORTING (510) 486-0700

Page 58

1  looking for at all. We weren't trying to get to that
2  point, so no. It could have been, but I wasn't looking
3  for it, so I don't know.
4      Q. Did you ever figure out into whose car you had
5  placed Miguel Ortega?
6      A. I do not remember whose car I had placed him
7  in.
8      Q. Do you remember whether or not Miguel and
9  Benjamin Ortega were ever placed together in the same
10 patrol car?
11     A. I don't believe so. I think we kept them
12 separate.
13     Q. At some point Mr. Miguel Ortega was released?
14     A. Yes.
15     Q. And did you do that?
16     A. Yes, I did.
17     Q. Anything else you can recall of any
18 conversation between you and Miguel Ortega that you
19 haven't already told us?
20     A. No.
21     Q. Did you ever overhear any conversation between
22 Officer Alcantar and either Benjamin or Miguel Ortega?
23     A. No.
24     Q. When you released Miguel Ortega, tell me what
25 you did.

Page 59

1      A. I just unhandcuffed him and let him go.
2      Q. Okay. And what did he do at that point?
3      A. He went back to the house.
4      Q. Did he say anything?
5      A. I'm sure -- the situation had calmed down and
6  we were actually not screaming at each other, so I -- he
7  could have said stuff. I don't remember exactly what
8  was said.
9      Q. Other than your concern that Miguel Ortega was
10 potentially presenting a threat to Officer Alcantar, did
11 you believe at the time that Miguel Ortega was
12 committing any crime?
13     A. I mean, again, you could use the 148 section,
14 but after talking to him and kind of understanding where
15 he's coming from, then no. But officer safety, this
16 wouldn't -- you can't let this happen. If he was to
17 come out of the house at Alcantar, it was my job to stop
18 that. And I don't know if that answers your question of
19 what you were asking.
20     Q. As far as Benjamin Ortega is concerned, the
21 person who was detained by Officer Alcantar, it's your
22 understanding that the only reason he was detained was
23 Section 148, PC 148, interfering with a police officer?
24     MR. VERBER: Objection. Are you talking about
25 his understanding as we sit here today, or at the time

Page 60

1  of the incident?
2      MR. JACOBSEN: Q. As we sit here today.
3      A. It would be from we're issuing you a ticket to
4  you fleeing for the 148, so it would be both, the
5  pedestrian suddenly in front of the curb infraction
6  violation to the misdemeanor arrest that comes.
7      Q. And when did you reach that understanding?
8      A. I think we had -- okay, when the event occurs,
9  or after it's all said and done.
10     Q. Well, at some point you told me you intended
11 to issue a citation to the flag carrier for improperly
12 entering the street.
13     A. Correct.
14     Q. And that determination was made at the time
15 you got out of your car.
16     A. Correct.
17     Q. At what point was the determination made to
18 detain the flag carrier for a violation of PC 148,
19 interfering with a police officer?
20     A. Now, are you asking for my perception?
21     Q. I'm asking -- all right. Good point.
22     I guess the determination to detain the flag
23 carrier for violation of PC 148 was made by Officer
24 Alcantar, is that your understanding?
25     A. Well, I can't tell you what Officer Al -- I

Page 61

1  can tell you my -- when I was going to detain him for
2  148, I can tell you that.
3      Q. All right. Tell me that.
4      A. It would be when I was trying to get him to
5  stop and he kept on going.
6      Q. Okay. But you didn't make any moves to detain
7  the flag carrier yourself, did you?
8      A. No, I was with Officer Alcantar. He just got
9  there first.
10     Q. All right. Do you know when Officer Alcantar
11 made the determination to detain the flag carrier?
12     A. I do not.
13     Q. Do you know at the time -- have you ever
14 learned what Officer Alcantar's purpose for entering the
15 yard was at the time that he entered the yard?
16     A. Not in that -- I assumed because of my
17 reasonings, but I have never asked him specifically.
18     Q. Did you hear any conversation going on between
19 the flag carrier and Officer Alcantar before Officer
20 Alcantar entered the yard?
21     A. No.
22     Q. Can you say whether there was a conversation
23 or not?
24     A. You know, I wasn't even -- I don't believe so.
25     Q. Can you say with any assurety?

16 (Pages 58 to 61)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 66

1    A.   Yeah, it wasn't a walk, not like someone
2   walking down, just walking down steps.  It was a
3   fast-moving action, very aggressive with intention, like
4   a tunnel vision type of intention.
5    Q.   What was Miguel Ortega's intention at the
6   moment that he was moving toward Officer Alcantar?
7    A.   My perception was going towards Officer
8   Alcantar.
9    Q.   Did you have any other knowledge of Miguel's
10   intention, other than that?
11    A.   Just his physical action.
12    Q.   Other than the physical action of Miguel
13   Ortega moving from the porch toward Officer Alcantar
14   that you've already described, did anyone in the crowd
15   there that day make any verbal or physical threats
16   toward any police officer that you observed?
17    A.   Well, people could have been talking, but
18   again, once you're focusing on handling this, you're
19   hoping another officer is making sure no one's coming to
20   get you.  So my full focus becomes on Miguel.
21    Now -- I can't say -- there's people yelling,
22   there's a whole bunch going on.  This isn't a calm
23   situation, but am I making out the words that are being
24   said?  No, I'm more paying attention to making sure
25   we're safe.

Page 67

1    Q.   All right.  So let me rephrase the question.
2    Other than the movement of Miguel Ortega from
3   the porch down toward the yard where Officer Alcantar
4   was with Benjamin Ortega, were you aware of any verbal
5   or physical threat made to any police officer at the
6   scene?
7    A.   No.
8    Q.   How long were Miguel and Benjamin Ortega
9   detained in the police cars?
10    A.   I would say maybe 10 minutes at the most.  It
11   wasn't a very long time, once the situation had gotten
12   calmed down.  But I couldn't give you the exact time.  I
13   wasn't keeping track.
14    Q.   Now, what is an FC?
15    A.   Field contact report.
16    Q.   And as an officer, are you supposed to fill
17   out -- or one of the pair of officers supposed to fill
18   out a field contact report every time you have an
19   incident where you detain someone?
20    A.   Yes.  It's either that or a citation or a
21   police report.
22    Q.   And was a field contact report prepared for
23   the contact that you and Officer Alcantar had with
24   Benjamin and Miguel Ortega?
25    A.   By me?

Page 68

1    Q.   By anyone, to your knowledge.
2    A.   I didn't prepare one.  I don't know if Officer
3   Alcantar did.
4    Q.   Why did you not prepare one?
5    A.   I personally thought that Officer Alcantar was
6   taking care of it, so I didn't prepare one.
7    Q.   Did you have any discussion with Officer
8   Alcantar as to who would write the report, the field
9   contact report?
10    A.   You know, I can't remember if we had actually
11   talked about it.
12    Q.   What led you to believe that Officer Alcantar
13   was going to take care of preparing the FC?
14    A.   There could have been an assumption on my
15   part.  I don't recall.
16    Q.   Now, this was a busy day for you, the Cinco de
17   Mayo festival going on, correct?
18    A.   Yes.
19    Q.   How many people did you detain that day?
20    A.   It wasn't so much me detaining; it was more of
21   we were doing a lot of covering of a lot of officers.
22   They were stopping larger groups, we were coming back
23   over.
24    Q.   Did either you or Officer Alcantar detain
25   anyone that day other than the Ortega brothers?

Page 69

1    A.   We could have.  I don't remember if we did or
2   not.
3    Q.   Did you file -- either one of you -- file any
4   field contact reports?
5    A.   Again, we could have.  I don't remember if we
6   did or not.
7    Q.   Did you issue any citations that day?
8    A.   Again, we could have, but I don't remember
9   filling out one or not.
10    MR. JACOBSEN:  Let's go off the record.
11    (Recess taken from 3:39 to 3:48 P.M.)
12    MR. JACOBSEN:  Q.   Let me go back for a moment
13   to reports from that day.  To your knowledge, did either
14   you or Officer Alcantar detain anyone that day?
15    A.   We could have.  I don't recall, but we could
16   have.
17    Q.   Do you recall whether or not -- do you know
18   whether or not either you or Officer Alcantar filed any
19   FCs that day?
20    A.   Again, we could have.  We stop a lot of people
21   throughout, you know, our work schedule, so we could
22   have that day.
23    Q.   Then when you stop people on the street,
24   you're supposed to file an FC?
25    A.   It depends.  Again, if it's a contact, we're

18 (Pages 66 to 69)

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 70

1 just talking to somebody, no. If it's a detention, from
2 what I understood, yes.
3    Q. Okay. In the case of Miguel and Benjamin
4 Ortega, was it a detention?
5    A. Oh, yes.
6    Q. And was it an arrest?
7    A. Yes.
8    Q. And so under those circumstances you're
9 obligated to file a report?
10    A. Yes.
11    Q. Do you know, was either you or Officer
12 Alcantar ever disciplined for failure to file a report?
13    A. I know I have not been.
14    Q. Has Officer Alcantar been, to your knowledge?
15    A. I wouldn't know that.
16    Q. Has anyone ever asked you where is the report
17 for the incident involving Miguel and Benjamin Ortega?
18    A. I don't believe so. IA asked, but I don't
19 believe it was asked of me.
20    Q. I'm sorry. I missed the first part of your
21 answer.
22    A. Internal Affairs asked, but I don't believe
23 that question was ever directed towards me.
24    Q. Okay. They asked Officer Alcantar?
25    A. Yes.

Page 71

1    Q. And do you know what Officer Alcantar told
2 them?
3    A. I do not know the answer to that.
4    Q. How do you decide, generally, which of the
5 two officers in the car will file the FC?
6    A. It depends on you, your partner, your
7 relationship you have with each other. I mean, there's
8 so many different ways that it can be decided.
9    Q. In the case of Miguel and Benjamin Ortega, did
10 you ever discuss with Officer Alcantar that you were
11 four FCs down?
12    A. No, I don't believe we ever had that
13 conversation.
14    Q. Okay. Is that a term that you would use?
15    A. No.
16    Q. Okay. How do you -- do you ever use a term
17 that discusses who has written more reports than the
18 other?
19    A. We could have. I mean, I'm down paper. I
20 mean, I don't -- it could have been discussed, but I
21 don't remember it being discussed.
22    Q. All right. What do you mean when you say,
23 "I'm down paper"?
24    A. That means that you have paperwork to do.
25    Q. All right. So if you were to say, "I'm four

Page 72

1 FCs down," that would mean that I have four FCs that I
2 still have to do?
3    A. We would never phrase it like that. We would
4 say, "I'm down paper." We wouldn't say specifically
5 what we have to do; we would say, "Paperwork is backed
6 up for us" is how I would say it.
7    Q. So it wouldn't be a matter of, "I have done
8 four more than you, so it's your turn," or anything like
9 that?
10    A. It could be even to that. I mean, again, it's
11 just different times, different partners and your
12 different relationship with them.
13    Q. Now, was a supervisor ever called to the scene
14 of the detention of Miguel and Benjamin Ortega?
15    A. You know, I don't recall if one was called.
16    Q. What was the policy at that time with regard
17 to calling the supervisor?
18    A. I do not believe there was a policy to call
19 the supervisor to a scene unless you're making a felony
20 arrest and he needed to sign off on that arrest.
21    Q. And in this case the arrest was not a felony
22 arrest?
23    A. Correct.
24    Q. Was it a misdemeanor?
25    A. Yes.

Page 73

1    Q. And that's the PC 148?
2    A. Yes.
3    Q. Because the other thing you referred to of
4 leaving the curb suddenly into the street, that's just
5 an infraction.
6    A. Correct.
7    Q. Has there been a policy change instituted at
8 OPD since the date of this incident with regard to
9 calling a supervisor to the scene?
10    A. You know, we've had so many policy changes
11 since the negotiated settlement agreement, which started
12 taking into effect probably in 2006, that the policy has
13 changed so many times I couldn't even tell you when they
14 changed. But as a supervisor now, they call me for
15 in-custody felony arrests. I will be called to the
16 scene where I need to approve the arrest.
17    Q. Okay. And you are a supervisor now, but you
18 weren't then; is that correct?
19    A. Correct.
20    Q. Okay. Now, you say this settlement that was
21 started to be instituted in 2006, settlement of what?
22    A. We call it the NSA, negotiated settlement
23 agreement. It was a lawsuit from the city.
24    Q. Was that the lawsuit involving the writers?
25    A. Yes.

19 (Pages 70 to 73)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 74

1    Q.    Now, there was some indication that your
2  status on your computer was changed from RT to OT during
3  the course of this incident.  Do you recall that?
4    A.    There could have been.
5    Q.    Tell me what those two classifications mean.
6    A.    "Report Taken" or "Other".
7    Q.    Okay.  So RT is "Report Taken"?
8    A.    Correct.
9    Q.    And OT is "Other"?
10   A.    Correct.
11   Q.    So at some point -- well, do you know whether
12  or not at some point your -- strike that.
13        Where is this indication made, whether it's RT
14  or OT?
15   A.    Again, there's two different ways it's
16  controlled, either through dispatch, or it's put over
17  the radio or through the computer system.
18   Q.    And at some point do you know whether or not
19  you were listed as RT in this incident?
20   A.    I do not know.  And then also for these, it's
21  how many units are assigned to the call, they also put
22  their dispositions to the call in there, so you can
23  have, like, multiple dispositions to any one given call.
24   Q.    Well, I'm talking specifically about the
25  disposition for your vehicle.

Page 75

1    A.    I don't know.  I didn't pay attention to that.
2    Q.    Did you ever place any disposition into your
3  computer or with dispatch, whether it was RT or OT?
4    A.    You know, I don't recall if I did or not.
5    Q.    It would have been either you or Officer
6  Alcantar that would have done that?
7    A.    Yes.
8    Q.    What does Code 4 mean?
9    A.    That we're fine, because we usually say "Code
10  4" or "Code 34", we're safe, and then Code 34 means
11  don't bring any additional units.  So you usually hear
12  them both simultaneously.
13   Q.    Now, do you remember Officers Melero and Bunn
14  being on scene?
15   A.    They could have been.  I don't remember them
16  being there, but they could have been there.
17   Q.    There is some indication in some of the
18  records that they described the incident as just a quick
19  scuffle.  Have you heard that term before used to
20  describe this incident?
21   A.    No.
22   Q.    Did you observe a scuffle?
23   A.    No.
24   Q.    Were any of the police cars at the scene
25  equipped with video cameras?

Page 76

1    A.    I don't know.  They could have been.  Most of
2  our fleet doesn't have them, but I know we're testing
3  them out, so I don't know.
4    Q.    The particular vehicle that you were driving
5  that day, did that have video in it?
6    A.    No.
7    Q.    Do you know if any of the cars into which
8  either Mr. Ortega would have been placed or might have
9  been placed had video?
10   A.    No, I do not.
11   Q.    Do the videos show what goes on inside the
12  car?
13   A.    Again, this is a whole new technology we're
14  using.  I don't know what they do, so I don't know.  I
15  know that they were testing them, but I don't know.
16   Q.    Do you know if there is any video of any of
17  the activities that occurred either at the intersection
18  that you observed or at the house on 62nd Avenue
19  involving the plaintiffs?
20   A.    Not to my knowledge.
21   Q.    How about photographs?
22   A.    Again, not to my knowledge.
23   Q.    Are there any photographs of the scene that
24  you're aware of?
25   A.    Not to my knowledge.

Page 77

1    Q.    During the course of your conversations with
2  Mr. Ortega, did you ever mention immigration?
3    A.    No.
4    Q.    Are you sure, or you just don't remember
5  mentioning it?
6    A.    No, I would never -- I don't deal with
7  immigration.
8    Q.    At some point did either you or Officer
9  Alcantar call for backup?
10   A.    Yes.
11   Q.    Who called, you or Officer Alcantar?
12   A.    You know, I can't remember which one of us
13  did.
14   Q.    And at what point did one of you call for
15  backup?
16   A.    I think it was when we said that there was a
17  crowd, when we were putting out that there was a large
18  crowd.
19   Q.    Was that when you first came to a stopped
20  intersection?
21   A.    Yeah, I believe so.
22   Q.    And I see there's a record that that occurred
23  at 1720 hours, so it would have been 5:20 P.M., correct?
24   A.    I don't know exactly what time.
25   Q.    When you advised that there was a crowd, what

20 (Pages 74 to 77)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 78

1  did you say?
2       A.  I think that we said that there was a crowd,
3  but I don't remember the exact wording that we used.
4       Q.  And you requested backup?
5       A.  I think we just said that there was a crowd.
6  I think it was assumed that backup would come.
7       Q.  When did the first backup arrive?
8       A.  Again, I do not know because now we were
9  dealing with the incident.
10      Q.  Did anyone arrive before you and Officer
11 Alcantar arrived at the house on 62nd Avenue?
12      A.  I don't believe so.
13      Q.  Okay.  When Officer Alcantar entered the yard,
14 was there any other officer present at the scene other
15 than you?
16      A.  You know, I don't believe so.
17      Q.  Did you ever get close enough to Benjamin
18 Ortega to determine whether or not he was under the
19 influence of any liquor or drug?
20      A.  No.
21      Q.  Did you ever see any indication, anything to
22 indicate to you that he might be?
23      A.  No.
24      Q.  Other than what you have told us about your
25 interaction with Miguel Ortega in terms of spinning him

Page 79

1  around, placing handcuffs on him and putting him in the
2  patrol car, was any other force used against Miguel
3  Ortega by any other officer?
4       A.  No.
5       Q.  Did you see what force, if any, was used
6  against Benjamin Ortega?
7       A.  No.
8       Q.  The only time you saw Benjamin Ortega was when
9  he was standing alone in the yard or when he was in the
10 back of the patrol car?
11      MR. VOSE:  I'm going to object to that
12 question.  I think it mischaracterizes his testimony in
13 the sense that he saw Benjamin standing alone in the
14 yard.  I think that his testimony was that he saw him
15 with Officer Alcantar in the yard.  But I'll let him
16 answer the question if he understands it.
17      MR. JACOBSEN:  Q.  Well, when I say "standing
18 in line", I mean standing without contacting him.
19      A.  I think we're misusing the word "standing".
20 Standing is like you had planted -- if he had went into
21 the yard and Officer Alcantar went in behind him and was
22 now contacting him, I am dealing with Miguel here.
23 That -- it wasn't no long delay.  It was like --
24      Q.  Let me rephrase the question.
25      Did you ever see any physical contact between

Page 80

1  any officer and Benjamin Ortega?
2       A.  No.
3       Q.  Any of the times you saw him was when he was
4  in the yard before physical contact with Officer
5  Alcantar and then later when Benjamin was in the back of
6  the patrol car?
7       A.  Again, I don't know if there was physical
8  contact, but the last I see of him is Officer Alcantar
9  is dealing with him and now I'm dealing with Miguel, and
10 then the next time I see him again he's in the back seat
11 of a car.
12      Q.  Was Benjamin handcuffed?
13      A.  Yes.
14      Q.  So at least you were aware that there was
15 sufficient force applied to Benjamin to place handcuffs
16 on him.
17      A.  Yes.
18      Q.  But you didn't see that occur?
19      A.  Correct.
20      Q.  Is it fair to say that you don't know what
21 other force may have been applied to Benjamin Ortega?
22      A.  Correct.
23      Q.  Have you had any complaints lodged against you
24 for the use of excessive force?
25      MR. VOSE:  At this point I'm going to -- we

Page 81

1  don't have a protective order in place.  I'm going to
2  request -- and I'll allow him to answer the questions,
3  but I'm going to request that the answers that he give
4  be subject to the stipulated protective order that's in
5  the case, and my request would be that it would be for
6  attorneys' eyes only since it does go to police
7  personnel records.
8       MR. JACOBSEN:  Well, let's go off the record
9  for a minute.
10      (Discussion off the record.)
11      MR. JACOBSEN:  So off the record we had a
12 discussion, and we have agreed that anything having to
13 do with complaints made against Officer Ortiz -- and I
14 understand it extends to anything in the Internal
15 Affairs file, correct?
16      MR. VOSE:  Correct.
17      MR. JACOBSEN:  -- is subject to the protective
18 order, the stipulation which we have signed which we all
19 intend shall be signed by the judge and shall become an
20 order.
21      Q.  Officer Ortiz, when did you first join the
22 police force of Oakland?
23      A.  1997.
24      Q.  And were you a police officer anywhere else
25 before that?

21 (Pages 78 to 81)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

Page 82

1     A.   No.
2     Q.   So Oakland is the only department where you
3  have served?
4     A.   Yes.
5     Q.   When did you go to the academy?
6     A.   1997.
7     Q.   Okay.  And to which academy?
8     A.   The Oakland Police Academy.
9     Q.   So essentially, 10 years you have been an
10  officer?
11     A.   Yes.
12     Q.   Okay.  I have been provided with a CIR index
13  log from the Internal Affairs division of the Oakland
14  Police Department referring to Ortiz, Bernard 8132.  Is
15  that you?
16     A.   Yes.
17     Q.   What is a CIR index log?
18     A.   You know, that's some big fancy word.  I don't
19  even know what it means.
20     Q.   Now, this -- do you know how many times
21  complaints have been made against you to Internal
22  Affairs?
23     A.   I do not.
24     Q.   I count on the three pages of this particular
25  log 41 separate incident dates or complaint dates, I

Page 83

1  should say.  Does that sound about right to you?
2     A.   Again, I don't keep track of how many times
3  complaints have been made against me.
4     Q.   Okay.  Have any of the complaints against you
5  ever been sustained?
6     A.   I believe I've had three sustaineds.
7     Q.   And what were they for?
8     A.   Performance of duties.
9     Q.   And what were you alleged to have done wrong
10  on those three cases that were sustained?
11     A.   Two for not putting my ending mileage out on
12  the radio for transporting a prisoner, I didn't put the
13  end mileage on, and one was a handcuff.
14     Q.   Handcuffing of a suspect?
15     A.   Yes.
16     Q.   Were you alleged to have used excessive force?
17     A.   No.
18     Q.   What were you alleged to have done wrong in
19  the handcuffing?
20     A.   I shouldn't have handcuffed that individual.
21     Q.   Are any of the complaints against you
22  complaints for use of excessive force?
23     A.   Yes.
24     Q.   Are any of them complaints for wrongful arrest
25  or wrongful detention?

Page 84

1     A.   I don't believe so.
2     Q.   The complaints that were lodged against you
3  for failure to write down your mileage, were those
4  complaints lodged by someone within the department?
5     A.   Yes.
6     Q.   Now, under the heading of "Status" on this CIR
7  index log, there are various notations, most of them
8  closed, but some of them say "Admin Closure".
9         What's the difference between closed and admin
10  closure?
11     A.   Again, I don't know the exacts of why -- from
12  my training on admin closure is that it was closed
13  through Internal Affairs themselves.  They decided, for
14  whatever reason, to close this case, and then closure
15  means that it was an actual investigation completed and
16  it was closed.
17     Q.   And there's one that says "final approval"
18  again under the status.  Do you know what that means?
19     A.   I do not know.
20     Q.   Now, I see under the heading "Finding" there
21  are five separate incidents where, under the finding, it
22  says "sustained".
23     A.   There should only be three.
24     Q.   Do you know what the other two are?
25     A.   No, there shouldn't be the other two.  There

Page 85

1  should only be three.
2     Q.   Have you had a chance to review your CIR index
3  log?
4     A.   I haven't reviewed that in a long, long time.
5  I've seen it, but I don't really pay much attention to
6  it.
7     Q.   Now, this log only goes as far as
8  December 13th, 2006.  Have any complaints been lodged
9  against you as a police officer since that time?
10     A.   Yes.
11     Q.   How many?
12     A.   I couldn't tell you.
13     Q.   Can you give me your best estimate?
14     A.   I wouldn't.
15     Q.   Was it, say, more than 10?
16     A.   I don't count them.  I don't keep track of
17  them.
18     Q.   Have any of those since then been sustained?
19     A.   I've only had three sustaineds.  That's it.
20     MR. JACOBSEN:  Counsel, do you know why the
21  CIR index is incomplete?
22     MR. VOSE:  Can we go off the record?
23     MR. JACOBSEN:  Sure.
24     (Discussion off the record.)
25     (Recess taken from 4:20 to 4:26 P.M.)

22 (Pages 82 to 85)

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 86

1    MR. JACOBSEN: Q. Now, again, back to the CIR
2  index log, the -- there's a heading called "Violation",
3  and it looks like the majority of them are either 370.27
4  or 314.39 or .07.
5        Do you know what those represent?
6    A. If I look at the manual of rules I could tell
7  you, but not offhand.
8    Q. All right. Now, having looked at the manual,
9  my understanding is a 314.39, which is cited in several
10  of these claims, is for illegal detention.
11        Do you recall more than one claim being filed
12  against you for illegal detention?
13    A. Again, I don't know if what you're citing is
14  correct, and I would have to look at the manual of
15  rules, and I don't really pay much attention to the
16  complaint log.
17    Q. How about Officer Alcantar, does he have
18  sustained claims against him that you're aware of?
19    A. I wouldn't even know what he's got against
20  him.
21    Q. Did you have any claims lodged against you for
22  use of physical force?
23    A. Yes.
24    Q. Does the department have guidelines for use by
25  officers of physical force?

Page 87

1    A. We do have a general order, yes.
2    Q. And are there different guidelines for use of
3  crowd control?
4    A. There is a crowd control general order also.
5    Q. And would you characterize what you were
6  involved with on the day of the incident with the Ortega
7  brothers as crowd control?
8        MR. VERBER: Objection. At what point in
9  time? It's vague and ambiguous.
10        MR. JACOBSEN: Q. At any point in time.
11    A. I mean, I wouldn't put them as either. I'm
12  observing a crowd of people and then watching what's
13  going on. I wouldn't say crowd control as in there's
14  100 people on the sidewalk and we're being ordered to
15  disperse this crowd. I would put what we did as within
16  the normal day-to-day duties of what we do.
17    Q. So a crowd of 20 people doesn't fall within
18  the crowd control guidelines for use of force?
19        MR. VOSE: I'm going to object. It calls for
20  speculation on his part.
21        He can answer if he knows.
22        THE WITNESS: There's one use-of-force policy.
23  That's it. Crowd control doesn't get a separate use of
24  force. There's use of force and then there's how to
25  handle a crowd, general order.

Page 88

1    MR. JACOBSEN: Q. Are you familiar with the
2  Oakland Police Department Use of Force policy manual?
3    A. Yes. That's the Use of Force K-4.
4    Q. K-4?
5    A. Yes. There will be two. There's K-3 and K-4.
6  K-4 is the report-writing version of it.
7    Q. And what is K-3?
8    A. The actual pack of force descriptions.
9    Q. So K-3 is the manual that actually dictates to
10  you what type of force you can use and when and under
11  what circumstances you can use it, correct?
12    A. No. Well, it describes the force types.
13    Q. I'm going to hand you a document. Do you
14  recognize this as being the Oakland Police Department
15  Use of Force policy handbook?
16    A. Yes.
17    Q. And turning to page 2.3 of this document, do
18  you see up at the top of this document is labeled K-3?
19    A. Uh-huh.
20    Q. Yes?
21    A. Yes.
22    Q. And will you read the part that's highlighted
23  in yellow?
24    A. "The department places additional restrictions
25  on the use of less than lethal forces during instances

Page 89

1  involving crowd control and crowd management as outlined
2  by training bulletin III-G, OPD crowd control and crowd
3  management policies."
4    Q. So does this document you just read, the
5  Oakland Police Department Use of Force policy handbook,
6  place additional restrictions on the use of less than
7  lethal force during incidents involving crowd control
8  and crowd management?
9    A. You're mistaking less than lethal. Less than
10  lethal force is basically what we consider beanbagging,
11  tear gas into a crowd, the shooting into the crowd.
12  That is, at this time frame, what less than lethal
13  means.
14        It has since changed to be non -- it's "other
15  than lethal" is the wording.
16    Q. So, for example, shooting a gun into a crowd
17  is lethal?
18    A. That's lethal. But shooting a beanbag into a
19  crowd falls under there's reasons to do it and then
20  there's stricter reasons in that training bulletin.
21    Q. So are you telling me that this particular
22  section which deals with less lethal force does not
23  involve the use of force which is less than lethal?
24    A. Again, you would have to look at what they
25  define less than lethal in this, and I think you're

23 (Pages 86 to 89)

CLARK REPORTING (510) 486-0700

Page 98

1  officer's fingers to the side of the subject's neck.
2      A.  Okay.  Again, the small -- the size doesn't
3  matter.  It's the word you're using, the word
4  "compliance", and again, if they were complying, there
5  would be no need to use force.
6      Q.  So based on your training, it would be
7  improper to use force?
8      A.  If there is compliance.
9      Q.  What if there's physical compliance but verbal
10  protestation?
11      A.  Again, you're saying if they're doing exactly
12  what they're ordered to do, which is compliance as I'm
13  defining it, there would still be no use of force
14  because they would be complying.
15      Q.  In which case the application of any force
16  would be excessive?
17      MR. VERBER:  I'm going to object that it calls
18  for an expert opinion in which this witness may not be
19  qualified to provide.
20      MR. JACOBSEN:  Q.  I'll qualify that.  Based
21  on your training.
22      A.  Again, the force needed to effect the arrest
23  may be the twist lock.  Now that's considered force for
24  us, so you would still need to touch them, twist lock,
25  put the handcuff on, grab the hand and put the other

Page 99

1  handcuff on.  So there's still -- even on full
2  compliance, we're still touching.  There's still some
3  level of a control hold being used.
4      MR. VOSE:  If I could just interrupt for a
5  second.
6      (Discussion off the record.)
7      THE WITNESS:  Did that one say '06 on there?
8      Oh, I was mistaken on my testimony because we
9  had one come out first that was in the rough, so this
10  did come into effect -- well, the back page will tell
11  you exactly.  Parts of this it came into effect at this
12  time.  I was wrong with saying it didn't come into
13  effect at this time.  We've had so many policies within
14  the last couple of years.  This one did come into effect
15  for the most part, parts of it did, and I think there's
16  a back page where you see where it was revised, changed,
17  where they signed.
18      MR. JACOBSEN:  Q.  This handbook is dated
19  February 17th, 2006, correct?
20      A.  Correct.  And this is the one that we're
21  actually using now, supervisors.
22      Q.  Okay.
23      A.  Because it just changed.
24      Q.  If an officer, based on this handbook dated
25  February 17th, 2006, if an officer uses force to effect

Page 100

1  an arrest or detention, does the officer have a
2  requirement to report that use of force to his or her
3  supervisor?
4      A.  Yes.
5      Q.  And how soon does that use of force need to be
6  reported?
7      A.  For this policy now, it is on scene they call
8  me and tell me that they've had a use of force.
9      Q.  For the policy in effect on February 17th,
10  2006?
11      A.  There's parts of it that came into -- it's
12  weird -- that came into effect, so -- but I believe it
13  started at that time were the levels.  Because sometimes
14  level 4s didn't have to be reported immediately.  You
15  could actually write the report and hand it to your
16  sergeant, and then it changed.
17      Q.  I'm looking at one of the last pages of the
18  handbook here.  Is this the page to which you're
19  referring that says that this document, the use of force
20  handbook, came into effect?
21      A.  No, this is the review board.
22      Q.  So we're looking for one of the last pages of
23  K-4?
24      A.  No, because you're in K-3, the paging of K-3,
25  if it's the last pages of the K-3 part.  I remember

Page 101

1  reading a page where it said the policy, they left it
2  where it was a work of art.
3      It might be in the policy itself.  This is the
4  handbook.  This is what we're reading and it's provided
5  to us, but there's an actual hard policy.  I think it
6  was with the revision, orders of when it changed or
7  updated might be even the better wording than I'm using.
8      Q.  Okay.  Looking at K-3, Use Of force, this is
9  dated the 1st of August 2007.  This refers to the use of
10  force guidelines enumerated in Graham vs. Connor, US
11  Supreme Court case.
12      Are you familiar with those use-of-force
13  guidelines?
14      A.  I'm not familiar with the case.  I'm familiar
15  with our guidelines.
16      Q.  Are these the same guidelines that were in
17  effect in May of 2006 when this incident took place?
18      A.  Yeah, I believe so.
19      Q.  Now, it says here that in determining which
20  level of force to use, the first criterion the officer
21  is to consider is the objectively reasonable perception
22  of a threat to a member, employee or third party.
23      Do you recall that?
24      A.  That's the case law part, right?
25      Q.  Well, that's part of the guidelines for use of

26 (Pages 98 to 101)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 102

1  force; is it not?
2      A.  I think that's what they're quoting from the
3  case law.
4      Q.  Well, let me ask you to look at the guidelines
5  starting at the bottom of page 1.4 and going over to
6  about halfway down on items 1 through 10 on page 1.5.
7  Are those the guidelines that you, as a police officer,
8  were trained to follow with regard to use of force?
9      A.  Yes.
10     Q.  And the first criterion is "The objectively
11  reasonable perception of a threat to the member" -- that
12  is, "member" being an officer, correct?
13     A.  Yes.
14     Q.  -- "to the member, employee or third party."
15      That's the first criterion you evaluate in
16  determining what level of force, if any, to use,
17  correct?
18     A.  Yes.
19     Q.  In this case was there any perception that you
20  were able to observe of a threat to anyone by Benjamin
21  Ortega?
22     A.  Again, I wasn't paying attention to what was
23  going on with Mr. Ortega over here.  I was paying
24  attention to the other Ortega.
25     Q.  Miguel Ortega?

Page 103

1      A.  Miguel Ortega.
2      Q.  Okay.  So you didn't perceive any objectively
3  reasonable threat coming from Benjamin Ortega; is that
4  correct?
5      A.  I didn't perceive anything.  I didn't see him.
6      Q.  Okay.  So the second criterion is, "Imminence
7  of a threat to the member, employee or third party."
8  And since you didn't perceive a threat from him, whether
9  there was a threat or not, you couldn't say whether it
10  was imminent or not; is that fair?
11     A.  Yes.
12     Q.  The third criterion is, "Physical
13  differences", for example, age, size, relative strength,
14  skill level, injuries, exhaustion, number of
15  members/employees versus subjects."
16      Were there any physical differences between
17  Benjamin Ortega and Officer Alcantar?
18     A.  Yes, there were physical differences between
19  the two.
20     Q.  Describe those for me, if you will.
21     A.  They are both different heights, different
22  weights, different body builds.
23     Q.  What's the age difference, approximately,
24  between Officer Alcantar and Benjamin Ortega?
25     A.  Again, at the time that we knew, or now?

Page 104

1      Q.  Could you determine, at the time, that Officer
2  Alcantar was older and more mature physically than
3  Benjamin?
4      A.  Again, you're -- I don't -- if you're trying
5  to say that he was younger than Ramon, yeah, he was
6  younger than Ramon.  Does that mean that he is in better
7  physical condition than Ramon?  I wouldn't know.
8      Q.  How do they compare in size?
9      A.  I don't know how tall Ramon is, but they're
10  about the same height.  Ramon isn't very tall.
11     Q.  Okay.  What about build?
12     A.  Even their builds are kind of the same.  I
13  really -- again, you're trying to go with someone in a
14  T-shirt.  You're not really going, "Stop.  Let me take a
15  look at you and see how big and strong you are before I
16  deal with you."
17     Q.  Did you believe that their relative strength
18  was approximately equal, or did you think that one of
19  them had more strength than the other?
20     MR. VERBER:  Well, I'm just going to object
21  that at the time of the incident -- well, that it calls
22  for a conclusion that the evidence doesn't indicate that
23  he even made.
24     MR. JACOBSEN:  All right.  That's fair enough.
25     Q.  Did you consider at all the physical

Page 105

1  differences between Officer Alcantar and Benjamin
2  Ortega?
3      A.  No, I didn't pay attention to anything.
4      Q.  And you also told us that you didn't believe
5  that drugs or alcohol were a factor in this; is that
6  correct?
7      A.  If it was, I wasn't -- again, that was not
8  something we were looking to do.
9      Q.  And there were no weapons in any proximity to
10  either Benjamin or Miguel Ortega that you were aware of,
11  correct?
12     A.  After the fact, yes, but during the incident,
13  again, you have to go back to what my original
14  perception would be.  I could put the flag as a weapon.
15  In my head, I always have to take into consideration he
16  is fleeing from a location.  Is he armed?  Why would a
17  normal person leave from here if I was trying to make a
18  stop from him?
19     Q.  During the five to ten minutes that you were
20  observing the group of approximately 20 people
21  including, at least, Benjamin Ortega at the
22  intersection, did you see any evidence of any weapons?
23     MR. VERBER:  Objection to the use of the term
24  "weapon".  Are you just confining that term to a gun or
25  anything, or bottles, rocks or anything?

27 (Pages 102 to 105)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 106

1    MR. JACOBSEN: Q. Anything that the officer
2  considers to be a weapon.
3    A. Again, the flag itself could be perceived as a
4  weapon. It's just how it was held and dealt with
5  towards us.
6    Q. Do you know what they mean in the Oakland
7  Police Department memorandum regarding Use of Force
8  policy handbook that contains the criteria that you use,
9  what they mean by weapons?
10   A. What I perceive at that moment as a weapon.
11   Q. Okay. Did you perceive any weapons?
12   A. Again, I could perceive that that flag could
13  be used as a weapon against me.
14   Q. Where was the flag at the time that you and
15  Officer Alcantar entered the yard?
16   A. I wasn't -- once we went in, I was -- you're
17  talking seconds. I wasn't paying attention to what
18  happened to the flag.
19   Q. Do you recall any other weapons?
20   A. Again, nobody told me they found any other
21  weapons, but there could have been.
22   Q. Did you ever hear that there were any weapons
23  of any kind anywhere involved in any of the people there
24  or their property?
25   A. I think you're -- I mean, a rock can be a

Page 107

1  weapon. If there was a rock laying on the ground, it
2  can be a weapon. A person's body can be a weapon if
3  they use it correctly. There's always the potential to
4  have weapons.
5    So did I believe there were no weapons near or
6  around me? There was plenty, it's just they were never
7  used as a weapon.
8    Q. Did you consider the proximity of any weapon
9  to Benjamin Ortega at the time?
10   A. Again, I wasn't dealing with him at all.
11   Q. Okay. So is it fair to say you didn't make
12  that consideration?
13   A. Correct.
14   Q. Was there any other option available? That's
15  the next criterion, "Availability of other options."
16  Was there any other option available to Officer Alcantar
17  to achieve whatever it was he was trying to achieve?
18   MR. VERBER: Objection. Calls for
19  speculation.
20   MR. VOSE: Yeah, I was going to say the same
21  thing. You're asking him -- the decision to use the
22  force is within the officer's perception. It would be
23  speculation for him to say what was going through
24  Officer Alcantar's mind.
25   MR. JACOBSEN: Q. I'm not asking you to

Page 108

1  speculate what Officer Alcantar was thinking, but you
2  were on the scene, you walked in immediately after
3  Officer Alcantar, you saw Benjamin in the yard and you
4  saw Officer Alcantar approach him. Were there any other
5  options available to Officer Alcantar short of the use
6  of physical force?
7    MR. VOSE: I'm going to object again, and he's
8  already testified that as soon as he got in the yard,
9  his focus was turned to Miguel.
10   MR. JACOBSEN: Well, you can object, but let's
11  not testify for the officer, okay?
12   THE WITNESS: Again, Ramon approached him,
13  he's coming off the porch. All my attention is now on
14  him.
15   MR. JACOBSEN: Q. Okay. So is that something
16  which you didn't consider at the time?
17   A. Again, you're asking me to consider something
18  that I'm not a part of. I'm a part of Miguel, and I
19  have to now take into consideration him dealing with him.
20   Q. Okay. So as far as the interaction between
21  Officer Alcantar and Benjamin Ortega, you didn't
22  consider the availability of other options?
23   A. I am not even a factor in -- I could never
24  consider what they were doing.
25   Q. The next criterion is, "Seriousness of the

Page 109

1  suspected offense or offenses." In this case the
2  suspected offenses were, one, potentially crossing the
3  street improperly, and second, not stopping when you
4  wanted them to stop, correct?
5    A. I think you're really simplifying that. But
6  if you were going just very black and white issue, yes.
7    Q. The next criterion is, "Training and
8  experience level of the member or employee?" Now, you
9  already told us that you had more time on the force than
10  Officer Alcantar.
11    Do you know what his experience level was at
12  the time?
13   A. I didn't remember how many years Ramon had on
14  him at the time.
15   Q. The next criterion is, "Potential for injury
16  to member, employee, third party or the subject."
17    At the time that you entered the yard, was
18  there any potential for injury to anyone?
19   A. There is always potential for injury.
20   Q. What was the potential for injury at the time
21  that Officer Alcantar entered the yard?
22   A. He could trip and fall. I mean, you're going
23  into a ground that you don't know, you've got a crowd
24  that's bigger than you are. There's always the
25  potential of you may get hurt.

28 (Pages 106 to 109)

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2