# EXHIBIT E

Page 1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DIVISION

MIGUEL ORTEGA and BENJAMIN
ORTEGA,

                Plaintiffs,

vs.                                Case No.: C 07-02659 JCS (ADR)

CITY OF OAKLAND, OAKLAND
POLICE DEPARTMENT, WAYNE
TUCKER, In His Capacity As The
Police Chief Of The City Of
Oakland, RAMON J. ALCANTAR,
Individually And In His
Capacity As A Police Officer
For The City Of Oakland, B.
ORTIZ Individually And In His
Capacity As A Police Officer
For The City Of Oakland, Does
 through 200,
                Defendants.
_____/


            DEPOSITION OF BERNARD ORTIZ
            Thursday, January 3, 2008


        REPORTER'S TRANSCRIPT OF PROCEEDINGS
        BY APRIL DAWN HEVEROH, CSR NO. 8759

_____

            CLARK REPORTING
    2161 SHATTUCK AVENUE, SUITE 201
        BERKELEY, CA   94704
            (510) 486-0700


        DEPOSITION OF BERNARD ORTIZ

Page 2

```
 1                          I N D E X

 2

 3   EXAMINATION BY:                                    PAGE

 4   MR. JACOBSEN                                          4

 5

 6                        ---o0o---

 7

 8           INDEX OF PLAINTIFF'S EXHIBITS

 9   (None marked.)

10

11                        ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                    APPEARANCES OF COUNSEL
 2   FOR THE PLAINTIFFS:
 3        LAW OFFICES OF STEVEN R. JACOBSEN
 4        BY:  STEVEN R. JACOBSEN, ATTORNEY AT LAW
 5        901 Clay Street
 6        Oakland, California  94607
 7        (510) 465-1500
 8
 9   FOR THE DEFENDANT CITY OF OAKLAND, OAKLAND POLICE
     DEPARTMENT, WAYNE TUCKER, B. ORTIZ:
10
          CITY OF OAKLAND
11
          BY:  CHARLES VOSE, DEPUTY CITY ATTORNEY
12
          1 Frank H. Ogawa Plaza, 6th Floor
13
          Oakland, California  94612
14
          (510) 238-2961
15
16
     FOR THE DEFENDANT RAMON ALCANTAR:
17
          BURNHAM & BROWN
18
          BY:  JOHN J. VERBER, ATTORNEY AT LAW
19
          1901 Harrison Street, 11th Floor
20
          Oakland, California  94612
21
          (510) 444-6800
22
23   Also present:  Miguel Ortega, Benjamin Ortega, Benjamin
24   Ortega, and Ana Rosa Ortega
25                        ---oOo---
```

863lbee3-c91b-4d8b-b549-f617f40ba1c2

Page 4

1              BE IT REMEMBERED, that pursuant to Notice of

2     Taking Deposition, and on Thursday, January 3, 2008,

3     commencing at the hour of 2:18 P.M., at the Law Office

4     of STEVEN R. JACOBSEN, 901 Clay Street, Oakland,

5     California, before me, APRIL DAWN HEVEROH, a duly

6     qualified Certified Shorthand Reporter, License No. 8759

7     in and for the State of California, there personally

8     appeared

9                        BERNARD ORTIZ,

10    called as a witness by Plaintiffs, who, being by me

11    first duly sworn to tell the truth under the laws of the

12    State of California, was thereupon examined and

13    testified as hereinafter set forth.

14                       ---o0o---

15                EXAMINATION BY MR. JACOBSEN

16             MR. JACOBSEN:  Q.  Will you state your full

17    name for the record, please.

18         A.   Bernard Ortiz.

19         Q.   Officer Ortiz, you're employed as a police

20    officer by the City of Oakland?

21         A.   Yes.

22         Q.   How long have you been so employed?

23         A.   10 years.

24         Q.   Have you ever given a deposition before?

25         A.   Yes.

Page 10

1    ordinary patrol officer in your district?

2        A.    The patrol guys answer calls for service, for

3    the most part.  We were specifically tasked with

4    handling drug dealing at this location.  That would be

5    our assignment for the day.  Or this individual is

6    wanted; we would be assigned to find this individual and

7    arrest them.  That was our day-to-day task.

8        Q.    I see.  You are a sergeant?

9        A.    Yes.

10       Q.    And were you a sergeant on May 7th, 2006?

11       A.    No.

12       Q.    When did you become a sergeant?

13       A.    February of 2007.

14       Q.    And what was your rank on May 7th, 2006?

15       A.    Police officer.

16       Q.    So Sergeant is one step up from what you were

17   at that time?

18       A.    Yes.

19       Q.    Comparing your build with Officer Alcantar's,

20   who is the larger build of the two?

21       A.    I am.

22       Q.    Now, your last name is Ortiz.  It appears to

23   be of Hispanic origin.

24             Do you speak Spanish?

25       A.    No.

CLARK REPORTING (510) 486-0700

Page 11

1       Q.    Do you understand any Spanish?

2       A.    No.

3       Q.    Now, on the morning of May 7th, 2006, did you

4    attend a dedicated lineup?

5       A.    Yes.

6       Q.    And tell me, what is a dedicated lineup?

7       A.    Well, on that day, specifically, it was for

8    Cinco de Mayo, so it was actually a huge lineup that we

9    had.  It wasn't for our individual squad.  It was a big

10   operation, and we had it at the Eastmont -- the command

11   at the time was Captain Kozicki briefed all the officers

12   on our responsibilities for the day.

13      Q.    Now, Cinco de Mayo means May 5th, correct?

14      A.    I believe so.

15      Q.    Okay.  This occurred on May 7th.

16      A.    That I don't remember the exact gist of the

17   history of that day.

18      Q.    Okay.  Was there to be a festival for Cinco de

19   Mayo on May 7th?

20      A.    I do know there was a festival, but I don't

21   know the whole -- when it was occurring.  I just knew

22   that day, that's what we were working.

23      Q.    Was this festival put on by the City of

24   Oakland?

25      A.    I don't know.

Page 18

1        A.    It's not so much allowed; it's is it something
2    we need to watch and observe, or is it something that we
3    need to pay attention to?  If you had a crowd of 100
4    people, we're not going to secure the police if they're
5    all in one corner.  We would monitor.
6        Q.    What do you mean, "We're not going to secure
7    the police"?
8        A.    You wouldn't send people home for that.  Our
9    job is to monitor what's going on with the festival.
10   Now we have to go and see what is going on, why there
11   are 100 people on this corner.
12       Q.    At some point you passed by the corner of 62nd
13   Avenue and International Boulevard?
14       A.    Correct.
15       Q.    And if I slip and say "East 14th Street",
16   you'll know I mean International Boulevard, correct?
17       A.    Correct.
18       Q.    How many people were in this crowd?
19       A.    It was a good-sized crowd.  I want to say it
20   was more like 20.
21       Q.    Okay.  And they were all on one particular
22   corner?
23       A.    They were starting on -- it would be the
24   Oakland -- southeast corner, but they were going across
25   International.  The crowd would go across International

Page 24

1        A.    I think it was after noticing the first

2   one hitting his brakes was when we decided it was time

3   to act.

4        Q.    Okay.  And how long had you observed the

5   group?

6        A.    Five.  I don't have a watch.  I would say

7   five to ten minutes.  I mean, time is kind of hard to

8   judge when you're not looking at your clock.

9        Q.    But that's your best estimate?

10       A.    Yes.

11       Q.    Okay.  And during this time you were parked,

12  you were seated in the car in the lot where they were

13  constructing a mini mart?

14       A.    Yes.

15       Q.    Were you driving, or was Officer Alcantar?

16       A.    I don't remember.

17       Q.    Who is senior, or who was, at the time, the

18  senior officer?

19       A.    I am.

20       Q.    So when you decided it was time to act, what

21  did you intend to do?

22       A.    Cite individuals that were carrying a flag, I

23  was going to cite that person, and there was -- I think

24  it was just the flag person that we were going to cite

25  at the time, or in my head, what I was going to do was

Page 25

1    cite the person with the flag.

2        Q.    Did you discuss this at all with Officer

3    Alcantar?

4        A.    No.

5        Q.    You didn't say, "Let's go do" such-and-such,

6    or "Let's get that guy", or anything like that?

7        A.    I don't remember saying anything specific to

8    that nature.

9        Q.    Did you and Officer Alcantar decide at the

10   same time that it was time to do something?

11       A.    You know, I don't remember if it was the same

12   time decision.  I just knew that I was acting.

13       Q.    Did you have any discussion at all with

14   Officer Alcantar during the time that you were sitting

15   in the car observing the group of people?

16       A.    I don't believe so.

17       Q.    What, if anything, did either of you say to

18   alert the other that it was time to act?

19       A.    I don't think we said anything.  I think I

20   just started acting.

21       Q.    And what did you do to start acting?

22       A.    Walking towards the crowd, trying to disperse

23   the crowd, going towards the person carrying the flag at

24   the time.

25       Q.    So you got out of the car?

Page 28

1    Q.    Still in the lot?

2    A.    Correct.

3    Q.    Okay.  Do you remember which direction the car

4    was facing?

5    A.    I do not.

6    Q.    Okay.  And did Officer Alcantar exit the

7    vehicle at the same time?

8    A.    I don't know if it was at the same time, but

9    he did exit the vehicle.

10    Q.    Do you remember if he did first or you did

11    first?

12    A.    I don't remember.

13    Q.    So you began to walk toward the intersection.

14    A.    Correct.

15    Q.    Were you heading toward any particular corner?

16    A.    We were -- I was heading towards the

17    individual carrying the flag.

18    Q.    And where was that individual at that time?

19    A.    When we exited and started walking, everyone

20    started running.  So if I remember correctly, he was

21    going southbound, or it would be Oakland south, down

22    International.  I mean not down International; down 62nd

23    Ave.  I'm sorry.

24    Q.    Okay.  Where was he at the time you got out of

25    the car?

CLARK REPORTING (510) 486-0700

Page 29

1    A.    I don't know if he was in the middle of the
2    road or just had started crossing again when we got out
3    of the car.
4    Q.    Okay.  Started crossing from where to where?
5    A.    I can't remember exactly from where.  I just
6    remember they were able to get down 62nd Ave. relatively
7    quick.
8    Q.    How far was your car from the southeast corner
9    of 62nd and International?
10    A.    I couldn't tell you.
11    Q.    Do you have an estimate?
12    A.    No, because I can't remember exactly where we
13    had parked.
14    Q.    Do you remember whether or not the person
15    carrying the flag was on the sidewalk or on the street
16    at the time you got out of the car?
17    A.    Again, I can't remember exactly because as we
18    got out of the car, everyone started running.  So you
19    would lose track of where people are.
20    Q.    And everyone started running south on 62nd
21    Avenue?
22    A.    The majority of the group, yes.  There was
23    others that went different directions.
24    Q.    Okay.  And what did you do at that point?
25    A.    Started going down 62nd Avenue.

863fbee3-c91b-4d8b-b549-f617f40ba1c2

1       A.    I remember that because it was distinct, and

2    that's the first time I had ever been called that.  They

3    were yelling a whole bunch of stuff at the time.

4       Q.    And you hadn't said, either one of you, either

5    you or Officer Alcantar, you hadn't said anything to

6    anyone in this group prior to that?

7            MR. VOSE:  I'm going to object to that.  I

8    don't think that was his testimony.  I think that his

9    answer was that he didn't remember saying anything.  I

10   didn't know if Officer Alcantar had said anything.

11           MR. JACOBSEN:  Q.  That's what I'm asking.

12           MR. VOSE:  I'm going to object to the

13   question.  You'll have to rephrase it.

14           MR. JACOBSEN:  Q.  Did either you or Officer

15   Alcantar say anything to anyone in this group before

16   anyone in the group said anything to you?

17      A.    I personally didn't say anything yet.  I don't

18   know about Officer Alcantar.

19      Q.    He could have said things, you just don't

20   remember one way or the other; is that correct?

21      A.    Again, I wasn't paying attention to what

22   Officer Alcantar was doing.  I don't know exactly what

23   he was doing.

24      Q.    But he was within earshot of you, correct?

25      A.    I don't remember exactly where he was at.  I

1      A.    My personal thought is it's the first time

2  anybody ever called me that, so I really didn't make a

3  basis of whether it was insulting or not.

4      Q.    Did you, at some point, say anything to anyone

5  in the group?

6      A.    I think we were trying -- at one point I'm

7  trying to tell the individual with the flag to come to

8  us or to stop, but that's about it.

9      Q.    And what, exactly, did you say to that person?

10     A.    You know, I can't remember the exact words.

11  It was a long time ago.

12     Q.    Can you remember the gist of what you said?

13     A.    No.  I do not know the exact words.  I

14  wouldn't even try to say what I could have said.

15     Q.    Do you remember anything that Officer Alcantar

16  said to anyone that day?

17     A.    No.

18     Q.    Do you remember anything that you said to

19  anyone during the course of this incident before you and

20  Officer Alcantar eventually left the area?

21     A.    I remember talking to an individual, that

22  individual there.  I remember the gist of my

23  conversation with him, and that's about it.

24     Q.    Okay.  Well, we'll get to that part.  But

25  that's the only thing you remember?

Page 37

1        A.    Correct.

2        Q.    When you arrived at the intersection of 62nd

3    Avenue and International, was that the first time you

4    passed through that intersection that day?

5        A.    You know, I don't remember.  But the odds are

6    probably not.  But again, I don't remember if I had been

7    through there before earlier that day or not.

8        Q.    In any case, when you decided to park -- you

9    or Officer Alcantar decided to park your car on the lot

10   on the corner where they were building a mini mart, that

11   was the first time you observed the group of

12   approximately 20 people on the corner or in the

13   environment of the intersection, correct?

14       A.    Correct.

15       Q.    Whose idea was it to pull over and park at

16   that intersection?

17       A.    You know, I don't remember whose idea.  I

18   mean, it was a crowd, and that was our responsibility,

19   to deal with crowds.  It could have been either one of

20   us.

21       Q.    Was the crowd doing anything, other than what

22   you've already told us, as far as crossing the street

23   and the way they were crossing the street?

24       A.    No.

25       Q.    Other than possibly violating the "pedestrian

CLARK REPORTING (510) 486-0700

1    moving suddenly into the street" statute or ordinance

2    that you mentioned, was the crowd doing anything else

3    that you felt was illegal at the time?

4         A.   No, I don't believe so.

5         Q.   Did you have any reason to believe that any of

6    the activity that you observed was gang-related?

7         A.   No.

8         Q.   Okay.  So you begin going down 62nd Avenue

9    toward where the flag carrier is moving, correct?

10        A.   Correct.

11        Q.   And you're on foot?

12        A.   Yes.

13        Q.   Were you walking or running?

14        A.   I think I was kind of -- like a brisk walk.

15   I'm not running in a full sprint, but I am moving rather

16   quickly towards where they're going.

17        Q.   And how was the crowd moving?  Was it walking

18   or running?

19        A.   It was run, slow down, and then -- because the

20   house is right there.  After a short distance, then

21   there's that yellow house they went into, that yard

22   right there.

23        Q.   And approximately how many of this group of

24   approximately 20 people went toward the yellow house

25   that you referred to?

Page 43

1  answer.

2          MR. VOSE:  Okay.  You can answer if you know.

3          THE WITNESS:  If you're asking me what Officer

4  Alcantar was thinking at the time he entered the yard,

5  is that what you're asking?

6          MR. JACOBSEN:  Q.  I'm asking you if anyone

7  has told you, other than your attorney, what Officer

8  Alcantar's justification was or his basis for entering

9  the property at the time that he entered.

10     A.  I'm sorry.  I'm confused of the question

11  because if you're asking me as he's walking in right

12  then and there, do I know the answer to that question --

13     Q.  No, I'm asking you today, do you know the

14  answer to that question?

15     A.  Yes.

16     Q.  Okay.  And what was his justification for

17  entering the private property?

18     A.  It's the 148, delaying or obstructing a police

19  officer in the line of duty.

20     Q.  Okay.  So was it Officer Alcantar's

21  contention, to your understanding, that someone in that

22  property had delayed or obstructed a police officer?

23     A.  Well --

24          MR. VERBER:  Well, let me just object again.

25  I think it calls for speculation.

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

1          MR. VOSE:  If you're asking him if he knows

2    today what that is, as before, that's fine.  If you're

3    asking him if he knew at the moment he entered the yard,

4    as we have already objected to, that calls for

5    speculation.

6          MR. JACOBSEN:  Q.  No, I'm not asking you to

7    guess as to what Officer Alcantar may have been thinking

8    at the time.  I want you to tell us what you know, and

9    if you know something today, even if you didn't know it

10   at that moment, you can answer it with what you know

11   today.

12         A.    Well, I can tell you my own personal mindset

13   was the flag carrier leaving from his spot where we were

14   trying to issue a citation and fleeing to the house is

15   148, and my mindset was he was delaying or obstructing a

16   police officer in the line of his duties, if that makes

17   it any -- if you can understand what I'm saying on that.

18         Q.    Okay.  Did the flag carrier have any way of

19   knowing that either you or Officer Alcantar wanted to

20   issue a citation to him?

21         MR. VERBER:  Objection.  Calls for

22   speculation.

23         MR. JACOBSEN:  Q.  As far as you know.

24         A.    I thought I said earlier that I was trying to

25   get his attention to stop, but I can't remember the

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

Page 45

1    exact wording that I had said for him to stop.

2        Q.    Do you know whether or not you succeeded in

3    getting the attention of the flag carrier at that time?

4        A.    I can't remember if he looked back at me or

5    not.

6        Q.    Have you and Officer Alcantar ever discussed

7    what his basis was for entering the yard at that time?

8        A.    Actually, no.

9        Q.    Have you discussed with anyone, other than

10   with your attorney, Officer Alcantar's basis for

11   entering the yard at that time?

12       A.    No.

13       Q.    Where were you when Officer Alcantar entered

14   the yard?

15       A.    When Ramon entered, I was maybe three people

16   behind him.  If you want to measure in people, I was

17   right behind him when he entered.

18       Q.    So you saw him enter?

19       A.    Yes.

20       Q.    And did you follow immediately after him?

21       A.    Oh, yes.  I'm not going to let my partner go

22   into the yard by himself.

23       Q.    Well, when Officer Alcantar got into the yard,

24   what did he do?

25       A.    He confronted the flag carrier.

CLARK REPORTING (510) 486-0700

Page 47

1    Officer Alcantar and the flag carrier?

2        A.    No.

3        Q.    Can you say one way or another whether there

4    was any physical contact between Officer Alcantar and

5    the flag carrier?

6        A.    No.

7        Q.    So you saw someone coming off the porch.    What

8    did you do?

9        A.    It was that individual right there, and he was

10   focusing on Officer Alcantar and what was going on over

11   there, and immediately I stepped in the middle of that

12   and detained that individual.

13       Q.    Okay.    "That individual" being Miguel Ortega?

14       A.    Yes.

15       Q.    All right.    How did you go about detaining

16   Miguel Ortega?

17       A.    I think I grabbed him, and it was -- at that

18   time I grabbed him, spun him around and handcuffed him

19   and took him out of the yard.

20       Q.    Grabbed what part of his body?

21       A.    I don't remember if I grabbed the front of his

22   arm or the back.    It was enough to spin him around.

23       Q.    And so you spun him around and did what?

24       A.    Handcuffed him.

25       Q.    Did he resist?

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 48

1       A.   No.

2       Q.   And so once you handcuffed him, did you have

3   to put him down on the ground to do that?

4       A.   I don't believe we put him down on the ground.

5   I think we were up against the porch area.  I don't

6   think I had to put him on the ground to do it.

7       Q.   Is this a raised porch that we're talking

8   about?

9       A.   I remember he had to come down the steps.  I

10  don't remember the exact details of the porch.  But you

11  do have to come down steps.

12      Q.   So it is some number of steps up off the

13  ground, whether it's one or two or more?

14      A.   I don't know.

15      Q.   Okay.  And at this point you had Miguel Ortega

16  up against the side of that porch?

17      A.   Miguel -- I was dealing with him -- it's

18  Miguel?

19      Q.   Yes.

20      A.   Yes.

21      Q.   Okay.  Did you accomplish the detention and

22  handcuffing of Mr. Ortega by yourself?

23      A.   I believe so, but I don't remember.  I know

24  that at the time more people were showing up.

25      Q.   By "more people", you mean other police

Page 51

1   being handcuffed?

2      A.   Said?  No.

3      Q.   Anything else that he did, other than what

4   you've already told us?

5      A.   It would be the actions of his response to

6   that being his brother, the aggressively coming off the

7   stairs, the targeting in to where I know Officer

8   Alcantar is at, this is what led me to believe that he

9   was going to confront Officer Alcantar where I had to

10   intervene.

11      Q.   And at this point you didn't see what Officer

12   Alcantar was doing; is that correct?

13      A.   No, I was more busy making sure that he was

14   safe from individuals in the crowd.

15      Q.   So it's correct that you did not see that?

16      A.   Correct.

17      Q.   At any time from the time that you first

18   contacted Miguel Ortega until the time he was placed in

19   a police car, did he resist?

20      A.   No.

21      Q.   Did you place him in the car yourself?

22      A.   Yes.

23      Q.   Was anyone else in the police car when you

24   placed Miguel Ortega into the police car?

25      A.   No.

1    A.    I'm sure at one point I did.

2    Q.    Did he show you identification?

3    A.    You know, I don't remember if he showed me or

4    I just took it down.

5    Q.    Did Officer Alcantar ever speak with Miguel

6    Ortega, to your knowledge?

7    A.    You know, I don't know if Ramon did or not.

8    Q.    At any time did you get the impression that

9    Miguel Ortega was under the influence of any kind of

10   intoxicating beverage or drug?

11   A.    No.   I mean, he could have had the smell of

12   alcohol on him, but not to the point where I thought he

13   was so intoxicated that he needed to go to jail for

14   being too intoxicated.

15   Q.    Do you remember whether or not he had the

16   smell of alcohol on him?

17   A.    I do not, and I didn't do the test for that.

18   Q.    Did you notice whether or not anyone else at

19   the scene appeared to be intoxicated or under the

20   influence of anything?

21   A.    I wasn't doing that kind of investigation.   I

22   wasn't trying to look for that.

23   Q.    Okay.   Was there any evidence at the scene of

24   drinking or drug use?

25   A.    Again, there was nothing of what we were

1    looking for at all. We weren't trying to get to that

2    point, so no. It could have been, but I wasn't looking

3    for it, so I don't know.

4         Q. Did you ever figure out into whose car you had

5    placed Miguel Ortega?

6         A. I do not remember whose car I had placed him

7    in.

8         Q. Do you remember whether or not Miguel and

9    Benjamin Ortega were ever placed together in the same

10   patrol car?

11        A. I don't believe so. I think we kept them

12   separate.

13        Q. At some point Mr. Miguel Ortega was released?

14        A. Yes.

15        Q. And did you do that?

16        A. Yes, I did.

17        Q. Anything else you can recall of any

18   conversation between you and Miguel Ortega that you

19   haven't already told us?

20        A. No.

21        Q. Did you ever overhear any conversation between

22   Officer Alcantar and either Benjamin or Miguel Ortega?

23        A. No.

24        Q. When you released Miguel Ortega, tell me what

25   you did.

CLARK REPORTING (510) 486-0700

Page 67

1        Q.    All right.  So let me rephrase the question.

2            Other than the movement of Miguel Ortega from

3    the porch down toward the yard where Officer Alcantar

4    was with Benjamin Ortega, were you aware of any verbal

5    or physical threat made to any police officer at the

6    scene?

7        A.    No.

8        Q.    How long were Miguel and Benjamin Ortega

9    detained in the police cars?

10       A.    I would say maybe 10 minutes at the most.  It

11   wasn't a very long time, once the situation had gotten

12   calmed down.  But I couldn't give you the exact time.  I

13   wasn't keeping track.

14       Q.    Now, what is an FC?

15       A.    Field contact report.

16       Q.    And as an officer, are you supposed to fill

17   out -- or one of the pair of officers supposed to fill

18   out a field contact report every time you have an

19   incident where you detain someone?

20       A.    Yes.  It's either that or a citation or a

21   police report.

22       Q.    And was a field contact report prepared for

23   the contact that you and Officer Alcantar had with

24   Benjamin and Miguel Ortega?

25       A.    By me?

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 73

1    Q.    And that's the PC 148?

2    A.    Yes.

3    Q.    Because the other thing you referred to of

4    leaving the curb suddenly into the street, that's just

5    an infraction.

6    A.    Correct.

7    Q.    Has there been a policy change instituted at

8    OPD since the date of this incident with regard to

9    calling a supervisor to the scene?

10    A.    You know, we've had so many policy changes

11    since the negotiated settlement agreement, which started

12    taking into effect probably in 2006, that the policy has

13    changed so many times I couldn't even tell you when they

14    changed.  But as a supervisor now, they call me for

15    in-custody felony arrests.  I will be called to the

16    scene where I need to approve the arrest.

17    Q.    Okay.  And you are a supervisor now, but you

18    weren't then; is that correct?

19    A.    Correct.

20    Q.    Okay.  Now, you say this settlement that was

21    started to be instituted in 2006, settlement of what?

22    A.    We call it the NSA, negotiated settlement

23    agreement.  It was a lawsuit from the city.

24    Q.    Was that the lawsuit involving the writers?

25    A.    Yes.

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 78

1    did you say?

2         A.    I think that we said that there was a crowd,

3    but I don't remember the exact wording that we used.

4         Q.    And you requested backup?

5         A.    I think we just said that there was a crowd.

6    I think it was assumed that backup would come.

7         Q.    When did the first backup arrive?

8         A.    Again, I do not know because now we were

9    dealing with the incident.

10        Q.    Did anyone arrive before you and Officer

11   Alcantar arrived at the house on 62nd Avenue?

12        A.    I don't believe so.

13        Q.    Okay.  When Officer Alcantar entered the yard,

14   was there any other officer present at the scene other

15   than you?

16        A.    You know, I don't believe so.

17        Q.    Did you ever get close enough to Benjamin

18   Ortega to determine whether or not he was under the

19   influence of any liquor or drug?

20        A.    No.

21        Q.    Did you ever see any indication, anything to

22   indicate to you that he might be?

23        A.    No.

24        Q.    Other than what you have told us about your

25   interaction with Miguel Ortega in terms of spinning him

DEPOSITION OF BERNARD ORTIZ

1    neck?

2        A.    Not that I can think of.

3        Q.    So if an officer applied a hold using fingers

4    to the side of a subject's neck, would that be improper

5    as far as what you're trained as a police officer?

6        A.    Again, now you're going into situations.  What

7    is exactly going on?  Is this a life-and-death

8    situation?  Are they in defense of their life?  That's

9    such an open-ended variable that I could never make.

10       Q.    Okay.  Fair enough.

11             Given a situation where an officer is

12   detaining a smaller person who is not threatening or

13   resisting, is it proper for an officer, based on your

14   training, to apply any kind of hold that involves

15   placing pressure on the sides of the subject's neck with

16   the fingers of the officer?

17       A.    Again, you're saying if this person was

18   complying completely, there would be no use of force

19   because you wouldn't have to use force because they

20   would have turned around and put their hands behind

21   them.  So you're making -- I'm sorry.  You're making --

22   it's too open, too vague.

23       Q.    I'm asking you to make certain assumptions.

24   I'm asking you to assume a large officer, a small

25   subject, compliance, and the application of force by the

Page 98

1    officer's fingers to the side of the subject's neck.

2         A.    Okay.    Again, the small -- the size doesn't

3    matter.    It's the word you're using, the word

4    "compliance", and again, if they were complying, there

5    would be no need to use force.

6         Q.    So based on your training, it would be

7    improper to use force?

8         A.    If there is compliance.

9         Q.    What if there's physical compliance but verbal

10   protestation?

11        A.    Again, you're saying if they're doing exactly

12   what they're ordered to do, which is compliance as I'm

13   defining it, there would still be no use of force

14   because they would be complying.

15        Q.    In which case the application of any force

16   would be excessive?

17             MR. VERBER:    I'm going to object that it calls

18   for an expert opinion in which this witness may not be

19   qualified to provide.

20             MR. JACOBSEN:    Q.    I'll qualify that.    Based

21   on your training.

22        A.    Again, the force needed to effect the arrest

23   may be the twist lock.    Now that's considered force for

24   us, so you would still need to touch them, twist lock,

25   put the handcuff on, grab the hand and put the other

1    handcuff on.  So there's still -- even on full

2    compliance, we're still touching.  There's still some

3    level of a control hold being used.

4              MR. VOSE:  If I could just interrupt for a

5    second.

6              (Discussion off the record.)

7              THE WITNESS:  Did that one say '06 on there?

8              Oh, I was mistaken on my testimony because we

9    had one come out first that was in the rough, so this

10   did come into effect -- well, the back page will tell

11   you exactly.  Parts of this it came into effect at this

12   time.  I was wrong with saying it didn't come into

13   effect at this time.  We've had so many policies within

14   the last couple of years.  This one did come into effect

15   for the most part, parts of it did, and I think there's

16   a back page where you see where it was revised, changed,

17   where they signed.

18             MR. JACOBSEN:  Q.  This handbook is dated

19   February 17th, 2006, correct?

20        A.   Correct.  And this is the one that we're

21   actually using now, supervisors.

22        Q.   Okay.

23        A.   Because it just changed.

24        Q.   If an officer, based on this handbook dated

25   February 17th, 2006, if an officer uses force to effect

Page 100

1    an arrest or detention, does the officer have a

2    requirement to report that use of force to his or her

3    supervisor?

4         A.   Yes.

5         Q.   And how soon does that use of force need to be

6    reported?

7         A.   For this policy now, it is on scene they call

8    me and tell me that they've had a use of force.

9         Q.   For the policy in effect on February 17th,

10   2006?

11        A.   There's parts of it that came into -- it's

12   weird -- that came into effect, so -- but I believe it

13   started at that time were the levels.  Because sometimes

14   level 4s didn't have to be reported immediately.  You

15   could actually write the report and hand it to your

16   sergeant, and then it changed.

17        Q.   I'm looking at one of the last pages of the

18   handbook here.  Is this the page to which you're

19   referring that says that this document, the use of force

20   handbook, came into effect?

21        A.   No, this is the review board.

22        Q.   So we're looking for one of the last pages of

23   K-4?

24        A.   No, because you're in K-3, the paging of K-3,

25   if it's the last pages of the K-3 part.  I remember

1   weapon.  If there was a rock laying on the ground, it

2   can be a weapon.  A person's body can be a weapon if

3   they use it correctly.  There's always the potential to

4   have weapons.

5        So did I believe there were no weapons near or

6   around me?  There was plenty, it's just they were never

7   used as a weapon.

8        Q.   Did you consider the proximity of any weapon

9   to Benjamin Ortega at the time?

10       A.   Again, I wasn't dealing with him at all.

11       Q.   Okay.  So is it fair to say you didn't make

12   that consideration?

13       A.   Correct.

14       Q.   Was there any other option available?  That's

15   the next criterion, "Availability of other options."

16   Was there any other option available to Officer Alcantar

17   to achieve whatever it was he was trying to achieve?

18       MR. VERBER:  Objection.  Calls for

19   speculation.

20       MR. VOSE:  Yeah, I was going to say the same

21   thing.  You're asking him -- the decision to use the

22   force is within the officer's perception.  It would be

23   speculation for him to say what was going through

24   Officer Alcantar's mind.

25       MR. JACOBSEN:  Q.  I'm not asking you to

1    speculate what Officer Alcantar was thinking, but you

2    were on the scene, you walked in immediately after

3    Officer Alcantar, you saw Benjamin in the yard and you

4    saw Officer Alcantar approach him.  Were there any other

5    options available to Officer Alcantar short of the use

6    of physical force?

7               MR. VOSE:  I'm going to object again, and he's

8    already testified that as soon as he got in the yard,

9    his focus was turned to Miguel.

10              MR. JACOBSEN:  Well, you can object, but let's

11   not testify for the officer, okay?

12              THE WITNESS:  Again, Ramon approached him,

13   he's coming off the porch.  All my attention is now on

14   him.

15              MR. JACOBSEN:  Q.  Okay.  So is that something

16   which you didn't consider at the time?

17        A.    Again, you're asking me to consider something

18   that I'm not a part of.  I'm a part of Miguel, and I

19   have to now take into consideration me dealing with him.

20        Q.    Okay.  So as far as the interaction between

21   Officer Alcantar and Benjamin Ortega, you didn't

22   consider the availability of other options?

23        A.    I am not even a factor in -- I could never

24   consider what they were doing.

25        Q.    The next criterion is, "Seriousness of the

CLARK REPORTING (510) 486-0700

Page 109

1    suspected offense or offenses."  In this case the

2    suspected offenses were, one, potentially crossing the

3    street improperly, and second, not stopping when you

4    wanted them to stop, correct?

5        A.    I think you're really simplifying that.  But

6    if you were going just very black and white issue, yes.

7        Q.    The next criterion is, "Training and

8    experience level of the member or employee?"  Now, you

9    already told us that you had more time on the force than

10   Officer Alcantar.

11           Do you know what his experience level was at

12   the time?

13       A.    I didn't remember how many years Ramon had on

14   him at the time.

15       Q.    The next criterion is, "Potential for injury

16   to member, employee, third party or the subject."

17           At the time that you entered the yard, was

18   there any potential for injury to anyone?

19       A.    There is always potential for injury.

20       Q.    What was the potential for injury at the time

21   that Officer Alcantar entered the yard?

22       A.    He could trip and fall.  I mean, you're going

23   into a ground that you don't know, you've got a crowd

24   that's bigger than you are.  There's always the

25   potential of you may get hurt.

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2

CLARK REPORTING (510) 486-0700

Page 112

1    was going to effect an arrest.

2        Q.    Did you intend to arrest anyone else when you

3    entered the yard, other than Benjamin?

4        A.    No.

5        Q.    In May of 2006 was it your habit and practice

6    to file field contact reports each time you made a field

7    contact?

8        A.    If there was a detention, yes.   If there was a

9    contact where I just talked to the guy, no.

10       Q.    Did the regulations require that you file an

11   FC even if you just talked to someone?

12       A.    I don't believe it did at the time.   For just

13   normal conversations to, "Hey, how are you doing?"

14   Either we knew each other or not.

15       Q.    Well --

16       A.    And then to get one, too, you have to ask for

17   identification.   Again, if you don't have a lawful

18   detention or the ability to ask for that, I can't fill

19   out, "I talked to a guy on a corner."

20       Q.    Certainly in a situation such as that

21   involving Benjamin and Miguel Ortega, it would have been

22   your custom and practice to file an FC for something

23   like that, correct?

24       A.    Yes.

25       Q.    How many detentions did you actually --

DEPOSITION OF BERNARD ORTIZ

Page 117

1          CLARK REPORTING
        Certified Shorthand Reporters
2       2161 Shattuck Avenue, Suite 201
          Berkeley, California  94704

3

4

5   BERNARD ORTIZ                    Date: 1/31/08
    C/O CHARLES VOSE, DEPUTY CITY ATTORNEY
6   1 Frank Ogawa Plaza, 6th Floor            COPY
    Oakland, California  94612

7

8   Dear Deponent,

9   Pursuant to Rule 30(e) of the Federal Rules of Civil
    Procedure, please be advised that the original
10  transcript of your deposition taken on January 3, 2008,
    is ready for your review and corrections, if necessary.
11  The original will be held in our office for a period of
    30 days, at which time it will be forwarded to the
12  noticing attorney.
    If your attorney has ordered a copy, please review the
13  transcript.  Reading, correcting and signing of
    depositions is an option and is not mandatory.  If
14  changes are necessary, please do so on the correction
    sheet provided.

15

    If your attorney has not ordered a copy of the
16  transcript, you may call to make an appointment to
    review the original in our office.

17

18  Thank you,

19

20  Clark Reporting

21

                        APRIL DAWN HEVEROH
22                        CSR #8759

23

24  cc. All counsel
        Original transcript

25

DEPOSITION OF BERNARD ORTIZ

CLARK REPORTING (510) 486-0700

Page 118

1                              ]

    COUNTY OF CONTRA COSTA ]

2

3

4           I, April Dawn Heveroh, Certified Shorthand

5    Reporter No. 8759 in and for the State of California, do

6    hereby certify that the deponent, BERNARD ORTIZ, was,

7    by me, duly sworn to tell the truth, the whole truth,

8    and nothing but the truth in the within-entitled cause;

9    that the foregoing is a full, true and correct

10   transcript of the proceedings had at the taking of said

11   deposition, to the best of my ability.

12

13

14   Date:_____, 2008

15

16              ___Dawn Heveroh___

                APRIL DAWN HEVEROH

17                CSR NO. 8759

                State of California

18

19

20

21

22

23

24

25

DEPOSITION OF BERNARD ORTIZ

863fbee3-c91b-4d8b-b549-f617f40ba1c2