EXHIBIT F

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

June 29, 2008

Mr. Steven R. Jacobsen
Ms. Brenda D. Posada
Attorney at Law
Law Offices of Steven R. Jacobsen
901 Clay Street
Oakland, CA 94607

**Regarding:**   *Miguel Ortega, et al, v. City of Oakland, et al.  USDC Case No. C-07-02659 JCS (ADR)*

Dear Ms Poseda and Mr. Jacobsen:

Pursuant to the requirements of Rule 26, I have studied the reports and other material provided to me regarding this case. While the material sent to me appears to be complete, please be advised that if there are any additional depositions or other materials produced in this case, a supplemental report may be necessary. The information submitted thus far regarding this incident supports the following opinions:

## Findings:

1.   **Unprofessional, Rude, and Inflammatory Officer Conduct:**

     Taking the citizen witnesses and the Plaintiff's allegations as true that Officer Alcantar told Benjamin Ortega, "Throw that flag away before I shove it up you ass." (Or words to that effect), Officer Alcantar was in gross violation of all POST requirements and professional ethics for this type of situation. Such a statement (as recounted in this set of facts) can only be viewed within the context of the unlawful use of police powers under the color of authority. Officers are trained that as such, citizens have the constitutional right to respond and object to such language and

humiliating treatment. This alleged statement appears in the record as the seminal act to all that followed.

This fundamental issue (whether or not Officer Alcantar used such unprofessional and provocative language) appears to be deliberately ignored during the Oakland Police Department's (OPD) inquiry into how and why this incident occurred. The investigator assigned to this case simply took Officer Alcantar's word that he never said it despite substantial evidence to the contrary.

It also appears in the record that there was no adequate continuing training or guidance from the City or within the OPD Policy and Procedures Manual that provided the rules and regulations regarding the necessary use of police communications designed to prevent incidents of this type. Officer Alcantar's language is absolutely contrary to any productive handling of this situation and, in my opinion, is indicative of Officer Alcantar's police attitudes in particular, and the negative culture of the Oakland Police department in general. This issue appears as a systemic cultural value that is an engine of the unnecessary and excessive force that occurred in this incident. If Officers Alcantar and Ortiz followed their basic POST tactical communications training they would not have acted so provocatively.

2.    **Excessive Force:**

This incident is a case of excessive force and incompetent arrest tactics by Oakland Police Officers Bernard Ortiz and Ramon Alcantar. Benjamin Ortega suffered substantial physical abuse and injury at the hands of Officer Alcantar at the time he was taken into custody. Additionally, the use of force by Officer Ortiz on Miguel Ortega was grossly excessive and unnecessary.

The record in this case indicates that the training provided at the POST Basic Academy to all state certified police officers (including the officers at the scene) regarding the use of force (and when it is even necessary to apply) was not followed. The fact that Officers did not follow the proper protocols as originally trained, indicates a substantial lack of required continuing professional training within the Oakland Police Department. The specific areas regarding the use of force during this incident that are of concern are:

a.  Assessing whether or not the necessity to use force exists.

b.  The proper conditions necessitating the use of controlling force.

c.  The proper conditions necessitating the application of control holds.

e.  The proper use of handcuffs and methods necessary to bring a handcuffed prone subject to a standing position.

f.  Unlawful and unethical acts of humiliation under the color of authority.

It appears in the record that there was no adequate continuing training or guidance from the City or within the OPD that provided the necessary rules and regulations regarding the use of force designed to prevent incidents of this type. Responsibility for the inadequate training and procedures fall directly upon the City of Oakland, the OPD Chief of Police, and his command staff. This is particularly odious in view of the requirements of the negotiated settlement agreement, *Delphine Allen, et al. v. City of Oakland.*

3.  **The Failure to Intercede:**

Among the officer's overarching duties is to protect lives, including the lives of those who are apprehended into their custody. Competent training for officers must include their duty to intervene if a fellow officer(s) apply unnecessary and excessive force – particularly if that force is excessively painful, injurious, and potentially deadly. In this case, none of the officers present or in close proximity reported any attempt to stop, or even reduce, the wholly excessive and potentially deadly force (the elbow blow to Benjamin's throat) inflicted on Benjamin and Miguel Ortega. Accordingly, the officers failed in their duty to intervene.

> "Peace officers must recognize the consequences of using unreasonable force, and their legal and ethical responsibilities to intervene if the force being used by another peace officer is inappropriate or unlawful." (POST Learning Domain #20, Chapter 6)

The record demonstrates that Benjamin and Miguel Ortega suffered significant physical and emotional harm stemming from the unnecessary and excessive force that occurred. That the officers present could all fail in this basic duty underscores their wholly inadequate training, and a seriously flawed organizational culture within the Oakland Police Department and its command staff. This finding takes on additional significance in view of the fact that the officers involved were seasoned police veterans. The responsibility for which falls directly on the OPD Chief of Police and his command staff.

4.     **The Failure to File the Requisite Police Reports:**

A glaring departure from required police procedure evident in this incident was the uncontested fact that the requisite police reports detailing the circumstances of the arrests that occurred, the use of force used on both Benjamin and Miguel Ortega, and their subsequent field release that occurred without any supervisory notification and/or approval. Written documentation was required in this case and mandated by policy for a number of important reasons. They include the fact that Benjamin Ortega was a juvenile, that he had been injured by officers on duty, that significant physical force was used by Oakland Police on both Benjamin and Miguel Ortega, that a multi unit response had been requested to the scene, and that a significant number of very concerned witnesses were present and had clearly voiced their concern.

5.     **Cover-up of the Facts in this Case:**

To any reasonably trained and competent investigator, the set of facts as proffered by Benjamin and Miguel Ortega (and witnesses) required a vigorous and thorough investigation. If the incident occurred as reported, then Officer Ortiz and Officer Alcantar demonstrated attitudes and beliefs and committed acts worthy of discharge and/or criminal prosecution. It cannot be overstated that such acts destroy years of honest effort to gain the trust and confidence of the community and put all at risk. Such acts of unlawful force and deliberate humiliation simply cannot be tolerated at any level. The record in this case demonstrates that Benjamin Ortega was simply a youngster legally displaying a flag that

apparently offended Officer Alcantar – nothing more – triggering the unjustified and illegal acts by Officers Alcantar and Ortiz.

The fundamental communications issues (as discussed in item 1 above) appear as completely ignored during the OPD's inquiry into how and why this incident occurred. The role it played in this incident is obvious, and the absence of any discussion of this key issue in the inquiry appears to be more deliberate than accidental.

Additionally, the fact the Oakland Police Department in their investigative reports has endorsed this incident as proper police procedure speaks to the attitudes, values and beliefs of the department as a whole and they are wrong.

## Items Studied:

1.    The Complaint for Damages filed in this case.

2.    The Plaintiff's Mediation Statement.

3.    The IA Investigation Report, File # 06-0902.

4.    The May 7, 2006 Cinco De Mayo Festival Operational Assignments Roster.

5.    The Oakland Police Department Report Writing Manual, (effective date December 1, 1993).

6.    The Oakland Police Department Use of Force Policy Handbook, (effective date February 17, 2006.

7.    The Oakland Police Department Use of Force Policy Handbook (effective date August 1, 2007).

8     Miscellaneous medical records relating to Benjamin Ortega.

9     The Deposition Transcript of Bernard Ortiz, taken January 3, 2008.

10    The Deposition Transcript of Ramon Alcantar, taken January 16, 2008.

11.  The Deposition Transcript of Benjamin Ortega, taken January 17, 2008.

12.  The Deposition Transcript of Eduardo Ortega, taken April 22, 2008.

13.  The Deposition Transcript of Genesis Preciado, taken May 15, 2008.

14.  Negotiated Settlement Agreement (*Delphine Allen, et al. v. City of Oakland*).

15.  POST Training Domain # 1: "History, Professionalism and Ethics."

16.  POST Training Domain # 2: "Criminal Justice System."

17.  POST Training Domain #11: "Juvenile Law and Procedure."

18.  POST Training Domain #15: "Laws of Arrest."

19.  POST Training Domain #18: "Investigative Report Writing."

20.  POST Training Domain # 20: "Use of Force."

21.  POST Training Domain # 21: "Patrol Techniques."

22.  POST Training Domain #24: "Handling Disputes/Crowd Control."

23.  POST Training Domain # 33: "Arrest Methods/Defensive Tactics."

24.  POST Training Domain #42: "Cultural Diversity/Discrimination."

25.  Photos of Benjamin's injuries.

26.  Maps and Satellite views of the incident scene.

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriffs Department (LASD).

I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/ Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriffs Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment,

Page 7 of 21

the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of the 380 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remains in force today, without change, and includes the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert in both civil and criminal cases on police administration, police procedures, police tactics, police investigative procedures, basic evidence evaluation and shooting scene reconstruction, jail procedures and jail administration, in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington. I have also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina, Oregon and Wyoming Federal and State Courts.

I have testified before the Los Angeles Police Department Board of Rights. I have testified before the Harris County (Texas) Grand Jury. I was selected (January 20, 2007) to present on the Topic of "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I have worked on projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project, and the Texas Civil Rights Project (Austin, Texas). I have been recognized and quoted by the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force (Gary Blankenhorn v. City of Orange, et al. No. 04-55938, D.C. No. CV-02-01160-GLT Opinion).

I have been found competent by both Federal and State Courts to render opinions as to the duties and responsibilities of police officers regarding their individual and collective responsibilities as occurred in this case. A number of my cases have involved law

enforcement officers as civil plaintiffs and as criminal defendants,. A complete listing of my expert testimony on all matters since January 2000 is attached to this report as Exhibit C.

## Previously Retained Cases Involving The Oakland Police Department:

| Court: | Case Name: | Case File Number: |
|---|---|---|
| USDC | McGill, v. City of Oakland | Case No. C 03 4602 (#148). |
| USDC | Tiffany Couch, et al. v. City of Oakland, et al. | Case No. C-05-0311 MEJ (#237). |
| Superior Court State of California (County of Alameda) | Elliot Noble, v. City of Oakland, et al. | Case No. RG 04152392 (#260). |
| USDC | Torry Smith; Patricia Gray, v. City of Oakland, et al. | Case No. 05-CV-04045 EMC (#271). |
| Superior Court State of California (County of Alameda) | Hodari Toure, v. City of Oakland, et al. | Case No. RG 05215444 (#300). |
| USDC | Johnny Lee Sloan, Jr. v. City of Oakland, et al. | Case No. C 00-4177 CW(PR) (#308). |
| USDC | Uganda Knapps v. City of Oakland, et al. | Case No. C 05-2935 MEJ (#310). |
| USDC | Posey v. City of Oakland, et al., Brown v. City of Oakland, et al., (Consolidated with Posey) | Case No. C 04- JL 2693 (#311). |
| USDC | Thomas Clarence Cousey, et al., v. City of Oakland, et al. | Case No C 05-1117 THE (MEJ) (#313). |
| USDC | Jack Zolowicz, et al, v. City of Oakland, et al. | Case No. C06-05915 MJJ (#362). |

| USDC | Sue Rosanne Taylor, v. City of Oakland, et al. | Case No. C 06-05169 WHA (#363). |
| USDC | Jane Smith No. 1, et al, v. City of Oakland, et al. | Case No. CO6p07171 MJJ. (#381). |
| USDC | Miguel Ortega, et al, v. City of Oakland, et al. | Case No. C-07-02659 JCS (#465). |

## Overview of Events:

On Sunday, May 7, 2006, the City of Oakland held a "Cinco de Mayo" festival, an important and well recognized holiday within the Hispanic community among citizens of Mexican decent. The festival was held along sections of International Boulevard (formerly East 14th Street). As such, it was a recognized and supported community event by the City of Oakland. It was well attended (as expected) by citizens within the community. Accordingly, a special deployment of police officers was called up and deployed in the area to enhance the police presence during the festival, keep the peace, and provide safety services as necessary. The special police deployment occurred pursuant to an operational plan (item 4 as listed above) drawn up by the department in advance of the event. City of Oakland Police Officers Ramon Alcantar and Bernard Ortiz were deployed as a two-man uniform patrol unit as part of this special deployment.

The incident began at the intersection of 62nd Avenue and International Boulevard, and ended a few yards away at 1387 62nd Avenue, Oakland, a single-family house with a small enclosed front yard. Benjamin Ortega, age 15, and his adult brother, Miguel, planned to celebrate the holiday at their cousin's home at 1387 62nd Avenue. They arrived at the residence by car. Benjamin Ortega had brought along a Mexican flag from another cousin's home. Shortly thereafter, a neighborhood friend appeared and asked Benjamin to accompany him to a McDonald's restaurant, less than one block away on the opposite side of International Boulevard. Benjamin agreed, taking the flag (which was attached to a pole), with him. A group of eight to ten young men and women (including Miguel) accompanied Benjamin and his friend as far as the corner of 62nd Avenue and International Boulevard, following Benjamin who was carrying the flag as he walked.

After approximately ten minutes at McDonald's, Benjamin left his friend (who was still eating) and walked the one-half block west to the corner of 62nd Avenue and International Boulevard. (Despite the testimony of Officers Alcantar and Ortiz, the intersection is controlled by electric traffic signals.) Benjamin testified that he waited for the green

pedestrian walk signal, and crossed International Boulevard, walking southbound in the east crosswalk and carrying the flag aloft as he walked.

As Benjamin legally crossed the street, a City of Oakland police car (driven by Ortiz with Alcantar in the passenger seat) exited from a parking lot on the south side of International Boulevard, and approached the crosswalk from the east in the eastbound lanes of International Boulevard against the flow of traffic, and without the use of emergency lights or siren.

All civilian witnesses present and within hearing (including Benjamin and Miguel) have testified that they observed Officer Alcantar address Benjamin through his open window, and order Benjamin to *"throw that flag away before I shove it up your ass."* Benjamin asked the officer if he could wait until he could put the flag in the house. Alcantar responded: *"No, now."* (Emphasis added) Miguel Ortega has testified that he told Officer Alcantar that he should not speak to his brother that way. Officer Ortiz, told Miguel: "shut up, you fat ass." Miguel responded to the insult by calling Officer Ortiz who (he observed to be overweight) a "fat ass". The officers then told the group to leave the corner or they would be arrested.

At that point, the entire group walked to the residence at 1387 62nd Avenue (the first house after a vacant lot on the southwest corner International Boulevard, and 62nd Avenue). The police car driven by Officer Ortiz followed the group slowly and stopped near the residence. When the group arrived in front of the house, Officers Ortiz and Alcantar ordered the entire group to get off the sidewalk and onto the private property. The group then went into the small enclosed front yard and closed the gate. Miguel Ortega went inside the house, and Benjamin Ortega remained in the front yard. The officers remained outside the gate, while telling those present that they better have their green cards, because they were going to call Immigration Services.

Several additional police cars arrived and stopped in front of the house, apparently called to the scene by Ortiz and Alcantar. At this point, the civilian witnesses have stated that Officer Alcantar began to taunt Miguel, who was standing inside the screen door watching events transpire. Comments specific to Officer Alcantar include: Are you scared, big mouth, now that the police are here?" "Is your mother holding you back?" Miguel didn't say anything in response, but Benjamin, (who was standing in the yard) said "At least my momma cares about us; I don't know about your momma."

At that point, Officer Alcantar rushed into the yard, followed by other officers (including Ortiz) who had arrived at the scene. Witnesses have stated that Officer Alcantar grabbed Benjamin by the front of the neck and quickly struck him in the throat with his elbow.

Alcantar then took Benjamin to the ground, and through the use of grossly excessive and injurious force humiliated and handcuffed him.

Witnesses and Benjamin have stated that he was screaming in pain. Alcantar had Benjamin's wrist bent and was pushing on the wrist, applying a pain hold. He told Benjamin that if Benjamin did not say that he was sorry, Alcantar would break Benjamin's wrist. Benjamin said that he was sorry, but Alcantar kept applying the pressure and continued to force Benjamin to say he was "sorry" before he released his pressure of Benjamin's hands and wrists. The testimony of independent witnesses in this regard is particularly odious. In this regard, I quote the deposition testimony of Genesis Preciado as follows:

> Q.    As Alcantar was coming into the yard, did Benjamin just stand there?
>
> A.    Benjamin just stood there. He didn't know what was coming.
>
> Q.    As Alcantar was getting closer -- you said it's only three steps, so as he was getting closer to Benjamin and it looked like, to you, that Alcantar was going toward Benjamin, did Benjamin do anything? Did he flinch? turn? make a step?
>
> A.    Really, I remember that he went like this or something, because he came in like that.
>
> Q.    We're going to have to describe that, because she can't take these motions down, so you have to bear with me a little bit. I want to be as accurate as possible, so if you don't think I'm doing the right description, you tell me, okay?
>
>        So you say that Benjamin sort of, if I describe it, he sort of turns -- he kind of turns his body?
>
> A.    He saw it coming and, like, you know, he tried to, like --
>
> Q.    He tried kind of like use his upper body to avoid --
>
> A.    He tried to protect himself by flinching himself. That's when Alcantar hit him with the elbow, and then he grabbed -- he had full possession of him, and he dropped him to the floor, flipped him on

Page 13 of 21

his back. Alcantar had his knee on Benjamin's back, grabbed
Benjamin's arm, and then he was just ready to get handcuffed, but
before he got handcuffed, Alcantar told him, *"Say sorry. You want
me to break your hand. little boy?  Say sorry."*

He said, "All right. I'm sorry." And at first Benjamin said "sorry."

Then he said, *"Say sorry again."*

Benjamin started crying because it was -- you know, it's just a little
snap and his wrist breaks, so then he was saying. "Sorry. All right.
I'm sorry"

He said, *"Say 'sorry, sir.'"*

He said, "Sorry. sir."

Once he said "Tell me sorry," he'll say it. "Sorry, sir," he said,
"Sorry, sir." So then he just, he let go, got him handcuffed.
(Deposition of Genesis Preciado, page 58. line 2 to page 59, line 19.
Emphasis added.)

Benjamin testified that when Officer Alcantar clamped the handcuffs on to his
wrists Alcantar tightened then to the extent that they caused extreme pain and left
deep marks on his wrists. (Item 25 as listed above). Additionally, Benjamin (and
other witnesses present) have testified that after Officer Alcantar handcuffed
Benjamin, he pulled Benjamin to his feet by lifting him by his handcuffed wrists.

It must be stated here that experienced patrol officers are well aware that when
handcuffs are applied too tightly, they are extremely painful, and injurious.
Further, officers are specifically trained as a POST requirement, methods and
techniques to avoid it, and how to bring handcuffed subjects to their feet without
inflicting further pain and injury

When Officer Alcantar attacked Benjamin, Miguel Ortega opened the screen door
and told Alcantar to leave his brother alone.  Officer Ortiz, assisted by two or three
other unknown police officers, grabbed Miguel and threw him from the top step of
the porch to the ground where he landed on his side. He was then handcuffed
while one of the officers held a Taser to his neck.

Officers Alcantar and Ortiz then placed Benjamin and Miguel, respectively, together into the rear seat of their patrol car, which was parked in the street near the house. After some time, all the officers left the yard, except Alcantar and Ortiz, who stayed in their car with Miguel and Benjamin Ortega. Miguel and Benjamin remained handcuffed and in the car for approximately 20 to 30 minutes.

One of Benjamin's and Miguel's cousins approached and told the officers that they were going to be sued. At that point it is alleged that Officers Alcantar and Ortiz extorted from Benjamin and Miguel an agreement that, in exchange for not being taken to jail, plaintiffs would give up their right to sue the defendants. Upon their agreement, Benjamin and Miguel were finally released, and Alcantar and Ortiz left the scene.

*Officer Ortiz's Statements Regarding the Incident:*

As stated above, Officer Ortiz, who was driving the patrol car, testified that the first time he and Officer Alcantar saw Benjamin Ortega, they stopped and parked in a parking lot on the southeast corner of the intersection to watch Benjamin's actions in the street. Ortiz stated that the intersection was uncontrolled, and that the group of approximately 20 people, led by Benjamin (who carried a flag), was stepping out into the street and crossing the street several times. The group moved in unison, and was stepping out into the street at inappropriate times, causing cars to stop to allow the pedestrians to cross the street or to swerve around the group of pedestrians.

According to Ortiz, they watched the group for a period of approximately five minutes, during which *only one car* had to stop to allow the group to cross the street. At that point, they decided to arrest Benjamin. Ortiz testified that they got out of their car in the parking lot and walked toward the group. He testified in deposition that he could not remember what may have been said by either Benjamin, Miguel, or others in the group, and he could not be sure that Benjamin heard or understood any command to stop. He stated that members of the group began to shout insults at him, calling him a "fat Mexican" and a "coconut" (brown on the outside; white on the inside), which he testified that he did not take as an insult.

The group disbursed, with the majority heading down 62nd Avenue to the first house on the west side of the street. Ortiz and Alcantar followed on foot. They called for backup. Upon reaching the property, Alcantar (without stopping) entered the property through the gate and approached Benjamin. Ortiz stated that

he did not see what transpired between Alcantar and Benjamin. When Miguel opened the door and began to walk "aggressively" toward where Alcantar was with Benjamin, Ortiz stopped him, turned him around and handcuffed him, then led him to a patrol car. According to Ortiz, Miguel did not resist, and *he was never on the ground.* Ortiz testified that *Miguel remained standing until he was placed into the patrol car.* Other officers had arrived on scene, and Ortiz testified that he was not sure if any other officer assisted in the detention and handcuffing of Miguel.

Officer Ortiz testified that he then turned his attention back to the group. He allegedly saw only Officer Alcantar placing a handcuffed Benjamin into the rear of a different patrol car. He spoke with Benjamin and Miguel individually and conducted a communication search for "wants and warrants" that came back negative. Ortiz explained that, because neither he nor Alcantar wanted to ruin the festivities for anyone, they decided to release Benjamin and Miguel. Ortiz testified that he saw no evidence of drinking, and was never threatened by either Benjamin or Miguel.

Further, Ortiz stated that Alcantar was to have prepared the "field contact" report of the incident and he had no further knowledge of the report. Officer Ortiz stated in his recorded interview with Internal Affairs that he and Alcantar had detained many people that day, however, no "field contact" or any other reports were turned in by either Ortiz nor Alcantar as required by policy and law.

*Officer Alcantar's Statements Regarding the Incident:*

Officer Alcantar related a story different from the accounts of Ortiz, Benjamin, Miguel and the independent witnesses. According to Alcantar, he and Ortiz had passed through the same intersection several times during that day (though Alcantar could not identify the intersection). Alcantar stated that on at least two prior occasions that day, they had seen a young, Hispanic male in a white t-shirt standing in the intersection waiving a flag. On each occasion, traffic was stopped. (Alcantar did not know whether the intersection was controlled or not, and could not say whether the traffic was stopped simply due to a red traffic signal. On each occasion, they shouted at the young man to get out of the street.

Officer Alcantar stated that he could not say how much time elapsed between the sightings, but the third time they spotted a young, Hispanic male in the street it was Benjamin. Alcantar stated that he and Ortiz decided to arrest Benjamin and pulled

over into a parking lot on the corner, and got out of their car. He could not recall what was said, but as they approached the group, he yelled to Benjamin to come to him.

Officer Alcantar stated that Benjamin ran into the front yard of the house, which was strewn with empty alcohol containers. Alcantar followed them into the yard and approached Benjamin. He stated that Benjamin sidestepped at the last moment as he grabbed for him. Alcantar lost his footing and went down. Benjamin, by sheer coincidence, also lost his footing and, though he was moving in a direction perpendicular to that of Alcantar, they somehow ended up side by side on the ground, with Alcantar's hand on Benjamin. (Alcantar stated that he did not push Benjamin to the ground; their falling together was pure coincidence.) Once on the ground, Alcantar first placed his knee over Benjamin, then straddled his back, as he handcuffed Benjamin. He has stated that he may have placed a hand on Benjamin's upper back, near his neck, but never applied any pressure to Benjamin's neck. Once handcuffed behind his back, Benjamin *got up unassisted* and Alcantar placed him into the rear of his and Ortiz' patrol car that was parked in the street near the house. Both Benjamin and Miguel were placed into the same patrol car.

Officer Alcantar has stated that even though he was within a few feet of Ortiz, he did not see what transpired between Miguel Ortega and Officer Ortiz – or any other officers.

Officer Alcantar further stated that after telling the rest of the group to move their illegally parked cars, they sat in their patrol car and spoke with Miguel and Benjamin. They explained that they were only trying to keep order, and were concerned with public safety. They didn't want to ruin the holiday for anyone, so they let the plaintiffs go.

Officer Alcantar stated that he saw no evidence that either plaintiff had been drinking, and he states that neither plaintiff ever threatened him.

Officer Alcantar further testified that he completed a "field contact" report and remembered placing it in the visor of the police unit but did not know how it did not get logged into the department as required. He has admitted that no such report appears to exist. He claims that he turned it in with other reports, but (as stated above) the records provided by the City of Oakland or the OPD show that neither he nor Ortiz completed any "field contract" reports for that date, notwithstanding that they had detained "many people".

Page 17 of 21

**Specific Obvious Violations of Policy, Procedure and the Negotiated Settlement Agreement:**

**Use of Force** (See Negotiated Settlement Agreement, Sections 5 and 6C):

Per the settlement agreement, within 390 days of the effective date of the settlement agreement (i.e., well before the August 10, 2004 incident), the OPD was required to adopt policies concerning the reporting of the use of force. These policies were to include, but were not limited to, requiring that the on site supervisor prepare a K-4 use of force report which included not only obtaining statements from the officers, but statements from witnesses. The supervisor was also required to separate and interview all officers at the scene. Negotiated Settlement Agreement, Sections V (A) and (B).

Per Section VI. ©, use of force reports were also required to include witness information, including the name, address and telephone numbers of civilian witnesses. If witnesses were not available or unwilling to cooperate, this was also to be included in the report. The reporting requirements also included that all OPD witnesses to be interviewed.

In addition, Section V(B)(1)(m) required use of force investigations by supervisors to include documentation of physical evidence and photographs.

As noted, no supervisor was even called to the scene of the subject incident, and therefore no supervisory report that met the requirements for K-4 reports as set forth in the Negotiated Settlement Agreement occurred.

Moreover, no supervisor or officer took any statement from the Plaintiffs, nor did they make any attempt at all to locate independent witnesses to the incident as required by the Negotiated Settlement Agreement. Neither officer or supervisor made any attempt to document physical evidence or take photographs of any alleged injuries that occurred.

In fact, as shown more fully below, not only were Acting Sgt. Cardoza and Officer Rojas not separated by Sgt. Kelly, but they spoke about the incident before writing their reports and wrote their reports in the same room and at the same time at the Eastmont Substation following the incident.

**Oakland Police Department Manual Violations:**

Section 314.07 of the City of Oakland Police Departments Manual of Rules states:

### CONDUCT TOWARD OTHERS DEMEANOR:

"Members and employees shall perform their duties attentively and courteously, avoiding rude, threatening, harsh, insulting, profane, insolent or demeaning language, and they shall maintain a professional bearing regardless of provocation to do otherwise. Upon request, they shall supply their names and serial numbers to any citizen who seeks such identification. They shall attend to requests from the public quickly and accurately, avoiding unnecessary referral to other parts of the Department. All persons, except the very youthful and those known personally by the member or employee, shall at all times be addressed by their appropriate title followed by their last name. Members and employees shall treat superior officers, subordinates and peers with respect. They shall be courteous and civil at all times in their relationships with one another and shall avoid any form of discrimination or racism. When on duty and in the presence of others, superior officers shall be referred to by rank title. Orders from superior to subordinate members and employees shall be given in a civil manner, without the use of profane or derogatory language."

Section 314.39 of the Manual of Rules states:

### PERFORMANCE OF DUTY:

"All members and employees shall perform their duties as required or directed by law, Departmental rule, policy or order, or by order of a superior officer. *Each member and employee is accountable for the exercise of delegated authority, and shall not conceal, divert or mitigate their true culpability.* All lawful duties required by competent authority shall be performed promptly as directed, notwithstanding the general assignment of duties and responsibilities."

In my opinion, there is substantial evidence in this case that supports the allegations that Officers Alcantar and Ortiz fabricated their account in an attempt to conceal the excessive force and other acts alleged to have occurred. Such conduct would violate Rule 314.9.

Section 314.48 of the Manual of Rules states:

REPORTING VIOLATIONS OF LAWS, ORDINANCES, RULES OR ORDERS:

"Members and employees knowing of other members or employees violating laws, ordinances, rules of the Department, or disobeying orders shall, as soon as is practical, but in no cases more than 24 hours, report the same, orally or in writing to the Chief of Police through the chain of command. If the member or employee believes the information is of such gravity that it must be brought to the immediate personal attention of the Chief of Police, the chain of command may be bypassed."

In the event that Officers Alcantar and Ortiz were aware that they were violating any of the aforementioned policies, they were required to orally report the same to the Chief of Police through the chain of command within 24 hours. The failure to do so, constituted a separate violation of Rule 314.48.

Section 370.27 of the Manual of Rules states:

USE OF PHYSICAL FORCE:

"The use of physical force shall be restricted to circumstances specified by Departmental policies and law. Malicious assaults or batteries committed by members or employees constitute gross misconduct."

Officer Alcantar and Ortiz' use of force on Benjamin and Miguel Ortega was not objectively reasonable and, as a result, was contrary to law. Therefore, their use of excessive force violated Section 370.27 of the OPD Manual of Rules.

Section 370.45 of the Manual of Rules states:

**REPORTS AND BOOKINGS:**

"No member or employee shall knowingly falsify any official report or enter or cause to be entered any inaccurate, false or improper information in the records of the Department."

The subject officers violated Rule Section 370.45 of the OPD Manual of Rules if any of their reports, statements to the City of Oakland Civilian Review Board and/or OPD were inaccurate, false or improper.

Please keep in mind that further reports from me may be necessary as additional depositions are taken and other reports are submitted. This report represents my preliminary findings in this case. As more information becomes available, I will probably need to submit subsequent reports. I look forward to reviewing all further data you are able to obtain as you move forward with this case. Please feel free to contact me if any further clarification of these points is required.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified since January 2000 as an expert.

Pursuant to 28 USC § 1746, I declare that the foregoing is true and correct.

Executed on June 29, 2008 at Santee, California.

Roger A. Clark