# EXHIBIT I

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4     MIGUEL ORTEGA, BENJAMIN ORTEGA,

      a minor, by and through his Guardian

5     Ad Litem, ANA ROSA ORTEGA,

6                         Plaintiffs,

7     -vs-                              CASE NO. C07-02659 JCS

8     CITY OF OAKLAND, OAKLAND POLICE

      DEPARTMENT, WAYNE TUCKER, in his

9     capacity as the Police Chief of the

      City of Oakland, RAMON J. ALCANTAR,

10    individually and in his capacity

      as a Police Officer for the City

11    of Oakland, BERNARD ORTIZ,

      individually and in his capacity

12    as a Police Officer for the City of

      Oakland, DOES 1 through 200,

13

                          Defendants.

14    _____/

15

16            DEPOSITION OF OFFICER RAMON ALCANTAR

17                     JANUARY 16, 2008

18

         REPORTER'S TRANSCRIPT OF PROCEEDINGS

19          BY CHERYL L. CHAUDOIR, CSR NO. 9501

20

21    _____

22           CLARK REPORTING & VIDEOCONFERENCING

23            2161 SHATTUCK AVENUE, SUITE 201

24                 BERKELEY, CA   94704

25                    (510) 486-0700

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 2

```
 1                    A P P E A R A N C E S:
 2
 3     For the Plaintiffs:   LAW OFFICES OF STEVEN R. JACOBSEN
                             BY:   STEVEN R. JACOBSEN
 4                                 ATTORNEY AT LAW
                             901 CLAY STREET
 5                           OAKLAND, CA  94607
                             (510) 465-1500/FAX:  465-1501
 6                           srj@theaccidentallawyer.com
 7     For the Defendants:   CITY OF OAKLAND
                             BY:   CHARLES VOSE
 8                                 DEPUTY CITY ATTORNEY
                             1 FRANK H. OGAWA PLAZA, 6TH FLOOR
 9                           OAKLAND, CA  94612
                             (510) 238-2961/FAX:  238-6500
10                           cevose@oaklandcityattorney.org
11
                             BURNHAM BROWN
12                           BY:   JOHN J. VERBER
                                   ATTORNEY AT LAW
13                           1901 HARRISON STREET, 11TH FLOOR
                             OAKLAND, CA  94612
14                           (510) 444-6800/FAX:  835-6666
                             jverber@burnhambrown.com
15                           For:  Officer Alcantar
16     Also present:  Miguel Ortega, Benjamin Ortega,
                      Ana Rosa Ortega
17
18                           --oOo--
19
20
21
22
23
24
25
```

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

1              INDEX OF EXAMINATION

2                                                    PAGE

3        Examination by:

4            MR. JACOBSEN                              4

5

                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 4

```
 1              BE IT REMEMBERED, that pursuant to Notice of
 2    Taking Deposition, and on Wednesday, January 16, 2008,
 3    commencing at the hour of 10:30 a.m., at the LAW OFFICES
 4    OF STEVEN R. JACOBSEN, 901 Clay Street, Oakland,
 5    California, before me, Cheryl L. Chaudoir, a duly
 6    qualified Certified Shorthand Reporter, License No. 9501
 7    in and for the State of California, there personally
 8    appeared
 9                    OFFICER RAMON ALCANTAR,
10    called as a witness by the Plaintiffs, who, being first
11    duly sworn by me to tell the truth under penalty of
12    perjury under the laws of the State of California, was
13    thereupon examined and testified as is hereinafter set
14    forth.
15                         --oOo--
16                    EXAMINATION BY
17            MR. JACOBSEN:  Q.  Will you state your full
18    name for the record, please?
19        A.    Ramon Alcantar.
20        Q.    And you're an officer with the Oakland Police
21    Department?
22        A.    Yes.
23        Q.    What's your rank?
24        A.    Police officer.
25        Q.    On May 7th, 2006, what was your rank?
```

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

1    walked to the sidewalk.

2        Q.    Where had he come from?

3        A.    When we observed him -- or I can only say for

4    myself, when I observed him he was standing in the

5    middle of the street.

6        Q.    So you don't know if when he walked to the

7    sidewalk he completed crossing the street or if he

8    returned to a place from which he had come?

9        A.    Correct, I do not know.

10       Q.    Was your car moving at the time you observed

11   him?

12       A.    It was.

13       Q.    Did you have to stop?

14       A.    Yes.

15       Q.    How long did you remain stopped?

16       A.    Not very long.  A few seconds.

17       Q.    Was there any exchange of words or anything

18   between either of you in the car and Benjamin?

19       A.    As we passed him, yes.

20       Q.    What was the exchange?

21       A.    We told him, "Stay out of the street."

22       Q.    Who told him?

23       A.    I believe I did.

24       Q.    And so you spoke to him through the passenger

25   window?

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 24

```
 1      A.   Yes.

 2      Q.   What was the weather like that day?

 3      A.   I don't recall.

 4      Q.   Were your windows down?

 5      A.   Yes.

 6      Q.   What were the exact words you used?

 7      A.   "Get out of the street."

 8      Q.   Okay.  And at that point, was he out of the

 9 street?

10      A.   Yes.

11      Q.   And did you see him do anything else after

12 that?

13      A.   We just kept driving.

14      Q.   Okay.  Did you see anyone else that was

15 involved in the incident other than Benjamin at

16 that time?

17      A.   At that specific location?

18      Q.   Yes.

19      A.   There was just a large group so, no, just

20 concentrating on Benjamin waving the flag.

21      Q.   How many seconds did you see him stopped in the

22 street?

23      A.   I don't know.  Approximately five to ten

24 seconds.

25      Q.   Where did you go from there?
```

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 36

1    A.    That time, no.

2        Q.    Okay.  Was there any traffic that was being

3    held up that time?

4    A.    There was a lot of traffic.  It just slowed.

5    It slowed down from when I saw him, and then he got out

6    of the street, and then it picked back up.

7        Q.    Didn't actually stop?

8    A.    That I recall, no, it didn't stop.  It just

9    slowed down.

10        Q.    Okay.  Was that the last time you saw either

11    Benjamin or Miguel Ortega that night?

12    A.    No.

13        Q.    How long between that contact and the next time

14    that you saw either Benjamin or Miguel Ortega?

15    A.    I don't recall.

16        Q.    Can you give me an estimate?

17    A.    No.

18        Q.    Describe for me the circumstances under which

19    you came into contact with them the next time.

20    A.    The third time we came up to them and realized

21    there was going to be a problem.  We drove by the

22    corner, told them to get off -- I think we told them to

23    get off the corner or get out of the street.  It was the

24    third time.  Again, Benjamin was in the middle of the

25    street waving the flag, so Bernard parked our vehicle on

CLARK REPORTING (510) 486-0700

Page 37

```
 1      the southeast corner parking lot.

 2          Q.    When you came upon Benjamin the third time,

 3      where was he?

 4          A.    He was in the middle of the street waving a

 5      flag.

 6          Q.    In the eastbound lanes or the westbound lanes

 7      or between them?

 8          A.    Eastbound lanes.

 9          Q.    How long did you observe him waving the flag in

10      the eastbound lanes?

11          A.    Again, seconds, because you could see him from

12      a distance because you could see the flag.

13          Q.    Do you remember now what kind of flag it was?

14          A.    No.

15          Q.    Okay.  So he was waving a flag for seconds.

16      Was he holding up any traffic this third time?

17          A.    Yes.

18          Q.    How many cars?

19          A.    I don't recall.

20          Q.    Was it more than one?

21          A.    Yes.

22          Q.    Can you give me your best estimate?

23          A.    No.

24          Q.    Did you have to stop as a result of any traffic

25      being held up?
```

DEPOSITION OF OFFICER RAMON ALCANTAR

CLARK REPORTING (510) 486-0700

Page 40

1   because it's likely to continue.  This is the reason why

2   we're out here.  We got to stop the problem."

3        Q.   Okay.

4        A.   So, meanwhile, that's when they started yelling

5   and actually started walking off, and we parked.

6        Q.   Okay.  So this group of people started walking

7   off?

8        A.   Correct.

9        Q.   How big of a group was it?

10       A.   Fifteen, 20 people.

11       Q.   Can you describe the group for me?

12       A.   No.  I don't recall.

13       Q.   Were they all blonde, Swedish women?

14       A.   I'm pretty sure they were not.

15       Q.   How would you characterize the group?

16       A.   If I don't recall, I don't have to make

17   something up, so...

18       Q.   So you don't recall anything about the group?

19       A.   No.  Just a large group.

20       Q.   Did you count them?

21       A.   No.  Estimate.

22       Q.   Okay.  Were they all male?

23       A.   I don't recall.

24       Q.   Were they all Hispanic?

25       A.   I don't recall.

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 45

    1       A.    Eastbound.

    2       Q.    And the group was on the south corner?

    3       A.    Southwest corner.

    4       Q.    Southwest corner?

    5       A.    Correct.

    6       Q.    Okay.  So the group didn't really have a good

    7    view of Officer Ortiz at that point, right?

    8            MR. VOSE:  I'm going to object.  I think it

    9    calls for speculation on his part.

   10            MR. VERBER:  Join.

   11            THE DEPONENT:  You want me to answer it?

   12            MR. VERBER:  You can answer, if you can.

   13            MR. VOSE:  If you can.

   14            THE DEPONENT:  Well, I can determine if

   15    someone is thin, medium or heavy set sitting in a

   16    driver's seat.  So if you want me to give my opinion --

   17    or their opinion, yes.

   18       Q.    (By Mr. Jacobsen)  Okay.  Once you parked the

   19    car and got out, what happened next?

   20       A.    I started walking over toward -- they began

   21    walking westbound -- I'm sorry.  They began walking

   22    southbound on the west sidewalk.  I started walking

   23    directly towards Benjamin and told him to come here.

   24       Q.    Do you know whether or not Benjamin heard you?

   25       A.    He was looking right at me.  You can say yes.

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 50

1      Q.    On the sidewalk or in the yard?

2      A.    Half the group was in the yard -- only a few

3   went in the yard -- well, before I got there, only

4   Benjamin went in the yard.

5      Q.    And then you crossed the street?

6      A.    I told Benjamin to come here again, and that's

7   when he started running.

8      Q.    Where was he when he started running?

9      A.    On the west sidewalk.

10     Q.    How far was he from the yard where he entered?

11     A.    Forty feet.

12     Q.    Okay.  And he started running to the yard?

13     A.    Yes.

14     Q.    Okay.  Did he hear you the second time you said

15   "Come here"?

16           MR. VERBER:  Objection.  Calls for

17   speculation.

18           You can answer.

19           THE DEPONENT:  Yes.  I was looking right at

20   him, and I directed -- I was walking right to him, and

21   by that time I was in the middle of the street.

22     Q.    (By Mr. Jacobsen)  Was there still yelling

23   going on at that point?

24     A.    I don't recall.

25     Q.    Do you know whether or not Benjamin knew you

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475e-a52d-e1a7697e155D

Page 51

1    were referring to him?

2         A.    By the situation, by our positioning, me

3    looking right at him, pointing at him telling him to

4    come here, and then the only person was he that I saw

5    running, he knew I was talking directly to him.

6         Q.    And he ran into the yard?

7         A.    Yes.

8         Q.    Is this a fenced yard?

9         A.    Yes.

10        Q.    What kind of fence?

11        A.    I don't recall.

12        Q.    How high was the fence?

13        A.    Three feet.  Estimating three feet; three, four

14   feet.

15        Q.    It's a low fence, then?

16        A.    It's a low fence, yes.

17        Q.    Okay.  Is there a gate on the fence?

18        A.    I believe.  I don't recall.

19        Q.    So you crossed the street.  Did you encounter

20   any of the other people who had been in the group?

21        A.    There was already a group at that address, and

22   another group, I guess you could say.

23        Q.    So the group that had been on the corner joined

24   the group that was already at the address?

25        A.    Right, but I got there before that first group

Page 52

 1    who were on the corner.

 2         Q.   What did you do when you arrived on the west

 3    sidewalk of the street?

 4         A.   I followed Benjamin into his yard -- into that

 5    yard, specific yard.

 6         Q.   Did you stop before entering the yard?

 7         A.   No.

 8         Q.   Did you have an understanding at that time that

 9    the yard was private property?

10         A.   Yes.

11         Q.   What was your basis for entering private

12    property at that point?

13         A.   Benjamin was under arrest.

14         Q.   This was hot pursuit?

15         A.   I guess you could say -- I guess you could say

16    hot pursuit.

17         Q.   Had you informed Benjamin prior to entering the

18    yard that he was under arrest?

19         A.   No.

20         Q.   Where was Officer Ortiz at this point?

21         A.   Specifically I don't know because I was going

22    forward.  And he was behind me.  So he wasn't in front

23    of me, he was behind me somewhere.

24         Q.   Okay.  So you entered the yard.  What did you

25    do next?

Page 53

```
 1       A.    Attempted to grab Benjamin, and then he -- what

 2  I call a juke move, like in football.  I side stepped,

 3  and as he side stepped, I grabbed him and we both went

 4  down to the ground.

 5       Q.    You grabbed him with your right hand?

 6       A.    I don't remember which arm, I just remember he

 7  side stepped.  I don't remember which direction.  As he

 8  side stepped, I grabbed his shirt, arm; I don't know.  I

 9  grabbed some part of him.

10       Q.    And he went down to the ground?

11       A.    Correct.

12       Q.    What did you land on?

13       A.    I think it's dirt; partially grass, mainly

14  dirt.

15       Q.    What part of your body hit the ground?

16       A.    My knees, my stomach.

17       Q.    Okay.  And Benjamin went down to the ground,

18  too?

19       A.    Yes.

20       Q.    And were you side by side?

21       A.    Yes.

22       Q.    What did you do next?

23       A.    I jumped on his back.

24       Q.    So he was face down?

25       A.    He was face down.
```

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 55

1    closer down to his legs, yes.

2        Q.    Did you ever touch his neck?

3        A.    I might have as I was holding him down.  How I

4    do it is when I have someone on the ground, I push one

5    hand on top of their back so they don't raise up.  So

6    it's on the upper back, could have been close to his

7    neck.

8        Q.    Did you ever put any part of your hands around

9    the side or the front of his neck?

10       A.    Not the front of his neck.  He was face down --

11   well, he was turned to the side, so could have been on

12   his neck.

13       Q.    How long did you have your hands up in the area

14   of his neck?

15       A.    It only takes me -- gosh, what? -- a second and

16   a half to take my handcuffs out, then I came off and

17   then I used two hands to handcuff.  So two seconds, at

18   the most.

19       Q.    Did you apply any pressure to Benjamin's neck

20   during that time?

21       A.    My weight was on it.

22       Q.    Other than your weight?

23       A.    No.

24       Q.    Did you ever squeeze his neck with your fingers?

25       A.    No.

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 65

1      A.    They all went inside the residence within the

2    gate with their alcohol, they picked up the alcohol

3    bottles that were just laying on the sidewalk, and they

4    began moving their vehicles that were illegally parked.

5      Q.    So they complied with your request?

6      A.    Yes.

7      Q.    Did you ever see any indication that either

8    Miguel or Benjamin Ortega had been drinking?

9      A.    No.

10     Q.    All right.  And what did you do next?

11     A.    Then I went back to the patrol car and spoke

12   with Benjamin.

13     Q.    By this time Miguel was also in the car?

14     A.    Yes.

15     Q.    So you spoke with both of them?

16     A.    Yes.

17     Q.    Was anyone else in the patrol car at that time?

18     A.    I don't recall.

19     Q.    Okay.  So, as far as you remember, it was

20   just -- you were the only officer speaking with both

21   Miguel and Benjamin Ortega?

22     A.    There was at least ten officers, maybe even 12

23   officers around -- I could say there was even more right

24   by the vehicle, so whether I was the only one that spoke

25   to them, I don't know because I was talking to the group

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

Page 68

 1   conversation.  I don't know who it was.

 2        Q.   Did you ever mention immigration during the

 3   course of your conversation?

 4        A.   I did not.  Gangs was there, and they were with

 5   ICE, they were with immigration.  I believe I heard

 6   immigration, "Do we need immigration?"  Something to

 7   that fact.  I did hear immigration, but that's because

 8   immigration was right there with us.

 9        Q.   I'm asking did you mention immigration?

10        A.   Oh, no.

11        Q.   Did you mention or question anyone's

12   immigration status?

13        A.   I don't recall.

14        Q.   At some point, did you have a conversation with

15   anyone else from the group?

16        A.   A conversation?

17        Q.   Yes.

18        A.   Yes.

19        Q.   And what was the conversation?

20        A.   They wanted my name, my badge number, and every

21   other officer's name and badge number.

22        Q.   And do you know who the person was that was

23   asking you this?

24        A.   No.

25        Q.   Do you have a name or address of that person?

CLARK REPORTING (510) 486-0700

```
 1        A.    We were at our -- within our -- yeah, just

 2   walked right back to our vehicle.

 3        Q.    So you opened the doors, let them out,

 4   unhandcuffed them, and they left?

 5        A.    Yes, they left back to that address.

 6        Q.    And you got back in the car?

 7        A.    Correct.

 8        Q.    So that was the car, your vehicle, that they

 9   had been detained in?

10        A.    I can't say specifically.  Walked back to our

11   vehicle that we had driven there in.

12        Q.    And you don't know if that was your vehicle

13   that they had been detained in or not?

14        A.    Correct.  When several officers respond to a

15   scene, and when you place someone in a vehicle, a lot of

16   times it doesn't matter -- if they were just being

17   detained or arrested at that time, doesn't matter what

18   vehicle they are in.

19        Q.    Okay.  And you placed it in the visor of the

20   vehicle that you had been patrolling in that day?

21        A.    Yes.

22        Q.    The report, that is?

23        A.    Yes.

24        Q.    And what happened to the report after that?

25        A.    That's what we can't determine.  I guess the
```

DEPOSITION OF OFFICER RAMON ALCANTAR

CLARK REPORTING (510) 486-0700

Page 73

1   department said they could not find the FC, and having

2   dealt with FCs and a lot of the paperwork -- as a police

3   officer, you have a lot of paperwork.  A lot of times it

4   gets turned in several days later, gets left in the

5   visor.  We are not the only people who use that vehicle,

6   so it's unknown what happened to that report.

7        Q.   Were you disciplined for failure to turn in a

8   report?

9        A.   No.

10       Q.   Was there an investigation done as a result of

11  your failure to turn in a report?

12       A.   Yes.

13       Q.   What was the result of that?

14       A.   No discipline.

15       Q.   Was there a finding made?

16       A.   I have been off for a year, so I don't know.  I

17  believe the case was closed.  And I have not been told I

18  was disciplined or anything, so I actually do not know.

19       Q.   Did you ever notify a supervisor of the use of

20  force in this incident?

21       A.   Not that I recall because, in my opinion, there

22  was no use of force.

23       Q.   Isn't handcuffing someone and taking them to a

24  patrol car a use of force?

25       A.   No.  It's a procedure.

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

1       Q.    Did you see any signs of physical injury?

2       A.    No.

3       Q.    Did you examine his neck?

4       A.    I don't recall.

5       Q.    Did anyone of the group of people that had been

6    on the corner, including the two Ortega brothers, ever

7    threaten any police officer, to your knowledge?

8       A.    Not that I recall.

9       Q.    Did the patrol vehicle that you were driving in

10   that day have a video camera?

11      A.    No.

12      Q.    Did any of the vehicles that responded to the

13   scene that day have a video camera?

14      A.    No.

15      Q.    Did you ever call a supervisor to the scene of

16   the incident?

17      A.    No.

18      Q.    Why not?

19      A.    There was no reason to.

20      Q.    Was there a regulation that required you to do

21   that?

22      A.    On certain situations.  Not on this one.

23      Q.    Under what situations do the regulations

24   require you to call a supervisor to the scene?  And,

25   again, I'm talking about regulations in effect on May

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

Page 87

1                    D E C L A R A T I O N

2

3

4          I, OFFICER RAMON ALCANTAR, do hereby declare

5     under penalty of perjury that I have read the foregoing

6     transcript of my deposition; that I have made such

7     corrections as noted herein, in ink, initialed by me, or

8     attached hereto; that my testimony as contained herein

9     as corrected is true and correct.

10               EXECUTED this ____ day of _____,

11     20__, at _____, _____.

12                        (City)              (State)

13

14

15

16

17

                            _____

                            OFFICER RAMON ALCANTAR

18

19

20

21

22

23

24

25

CLARK REPORTING (510) 486-0700

Page 88

1

2              CLARK REPORTING & VIDEOCONFERENCING
                2161 SHATTUCK AVENUE, SUITE 201
                    BERKELEY, CA  94704
3                       (510) 486-0700
4
       January 29, 2008                    COPY
5
6      Ramon Alcantar
       c/o John J. Verber, Esquire
7      BURNHAM BROWN
       1901 Harrison Street, 11th Floor
8      Oakland, CA  94612
9      Dear Deponent,
10     Pursuant to the California Code of Civil Procedure,
       please be advised that the original transcript of your
11     deposition taken on January 16, 2008, is ready for your
       review and corrections, if necessary.  The original will
12     be held in our office for a period of 35 days, at which
       time it will be forwarded to the noticing attorney.
13

       If your attorney has ordered a copy, please review the
14     transcript.  Reading, correcting and signing of
       depositions is an option and is not mandatory.  If
15     changes are necessary, please do so on the correction
       sheet provided.
16

       If your attorney has not ordered a copy of the
17     transcript, you may call to make an appointment to review
       the original in our office.
18

       Thank you,
19
20
       Clark Reporting & Videoconferencing
21
22
23
24
25

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-e1a7697e1550

CLARK REPORTING (510) 486-0700

Page 89

1

2                  R E P O R T E R ' S    C E R T I F I C A T E

3

4              I, the undersigned, duly qualified Certified

5      Shorthand Reporter in and for the State of California,

6      do hereby certify:

7              That the witness in the foregoing deposition

8      named, was present at the time and place therein

9      specified;

10             That the said proceeding was taken before me as

11     a Certified Shorthand Reporter at the said time and

12     place and was taken down in shorthand writing by me;

13             That I am a Certified Shorthand Reporter of the

14     State of California, that the said proceeding was

15     thereafter transcribed by means of computer-aided

16     transcription, and that the foregoing transcript

17     constitutes a full, true and correct report of the

18     proceedings which then took place;

19             That I am a disinterested person to the said

20     action.

21             IN WITNESS WHEREOF, I have hereunto set my hand

22     this 28th day of January, 2008.

23

24                                 _Cheryl Chaudoir_____

                                   CHERYL CHAUDOIR, CSR #9501

25

DEPOSITION OF OFFICER RAMON ALCANTAR

29b8414a-e7b4-475a-a52d-o1a7697e1550