STEVEN R. JACOBSEN, BAR NO. 95246
srj@theaccidentallawyer.com
BRENDA D. POSADA, BAR NO. 152480
bdp@theaccidentallawyer.com
LAW OFFICES OF STEVEN R. JACOBSEN
901 CLAY STREET
OAKLAND, CALIFORNIA 94607
TELEPHONE: (510) 465-1500

ATTORNEYS FOR PLAINTIFFS
MIGUEL ORTEGA AND BENJAMIN ORTEGA

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ORTEGA, and BENJAMIN ORTEGA, <br><br> Plaintiffs <br><br> vs. <br><br> CITY OF OAKLAND, et al., <br><br> Defendants. | Case No.: C 07-02659 JCS (ADR) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT** <br><br> Date:      September 19, 2008 <br> Time:      9:30 a.m. <br> Location: Courtroom A, 15th Floor |

## I.

## STATEMENT OF THE ISSUES

Defendants bring their Partial Summary Judgment seeking dismissal of eight causes of action as against Ortiz, the City and/or Tucker. Various depositions have been taken in this case, and the facts regarding the sequence of events on the date of the incident largely remain disputed. Although the Ninth cause of action involves Negligent Selection, Training, Retention, Supervision, Investigation, and Discipline is also not a subject of this motion but instead the subject of another motion brought by defendants, i.e. Motion to Strike. In effect, including the Motion to Strike, defendants Tucker, City and Ortiz seek complete dismissal of all claims alleged against them. The claims against Alcantar are not the subject of the present partial summary judgment motion.

## II.
## STATEMENT OF THE FACTS

This claim arises from an incident that occurred on May 7, 2006 on the private property of plaintiffs' family members, located at 1387 – 62nd Avenue, Oakland.  The incident began a few yards away at the intersection of 62nd Avenue and International Blvd. (formerly East 14th Street).  The City of Oakland held a "Cinco de Mayo" festival along parts of International Blvd., and many people of Mexican ancestry were celebrating the holiday.  The police department was out in force to control crowds and to "keep the peace".  The police involved were Defendant Officer Bernard Ortiz who drove the car and defendant Officer Ramon Alcantar who was on the passenger side.  These are the two officers that detained both Benjamin and Miguel Ortega.  See ¶ 6 of Declaration of Bernard Ortiz, Doc#82, at 2:11-14.

Plaintiffs intended to celebrate the holiday at their cousin's home at 1387 – 62nd Avenue.  They arrived by car.  Benjamin Ortega had brought a Mexican flag from another cousin's home.  Shortly thereafter, a neighborhood friend appeared and asked Benjamin (age 15 at the time) to accompany him to McDonald's, less than one block away on the opposite side of International Blvd.  Benjamin agreed.

Police first approached Benjamin Ortega while crossing International Blvd. See Deposition of Eduardo Ortega, hereinafter referred to as "Eduardo Depo", relevant excerpts attached as Exhibit A to the Declaration of Brenda D. Posada, hereinafter referred to as "Posada Decl", at 10:20-24; 12:10-13; Also see JSUF 26. Across the street from Benjamin on 62nd Street and International stood Eduardo Ortega, Preciado, Miguel Ortega, Cesar, Jaime, and Israel. All of them stand on this corner every year during the parade to watch the nice sports cars cruising around. Eduardo Depo at 11:13-25; 12:17-23; 13:15-21; 14:1. The Ortega brothers' cousin, Javier Israel Negrete, lives right there on 62nd and International and could see Benjamin crossing the street. See Eduardo Depo at 14:4-10. The light was green for Benjamin. Miguel Depo 77:17-20. While Benjamin was still crossing International Blvd, Eduardo Ortega saw a police car pull

-2-

up to Benjamin who at the time was carrying the Mexican flag. This is consistent with the testimony of Ortiz who testified that he approached Benjamin while he was crossing down 62nd and was still in "middle of the road". Deposition of Bernard Ortiz hereinafter referred to as "Ortiz Depo" 28:24-25; 29:1-7, attached as Exhibit E to the Posada Decl. See the Deposition of Benjamin Ortega taken January 17, 2008 attached as Exhibit G to the Posada Decl, hereinafter referred to as "Benjamin Depo" at 23:21-25.

Eduardo heard the officer say to Benjamin, "Move up—you better move up faster before I get the flag and shove it up your ass." Eduardo Depo 17:11-25;18:1-3; Benjamin Depo 24:1-16. Preciado also observed the officer say something to Benjamin Ortega while he has walking halfway across the street, and heard the officer say, "Put that flag away now, before we shove it up your ass." See Deposition of Genesis Preciado hereinafter referred to as "Preciado Depo" 37:19-25; 40:7-17, attached to the Posada Decl as Exhibit C. In fact, at his deposition Ortiz was unable to deny that Alcantar said this to Benjamin. Ortiz simply stated at his deposition, "I personally didn't say anything..I don't know about Alcantar." Ortiz Depo 31:14-18. Ortiz testified that he was "*trying* to tell the individual with the flag to come to us or stop…" Ortiz Depo 33:4-8. Ortiz statement falls short; "trying" to communicate is not the same as giving the instruction. But Ortiz did not know if Benjamin knew that. Ortiz Depo 44:12-25; 45:1-5. Ortiz simply admitted he did not know what was said. "You know, I can't remember the exact words. It was a long time ago." Ortiz Depo 33:9-11. But Alcantar recalls it differently, "We told him, 'Stay out of the street.'" Alcantar Depo 23:17-25; 24:1.

So Benjamin was doing what he was told by continuing to walk across the street. Alcantar also testifies that he sees Benjamin two more times but Ortiz does not remember two other times just the one time. The third time he saw Benjamin, Alcantar tells him "get off the corner or get out of the street". Alcantar Depo 36:18-25; 37:1-5. Again even by his own story, Alcantar is only telling Benjamin to get out of the street; Alcantar's testimony contradicts Ortiz' version wherein Ortiz is asking Benjamin to stop so he

can cite him with an infraction. Eduardo Ortega and Genesis Preciado observed that at that time Benjamin was crossing the street, he did not respond back to the officer who made the comment. Instead, Benjamin appeared to follow Alcantar's instructions and continued walking to the corner, the other side of 62nd and International where Eduardo and Preciado were standing. Eduardo Depo 19:11-22; Preciado Depo 40:22-25; 41:1-4; 41:13-14. He was crossing on a green light and between the two lines. Benjamin Depo 27:3-18; 98:7-9.

At this point, Eduardo heard Miguel Ortega say to the officer, "Don't talk to my brother like that." After a few minutes of talking, not arguing, back and forth, the officer said "Go back to the house, whatever. Go—go home" Then they all walked back to the cousin's house which was less than one minute away. Eduardo Depo 20:1-17; 21:6-14; 21:15-20; Miguel Depo 27:10-24. Everybody walked back to their cousin's house, and the police car followed them slowly. Eduardo Depo 22:5-25; 23:1; Preciado Depo 47:7-9; Miguel Depo 81:10-14. Even Alcantar admits that when he told the group of some 15-20 people started **walking off**. Alcantar Depo 40:6-10; 45:18-24. Ortiz has them all running. Alcantar said only Benjamin was running. Alcantar Depo 51:2-5.

Once they arrived at the house, Eduardo stayed in the porch. Eduardo observed Miguel enter the house and Benjamin stay in the porch along with everybody. Eduardo Depo 23:2-25. Eduardo observed and heard everyone chilling and talking in the front yard when a big black Ford Excursion and a lot of police cars arrived, including the officers that talked to Benjamin at the corner. Eduardo Depo at 24:22-25; 25:11-25; 26:1-12. Eduardo observed and heard the officers speak to Miguel and Benjamin. Then Benjamin said to one of the officers, "at least my mom take care of me," or "at least my mom care about us" and at that time Alcantar became so mad, entered the front yard and grabbed Benjamin Ortega. Eduardo Depo 26:13-25; 27:1; 28:15-17; Preciado Depo 57:2-9.

Preciado characterized the attack on Benjamin by Alcantar as brutal. Preciado Depo 57:10-12.
Standing only a couple of feet away, Eduardo observed the Hispanic officer grab Benjamin in the neck
area, hit him there with his elbow, twist his arm behind his back, then put him "boom" to the floor.
Benjamin landed flat on his belly with the officer on top of him. Eduardo Depo 28:15-21; 29:21-23; 30:20-
25; 31:1-12; 31:25; 32:1-4; 33:1-7; 60:23-25; 61:1-7. Preciado also witnessed Alcantar hit Benjamin with his
elbow on the right side of his neck. Preciado at 61:6-8. Preciado was standing only two feet away and could
also clearly hear what Alcantar was saying to Benjamin. Preciado Depo at 83:20-25; 84:1-4. Benjamin
remembers that it all happened quickly. Alcantar came into the yard "grabbed [his] neck and then he
punched [him]; he choked [him]." Benjamin Depo 39:12-25; 40-41.

Alcantar then testifies that he immediately entered the yard to arrest Benjamin because he was in
"hot pursuit" of him. Alcantar Depo 52:2-19. Alcantar says that he handcuffed Benjamin and they slipped
together to the floor. Alcantar Depo 53:1-25. Alcantar denies putting his hand or fingers to the front of
Benjamin's neck. Alcantar Depo 55:8-25.

Preciado observed once Alcantar had his knee on Benjamin's back he said to Benjamin, "Say sorry.
You want me to break your hand, little boy? Say sorry." At this point, Benjamin said, "All right. I'm sorry."
Then Alcantar said "Say sorry again." Benjamin started crying because it was just a little snap and his wrist
would break so he said again, "Sorry. All right. I'm sorry." But Alcantar continued to torture Benjamin and
says, "Say sorry, sir." And Benjamin replied, "Sorry, sir." At that point he released the painful grip was
handcuffed. Preciado Depo 59:1-19; Benjamin Depo 47:19-25; 81:1-5. Benjamin also recalls hitting his lips
on the ground. Benjamin Depo 42:1-11. Ortiz could not say one way or the other the extent of Alcantar
physical contact with Benjamin. Ortiz Depo 47:3-12.

Standing a couple of feet away, while Alcantar was on top of Benjamin, he placed him in handcuffs
on Benjamin while Benjamin was screaming "Ahhh". Eduardo Depo 33:8-17; 33:21-24. Benjamin was

-5-

screaming in pain. See Declaration of Eduardo Ortega attached as Exhibit B to Posada Decl, hereinafter referred to as "Eduardo Decl" at p.2:17-18. The officer had his knee in Benjamin's back while handcuffing him. Eduardo Decl 2:17; Benjamin Depo 43:6-12. Eduardo observed that although Miguel had been inside the house the entire time when Benjamin was grabbed and Benjamin was screaming "Ahhh", Miguel opened the screen door and said, "leave my brother alone". Miguel recalls that after Alcantar hit Benjamin in the neck with an elbow blow, twist him around, twist Benjamin's wrist upward saying, "if you don't say sorry I will break your wrist." Miguel heard his brother screaming "Ahh" in pain and it was at that point that he opened the screen door to proceed outside. Miguel Decl ¶ 3.  In Miguel's perception Benjamin was being tortured. *Id.*

Eduardo observed the officers grab Miguel and "boom" drop him down a flight of about 5-6 stairs. Eduardo Depo at 28:22-25; 29:1-3; 33:14-20; 34:18-25; 35: 1-5; 35:12-25; 36:1-2. Eduardo Decl 2:19-20. According to Miguel, he was violently thrown on the stairs hitting his back and ribs against the stairs. Miguel Decl ¶ 4. Also see Miguel Depo 54:24-25; 55:8-11; 55:20-23; 56:1-9. Witnesses state that it was more than two officers that grabbed Miguel. Preciado Depo 65:6-8; Benjamin Depo 46:14-17.

Eduardo saw Benjamin picked up off the ground by the officers. He was standing only 5-7 feet away at this time. Benjamin was saying "Ahhh" like it hurts.  Eduardo Depo 39:20-25; 40:1-10. Eduardo observed Benjamin taken to the patrol car of the same two officers that had approached him earlier while on the corner. Eduardo Depo 40:19-25; 41:1-2. Eduardo identified Officer Alcantar as the officer that took Benjamin to the ground and cuffed him. Eduardo Depo 41:18-21.

Standing a couple of feet away, Eduardo observed that one of the officers was a "black" officer. Eduardo observed the officer put an electric gun or Taser to the back of Miguel's neck and then the same officer handcuffed Miguel and put him in the back of the patrol car. Eduardo Depo 37:2-7; 37:14-24; 38:14-25; 39:1-11. Preciado said that several of the officers had their Tasers out and also witnessed

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
C 07-02659 JCS (ADR)

an officer put the Taser to the back of Miguel's head. Preciado Depo 65:1-5; also see Declaration of Genesis Preciado hereinafter referred to as "Preciado Decl", attached as Exhibit D) Meanwhile, Ortiz saw Miguel coming towards Alcantar so he admits he was the one that grabbed him and handcuffed Miguel. Ortiz Depo 47:15-24.  Miguel did not resist arrest. Ortiz Depo 47:24-25; 48:1; 51:17-20. Ortiz believes that Miguel may have been detained by more than just himself; adding however that he doesn't believe "we put him to the ground". Ortiz Depo 48:2-6; 48:21-24.

At the time of the incident, Benjamin was only 15 years old, 4"8 tall and weighed only 115 pounds. At the time of the incident he was in the 9th grade of high school. All his friends and family present at the scene were shocked that Alcantar would so physically and brutally attack a little boy.  See ¶ 4 Declaration of Ana Rosa Ortega, hereinafter referred to as "Ana Rosa Decl", ¶ 3 Declaration of Miguel Ortega in support of Plaintiffs' Opposition, hereinafter referred to as "Miguel Decl". In fact, Alcantar was fully aware that Benjamin was just a "little boy". Preciado Depo 59:7-8.

Eduardo perceived that both Benjamin and Miguel Ortega were handcuffed in the back of the patrol car and kept there for 30 minutes. JSUD 48. Eduardo had been waiting for them in the front yard throughout the whole time. Eduardo Depo 45:4-12. After both were released from the patrol car, Eduardo observed red marks on Benjamin's neck. The marks were red as in "hickey" red or red as if bruised. The next day the mark was still there but it had changed; it was dark. Eduardo Depo 61:23-25; 62:20-24; 72:17-25; 73:1-8. Preciado also observed a big mark on his neck after the incident.  Preciado Depo 61:2-5. In addition, Eduardo observed Benjamin was experiencing pain in his arm and marks on Benjamin's wrists where the handcuffs had been. Eduardo Depo 62:2-15; 63:2-8. After the incident, Preciado took pictures of Benjamin's neck mark and the marks on his wrist. He took the pictures with Benjamin's camera soon after he returned from being handcuffed in the patrol car. Preciado Depo 70:1-9; 71:3-9.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
C 07-02659 JCS (ADR)

# III.

## ARGUMENT

### A. Defendants failed to meet its burden as moving party.

FRCP 56 (c) provides in pertinent part:

...The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is proper only where there is no genuine issue of "material fact". In their motion, defendant makes no significant offer of probative evidence which supports their argument that plaintiffs have no disputed issue of material fact to support the eight causes of action against the various defendants. In order to succeed on its motion, Defendants would have to prove that the event proffered by the plaintiffs could not constitute viable causes of action. A motion for summary judgment is not a device for testing the truth of what is asserted or for determining whether the plaintiff has any evidence to back up what is in the complaint. *ACLU Foundation v. Barr,* 952 F.2d 457, 467 (D.C. Cir. 1991).

### B. Assuming defendants met their burden as moving party, their motion for summary judgment should nonetheless denied because material facts in dispute exist supporting plaintiffs' claims.

The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmoving party must then show the existence of a material fact which must be tried. *Id.* at 324. When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion. . . ." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.,* 369 F.2d 648 (6th Cir. 1966). This includes taking the

-8-

nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to the nonmoving party's assertions when they conflict with those of the movant. *Bishop v. Wood,* 426 U.S. 341 (1976); *Bosely v. City of Euclid,* 496 F.2d 193, 197 (6th Cir. 1974). While the parties agree to certain undisputed facts, those facts set forth in the Joint Statement of Undisputed Facts fail to set forth the whole story. The officers being accused of various violations as set forth in the complaint maintain one version of the story and the plaintiffs as well as other witnesses recall a different much darker version.

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *Celotex* at 324. The nonmoving party must oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ." *Id.* If the evidence is such that when viewed in the light most favorable to the non-moving party, a reasonable fact finder could return a verdict for the party, then a genuine issue of material fact exists, and summary judgment is not warranted. *Green Door Realty Corp. v. TIG Ins. Co.,* 329 F.3d 282, 286-287 (2d Cir. 2003).

   1) **Plaintiffs can establish that sufficient material facts in dispute exist to submit their §1981 Claim because they establish intentional racial discrimination and/or deprivation of §1981 rights.**

The materiality of particular facts is determined by the pleadings. See Weil & Brown, *Federal Civil Procedure before Trial,* The Rutter Group, Chapters 12-17, 14:27.1.

   **a) 42 USC 1981 (a)**

42 USC 1981 (a) provides:

   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to **like punishment, pains,** penalties, taxes, licenses, and exactions of every kind, and to no other. [Emphasis added]

In this case, as set forth in plaintiffs' statement of facts above and the JSUD submitted by the

-9-

moving party, sufficient facts exist to support the claim that both Benjamin and Miguel were falsely arrested, assaulted, battered, threatened and coerced by defendants Ortiz and Alcantar who acted under color of law and by the authority of the City of Oakland Police Department.  The evidence regarding the unjustified, unprovoked and unreasonable attack by Ortiz on Miguel Ortega is extensive and cannot be ignored. Ortiz and at least two other officers grabbed Miguel violently throwing him down the stairs, and thereafter placing a Taser to the back of his head. Miguel was not intoxicated, he made no verbal threat, had committed no crime, had no weapon and had only tried to avoid a confrontation with police by staying inside the house behind the screen door. Alcantar taunted Miguel to come out. It was only after Alcantar's attack on his little brother Benjamin, was only 15 years old and 4'11, Miguel opened the screen door and proceeded outside. Miguel Decl ¶¶ 3,4, & 5. The factual evidence is abundant and the issue should be allowed to proceed to the fact-finder. Defendants' argument only address false arrest as a basis for §1981 (a); however, Miguel was not just falsely arrested, he was thrown down and threatened after he had been controlled with an electric gun/taser/pistol to the back of his head. Both officers had followed Benjamin and Miguel into the private property after making comments about the Mexican flag, and immigration status. Plaintiffs also incorporates their discussion under §1981 (c) below.

### b) 42 USC 1981 (c)

Protection against impairment is set forth in 42 USC §1981 (c) which provides:

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Although both officers were apparently Hispanic and the parade was a Hispanic event, several inappropriate comments were made by the two officers who confronted Benjamin and Miguel. These comments were menacing and threatening and directly related to their being Hispanic. The first threat was directed at Benjamin Ortega when first approached by the involved officers on 62nd and International. The officer told Benjamin who was crossing the street carrying a Mexican flag: "throw that flag before I shove it up your ass". JSUD 25; Benjamin Depo 24:7-10; Miguel Depo 24:25; 25:1-25;

-10-

26:1-11. In fact, Ortiz maintains that it was his "intention" to cite Benjamin for carrying the flag but this intention was only in the mind of Ortiz. No one heard Ortiz say those words to Benjamin and in fact Ortiz admits that he never even communicated that intention to his partner Alcantar. Ortiz Depo at 24:20-25; 25:4. He also did not remember what words were actually stated.

Secondly, Preciado heard the officers say "We're going to call Immigration. I hope you all have your green cards." Preciado Depo at 73:17-25; 74:1-3. In fact, the officers had no basis for said comments, Miguel is a legal resident of the United States and Benjamin a citizen. See ¶¶2 & 3 Ana Rosa Decl  Both officers saw Hispanic young persons and concluded they were in the United States illegally. Their verbal threat demonstrates that their outrageous conduct was based on their being Hispanic. Had they not been Hispanic but Caucasian or African American the comment regarding immigration would not have been made.  The fact that both officers are Hispanic does not signify their comment was not race motivated. Defendants have submitted no evidence that a person that speaks the same language cannot be racist against persons of same racial background, i.e. light skinned persons from Mexico have demonstrated racism against their own people of darker skin color. In fact, Ortiz testified that he neither understands nor speaks Spanish. Ortiz Depo 10:22-25; 11:1-2. Various research commentaries and news articles speak on the problem of racism among Spanish-speaking people.

Thereafter, after both Miguel and Benjamin were handcuffed, and while in the patrol car Alcantar in the presence of Ortiz asked Benjamin and Miguel for their green card because otherwise he would call immigration. Benjamin Depo 50:1-16;72:21-25; 73:1-2; Miguel Depo 45:11-16. Alcantar admits that he heard say, "Do we need immigration?" and doesn't recall if he himself mentioned it or questioned anybody's immigration status. Alcantar Depo 68:2-13.

    2) **Plaintiffs can establish that sufficient material facts in dispute exist to submit their 1983 claim against both Ortiz and Chief Tucker.**

        a.)      **Unreasonable Seizure Claim**

            i)      **Ortiz**

In order to arrest Miguel, Ortiz must have known that there were sufficient facts and

-11-

circumstances to warrant a prudent person to believe that Miguel had committed an offense. *Beck v. Ohio*, 379 US 89, 91 (1964). Moreover, the only "probable cause" stated by Ortiz was his belief that Benjamin not Miguel had committed a PC 148 violation. JSUD 29. Ultimately, no citations were issued to either plaintiff. JSUD 38. After Miguel was stopped by three officers and thrown down the stairs, he was placed in handcuffs and told he was going to jail. He was placed in the patrol car for 30 mniutes. JSUD 48. He was never charged with any crime and both officers admit he was not a threat. Defendants argue semantics and call the arrest a detention but the fact remains that Miguel, as well as his brother, were handcuffed, told they were going to jail and placed in a patrol car for an extended period of time. At no time prior to this false arrest, were either plaintiff informed what they did wrong. Moreover, the manner with which both plaintiffs were arrested was more consistent with an "arrest" not a "detention". There exist disputed issues of fact about whether probable cause existed for the officers to enter the private property. The officers both testified that Benjamin was fleeing but witness accounts dispute that fact, stating that Benjamin was simply following the order to get away from the corner which even Alcantar testifies he told him. As such, assuming the facts establish no basis for entering the property, entering the property was therefore accomplished without probable cause and constituted unreasonable seizure.

### ii)    Chief Tucker

Chief Tucker is vicariously liable for the actions of his own officers and for promoting an organizational culture within the Oakland Police Department and its command staff such that officers feel that they can use excessive force without fear of any discipline. Alcantar's failure to execute a basic duty to Miguel and Benjamin "underscores their inadequate training". Clark Report at p.4, ¶3.

### b.)    Excessive Force Claim

### i)    Ortiz

-12-

The leading case on the subject of the use of "reasonable force" by police officers (and the case referred to in the Oakland Police Department's Training Manuel) is *Graham v. Connor* (1989) 490 U.S. 386, 396. Both defendants used force against the persons of plaintiffs. Ortiz was not attempting to achieve any legitimate police objective. They forcefully tackled Miguel who was trying to persuade the officer to stop causing severe injury on his little brother who he witnessed was being choked, struck in the neck with elbow, wrestled, and thrown on the ground, depriving as well of his freedom without any justification or probable cause, having committed no crime, and without even the allegation of a crime. (JSUD 37, 38 & 47) Under the *Graham v. Connor* test, no use of force was justified against either plaintiff.

A list of *Graham* considerations is to be assessed by each police officer in determining the appropriate level of force, if any, to be used:

### 1.)    The severity of the crime at issue.

Neither handcuffed victim was charged with any crime. (JSUD 37) Neither Miguel nor Benjamin resisted arrest. (JSUD 37) Ortiz Depo 57:11-13 attached to Vose Decl Exhibit C, Doc#84-4 at p.15. Neither Miguel or Benjamin were intoxicated or under the influence of any drug. Ortiz Depo 57:8-25; 58:1-3; 78:17-23; Miguel Depo 13:19-22; Alcantar Depo 65:7-9. Neither Miguel or Benjamin carried a weapon. Ortiz Depo 107:5-13. Neither Miguel nor Benjamin was thought to be associated with any gang. Ortiz Depo 38:5-7. Ortiz specifically testified that there was no other illegal activity taking place at that time when he first made contact with Benjamin. Ortiz Depo 37:25; 38:1-6. In fact, from the initial contact with Benjamin, the only violation that Ortiz intended to cite Benjamin with, was an infraction for stepping down from a curb onto the street. Although Ortiz does not know if those intentions were communicated to Benjamin and admits he never told his partner Alcantar of his intentions. Ortiz Depo 73:3-6.

Alcantar entered the property due to an alleged PC 148 violation on the part of Benjamin, obstructing a police officer in the line of duty. The duty Benjamin allegedly obstructed was not stopping to be issued his citation and going away from the officers. Although Ortiz admits that he

-13-

doesn't know if Benjamin was aware that they were trying to get him to stop and issue him a citation. Ortiz Depo 43:6-19; 44:12-25; 45:1-5. Also see 108:25; 109:1-6. In fact the "crowd" had followed the officer's instruction and gone back to the house located on 62nd and International and were just chilling and talking. Eduardo Depo 24:22-25; 25:11-25; 26:1-12.

### 2.) Whether the suspect poses an immediate threat to the safety of the officers or others

At the time that Benjamin and Miguel were taken down violently there was no immediate threat to any officer or any person. Alcantar Depo 84:5-8. Benjamin was a child, only 15 years old and small in size. Miguel had been inside the house of his cousin trying to avoid any further confrontation with the officers. The only impetus that motivated Alcantar to grab Benjamin and strike him in the neck with his elbow was Benjamin's comment regarding "[his] mom takes care of [him]" and that the officer's mom does not. This type of statement by Benjamin may have provoked a vindictive teenager to violence but a police officer has a responsibility to not abuse his power and/or act wrongfully under color of law. It is certainly unreasonable to infer from that statement that Benjamin was threat to his safety and in fact Alcantar testified that he did not feel threatened by Benjamin and that Benjamin did not resist arrest.

Benjamin's "back talk" to Alcantar does not justify the use of such excessive force. The force was excessive not only because the situation did not warrant its use, but because Benjamin was just a little boy. He was 4'11, 115 pounds and in the 9th grade. He did not iterate any physical threats to the officers nor did he have possession of any kind of object that could be construed as a weapon. Alcantar Depo 84:5-8; Ortiz Depo 67:1-7; 107:5-13. Alcantar was solely motivated by vindictiveness and clearly the use of such force in those circumstances by an officer with 8 years experience was grossly excessive and irresponsible. Alcantar Depo 84:5-8.

In fact, Benjamin and Miguel were on their cousin's private property when the officers approached them. Defendants' have not submitted one scintilla of evidence that shows that Miguel posed the kind of threat to the safety of the officers or others after he was handcuffed but before the Taser gun/pistol was placed to the back of his head.

### 3.) Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

-14-

In this case, the alleged "crimes" (which plaintiffs deny) were infractions, not justifying the use of any force. Both defendants testified that neither was threatened by either plaintiff, and there is no evidence that either plaintiff threatened anyone else at the scene. Alcantar Depo 84:5-8. Both Ortiz and Alcantar testify that neither Benjamin or Miguel actively resisting arrest. JSUD 37. Instead, both plaintiffs were in the front yard of their cousin, Javier Negrete and were not attempting to evade arrest by flight.

Defendant Ortiz arrested and detained Miguel Ortega without any probable cause. No crime is alleged by any defendant against Miguel Ortega. Miguel was grabbed by three or four officers and thrown from the top step of the porch stairs to the ground below, landing on his side. He was then handcuffed while one of the officers held a Taser to his head. Preciado Depo 65:1-5. It may have been appropriate for Ortiz to stop Miguel from approaching Alcantar and Benjamin, but the presence and physical assistance of three or four officers meant that he could have been stopped without the use of force. However, after he was stopped and thrown down the stairs, and handcuffed, the use of force should have ceased. Albeit that force was excessive, as well. Regardless, the arresting officer according to various witness accounts placed a Taser to the back of his head. Ortiz admits that he was the officer that "detained" Miguel. See ¶ 6 of Declaration of Bernard Ortiz, Doc#82, at 2:11-14.

Roger Clark police procedures expert wrote in his expert report that the use of force by Ortiz on Miguel was grossly excessive and unnecessary. See Report prepared by Roger Clark attached as Exhibit F to the Posada Decl, hereinafter referred to as "Clark Report", at p.2. Defendants cite *Jackson v. City of Bremerton*, 268 F.3d 646, 651-652 (9th Cir. 2001) which focuses on type of force inflicted. Here, Miguel was handcuffed and posed no threat and therefore placing the Taser to the back of his head was unnecessary. The amount of force used on Miguel was likewise unnecessary. Defendants' argument that Miguel has suffered no injury as a result of any excessive force is unsupported by the evidence. Miguel has stated under oath that he has suffered physical injury to his back, ribs, as well as suffered

-15-

1  emotionally, further described below. These injuries were directly caused by his being thrown down,

2  witnessing the attack on his brother Benjamin, and having a pistol to his head.

3      Defendants cite *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 to support

4  their argument that without medical records or "other evidence" the allegation is insufficient to establish

5  excessive force. In *Arpin*, the plaintiff "does not set forth any specific facts disputing Officer Stone's

6  version of events." *Arpin* at 922. Here Miguel's version and that of the other witnesses differs greatly

7  from both Ortiz and Alcantar's version of events. In addition, the declaration of Miguel and his mother,

8  Ana Rosa, hereto provided in support of Plaintiffs' Opposition constitute evidence that an injury was

9  sustained by Miguel.

10

11

12          **ii)**     **Chief Tucker**

13      Chief Tucker is vicariously liable for the acts of his officers as a city leader. In his expert report,

14  Mr. Roger Clark states:

15

16      The record in this case indicates that the training provided at the POST Basic Academy to all
    state certified police officers (including the officers at the scene) regarding the use of force (and

17      when it is even necessary to apply) was not followed. The fact that Officers did not follow the
    proper protocols as originally trained, indicates a substantial lack of required continuing

18      professional training within the Oakland Police Department. Clark Report at p.2.

19

20      Mr. Clark opines:

21      It appears ..there was no adequate continuing training or guidance from the City or within the
    OPD that provided the necessary rules and regulations regarding the use of force designed to

22      prevent incidents of this type. Responsibility for the inadequate training and procedures fall
    directly upon the City of Oakland, the OPD Chief of Police, and his command staff. This is

23      particularly odious in view of the requirements of the negotiated settlement agreement, *Delphine*
    *Allen, et. Al. v. City of Oakland*. Clark Report at p.3.

24

25          **c.)**     **Right to Privacy Claim**

26              **i)**     **Ortiz**

27      For reasons expressed under the seizure discussion above, plaintiffs should be allowed to

28

-16-

likewise proceed to trial on the right to privacy claim.

### ii)    Chief Tucker

For reasons expressed under the seizure discussion above, plaintiffs should be allowed to likewise proceed to trial on the right to privacy claim

### d)    First Amendment Claim

#### i) Ortiz

The First Amendment of the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Freedom of assembly, sometimes used interchangeably with the freedom of association, is the individual right to come together with other individuals and collectively express, promote, pursue and defend common interests. The right to freedom of association is recognised as a human right, political freedom and a civil liberty. According to Ortiz' own testimony he ordered a group of people to go home while they were enjoying Cinco De Mayo celebration—Mexican Independence Day. The group was about ten people in size and were all Mexican decendents or nationals. They were enjoying a day outside and displaying national pride by carrying the Mexican flag. Ortiz admits in his deposition that he told Benjamin to throw it away. Ortiz admits that he ordered them all to go away, away from the corner and away from the public street. He ordered them in essence to stop assembling and participating in their national holiday celebration. There was no good reason the only time crowds called for police attention or sent people home was when the groups exceeded 100 people. Ortiz Depo 18:6-11. There were about 10 people on the corner maybe a few more, hardly a concern for public safety. Forcing them to put away the flag and stop assembling in the streets constituted a deprivation of Miguel and Benajmin's rights to assemble.

#### ii)Chief Tucker

-17-

For the same reasons expressed regarding Tucker's duty as head of Oakland Police Department and his officers, he is vicariously responsible for the acts of his individual officers.

### C. Plaintiffs can establish that sufficient material facts in dispute exist to proceed with their §1983 Monell Claim that the City of Oakland had a policy, practice or custom to violate constitutional rights.

For the same reasons expressed under Plaintiffs argument regarding there being sufficient material facts in dispute to submit their 1983 claim against Chief Tucker, plaintiff can establish sufficient material facts to proceed with their §1983 Monell Claim. Ortiz testified at his deposition that the policy is if the person is being compliant, "doing exactly what they're ordered to do, which is compliance as I'm defining it, there will still be no use of force because they would be complying." Ortiz Depo 98:9-14. Ortiz even admits that if there was compliance, "the application of force by the officer's fingers to the side of the subject's neck" would be "improper use of force". Ortiz Depo 97:23-25; 98:1-14. And the requirement to report the use of force to his or her supervisor is also required and yet the Oakland Police Department does not enforce that requirement such that both Ortiz and Alcantar did not complete an FC report and Internal Affairs did not discipline either one for failing to submit the FC report. Ortiz Depo 99:24-25; 100: 1-4. Ortiz Depo 69:23-25; 70:1-25 attached as Exhibit C to Charles Vose Decl, Doc#84-4, 17; Alcantar Depo 72:24-25; 73:1-14. Thus, the mere fact that the very checks in place to ensure against abuse of power are not enforced sends a message to officers that they will not need to answer for their actions on the field.

### D. Plaintiffs can establish that sufficient material facts in dispute exist to proceed with assault and battery claims against Ortiz.

Miguel were falsely arrested, assaulted, battered, threatened and coerced by defendants who acted under color of law and by the authority of the City of Oakland Police Department. The evidence regarding the unjustified, unprovoked and unreasonable attack by Ortiz on Miguel Ortega is extensive

and cannot be ignored.

The testimony of Eduardo Ortega indicates that Ortiz placed a Taser weapon to the back of Miguel's head but did not use it. Ortiz admits that Miguel was not resisting arrest. (JSUD 37) Miguel thought that Ortiz had a pistol to his head. (JSUD 39) Others testified that it was electric gun. See Statement of Facts above.

The fact that the officer according to several witnesses had a Taser and the fact that the officer states that he had not been authorized to carry one that day is pertinent. The fact that neither Alcantar or Ortiz were authorized that day to carry a Taser to the event they were assigned to control indicates that either or both carried the Taser without authorization. The carrying of Tasers to a crowd event is customary. According to Oakland Police Department's "Use of Force Policy Handbook" less-lethal force is to be used for Crowd Control & Crowd Management. [See 2.3, Part II-B(3) attached to Defendant's Request for Judicial Notice, hereinafter referred to as "Force Policy", Doc#85-2 at p.15] According to that same policy a Taser is considered a "less-lethal force" option. [See Force Policy at 3.1, Part III-B (3), Doc#85-2 at 16.] However, in the case of Miguel, and according to police procedures expert Roger Clark, as opined in his expert report, the force used on Miguel was "grossly excessive". See Clark Report at p.2. Ortiz also admits that where there is a compliant subject the application of force is unnecessary. Ortiz Depo 97:11-25; 98:1-14.

Mr. Clark quotes Section 370.27 of the Manual of Rules which provides:

USE OF PHYSICAL FORCE:

The use of physical force shall be restricted to circumstances specified by Departmental policies and law. Malicious assaults or batteries committed by members or employees constitute gross misconduct.

Mr. Clark, plaintiffs' police procedures expert[1] in this case, indicates "Officer Alcantar and

---

[1] Mr. Clark's qualifications are set forth in his report on pp.6-10 of Exhibit F attached to the Posada Decl.

Ortiz' use of force on Benjamin and Miguel Ortega was not objectively reasonable and, as a result, was contrary to law. Therefore, their use of excessive force violated Section 370.27 of the OPD Manual of Rules." See Clark Report at p.20.

Although Ortiz denies carrying a Taser weapon that day, witnesses testified that the officer who arrested Miguel placed an "electric gun" or "Taser" weapon to the back of Miguel's head in a threatening manner. Though these same witnesses say ultimately the Taser was not used on Miguel, the threat of its use was imminent and witnessed by Eduardo. Eduardo Depo 37:2-7; 37:14-24; 38:14-25; 39:1-11. Neither Benjamin nor Miguel fled any arrest. Several witnesses' testimony supports that. Although Ortiz says they ran it is a factual dispute and the law requires that this court place more weight on the facts proffered by non-moving parties.

Defendants' proffered the declaration of employee Ersie Joyner who declared that that no Tasers were issued to either Ortiz or Alcantar on that day does not in and of itself  constitute determinative evidence that they did not carry a Taser. In fact in his declaration, Ortiz is silent as to whether he in fact owns a Taser. The fact that a Taser was not warranted for this event shows that such use of force for this event was not deemed warranted by his own department. (JSUF No.43)

   **E. Plaintiffs can establish that sufficient material facts in dispute exist to proceed with their California Civil Code §52.1 claim against Ortiz.**

For all the same reasons plaintiffs' are entitled to proceed with their assault and battery and excessive force claims against Ortiz, plaintiffs can establish sufficient material facts in dispute likewise exist to submit their California Civil Code §52.1 claim against Ortiz to a jury. A jury will find no justification for the defendants' actions. Liability will be sustained, as well as violations of California Civil Code §52.1(b) (which provides for additional civil penalties), and the jury will probably assess punitive damages against defendant Ortiz.

   **F. Plaintiffs can establish that sufficient material facts in dispute exist to proceed with their California Civil Code §51.7 claim against Ortiz.**

For all the same reasons plaintiffs' are entitled to proceed with their §1981 claims against Ortiz, as well as the excessive force showing, plaintiffs can establish sufficient material facts in dispute likewise exist to proceed with their California Civil Code §51.7 claim against Ortiz.

### G.    Plaintiffs can establish that sufficient material facts in dispute exist to submit their intentional infliction of emotional distress to a jury.

Defendants accurately set forth the elements of intentional infliction of emotional distress in their moving papers but provide no substance, only a conclusory statement that no such intention to inflict emotional distress is shown. They do not cite to any deposition or JSUD nor can they since there is much evidence to the contrary. The testimony of Eduardo Ortega indicates that Ortiz placed a Taser weapon to the back of Miguel's head but did not use it. Miguel thought that Ortiz had a pistol to his head. (JSUD 39) Miguel even tells the officer while the "pistol" is to his head that it wasn't necessary. Miguel Depo 93:10-22. Ortiz even admits that Miguel was not resisting arrest. (JSUD 37) It is reasonable to infer that placing any weapon to the back of anyone's neck will inflict extreme emotional distress. Thus, assuming therefore there was a pistol or Taser weapon to the back of Miguel's head, the circumstances did not justify such a display of force. Miguel was no longer a threat. Miguel, according to Ortiz and witnesses, had not resisted arrest and was already handcuffed. The only purpose of such a tactic was therefore to inflict emotional distress and as such that conduct is outrageous. Indeed, Miguel thought he was going to die at that point. Miguel Decl ¶3.

Even though the police officers deny using such force, the law requires that all inferences must be drawn from the evidence and viewed in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992). Such a dispute would be one of material fact and should be left to a jury to decide.

Moreover, while Miguel may not have received medical treatment for emotional distress, he has in fact experienced emotional distress from the inception and his symptoms are consistent with that

-21-

injury. Immediately following the incident, Miguel was unable to sleep and had insomnia; he also experienced anxiety, fear and panic when he saw police officers. Witnessing his brother being attacked has also tormented him as he viewed it as essentially the torture of a small boy. Miguel Decl ¶¶ 3 & 4. He experiences guilt for not having been able to help his brother Benjamin during the brutal attack and also has unresolved anger towards the police officers that violated their rights. Ana Rosa Decl ¶¶5,6 & 8; Miguel Decl ¶¶3 & 7. Miguel is much changed after the incident as observed by his mother. He was once happy, care-free, easy going and now he is fearful, anxious, serious and prefers to stay home; he also seems depressed. Ana Rosa Decl ¶10.

Miguel never informed anyone about his psychological injuries because he was embarrassed that he would appear weak. Miguel Decl ¶3. Many men are stoic in their reactions and males frequently underreport psychological injuries. But Miguel did testify that he has had symptoms consistent with an emotional injury though he has chosen not to tell anyone. Miguel has indicated that he suffers from anxiety and stress when he sees police officers. (JSUD 59) But according to Miguel and his mother, the only reason he did not seek necessary medical attention is because he did not have medical insurance and could not independently finance his medical treatment. Miguel Decl ¶2 & Ana Rosa Decl ¶¶8 & 10.

The fact that he does not tell anyone about his emotional pain is not proof positive that he is not suffering emotionally. In any event, the issue may be one of credibility that should be submitted to the fact finder. It should not be assessed at summary judgment. He also suffered physical injury to his back and ribs. In fact, at his deposition, Miguel testified that he "wants to go" receive medical treatment for his pains. Miguel Depo 94:20-23. He has been complaining to his mother about this pain since the day after the incident. Miguel Decl ¶5 and Ana Rosa Decl ¶9. The fact that he has not received medical care does not prove that he has not suffered injuries; it may go to the credibility of the claim but the testimony of Miguel and his mother constitute evidence that he did suffer emotionally, as well as physically.

-22-

**H. Plaintiffs can establish legal duty is owed to them by Ortiz and Chief Tucker.**

Defendants' argument infers that plaintiffs only avenue against Ortiz is a duty to save Benjamin from being attacked by his partner Alcantar.  However, plaintiffs maintain that Ortiz owed a duty to Miguel against false arrest which defendants concur is a viable cause of action.  Although defendants maintain that there was no arrest for the reasons stated above under the Unreasonable Seizure claim the fact as to whether it was an arrest or a detention is an issue of fact and the issue as to whether there existed sufficient basis for probable cause is likewise an issue of fact that is material and in dispute.

Furthermore, as discussed under excessive force discussion above, the department did not authorize the use of Tasers at the Cinco de Mayo event. And yet according to witnesses the officer detaining Miguel placed one to his head.  If Ortiz was not acting under color of law, as their moving papers seem to suggest, he was acting on his own.  Such liability is taken outside his authority as a government employee and raises his individual liability as an individual committing a negligent act resulting in injury to Miguel. Thus, even if Ortiz did not intend to inflict emotional distress on Miguel, even if Ortiz did not commit a battery or assault, the manner in which he conducted himself when dealing with Miguel under those circumstances, as is further described above, he still owed a duty to Miguel in that he should have known that his negligent actions would cause Miguel to suffer injuries as set forth in Miguel's declaration. While the defendants contend there is no causation, both Miguel and his mother submit declarations herewith that proves otherwise. See Miguel and Ana Rosa Decl.

**IV.**

**CONCLUSION**

Sufficient disputed issues of material fact exist on the various issues to allow this matter to proceed to trial. Any inconsistencies in testimony go to the credibility of the witnesses and are not appropriate for disposition at summary judgment. For the reasons set forth above, defendants' motion for partial summary judgment should be denied.

Dated: August 29, 2008                    LAW OFFICES OF STEVEN R. JACOBSEN

By_____\\s\_____
                    Brenda D. Posada
                    Attorney for Plaintiffs

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
C 07-02659 JCS (ADR)