1  John J. Verber, State Bar No. 139917
   James Y. Higa, State Bar No. 225683
2  BURNHAM BROWN
   A Professional Law Corporation
3  P.O. Box 119
   Oakland, California 94604
4  ---
   1901 Harrison Street, 11th Floor
5  Oakland, California 94612
   Telephone:    (510) 444-6800
6  Facsimile:    (510) 835-6666
   Email:        jverber@burnhambrown.com
7                jhiga@burnhambrown.com

8  Attorneys for Defendant
   RAMON J. ALCANTAR individually and in his capacity as
9  a police officer for the City of Oakland

**FILED**

DEC X 3 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10

11                    UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13  MIGUEL ORTEGA, BENJAMIN ORTEGA,          No. C-07-02659 JCS
    a minor, by and through his Guardian Ad
14  Litem, ANA ROSA ORTEGA                   **DEFENDANT RAMON J. ALCANTAR'S
                                             OBJECTIONS TO PLAINTIFF'S**
15              Plaintiff,                    **DEPOSITION DESIGNATIONS OF
                                             THE TESTIMONY OF DR. SEAN**
16  v.                                       **HANEY AND COUNTER
                                             DESIGNATIONS**
17  CITY OF OAKLAND, OAKLAND POLICE
    DEPARTMENT, WAYNE TUCKER, in his         Trial Date: December 1, 2008
18  capacity as the Police Chief of the City of   Time:       8:30 a.m.
    Oakland, SGT. BERNARD ORTIZ,             Location:   Courtroom A
19  individually and in his capacity as a police   Judge:      Joseph C. Spero, Magistrate
    officer for the City of Oakland, OFC.                     Judge of the United States
20  RAMON J. ALCANTAR, individually and in                    District Court
    his capacity as a police officer for the City of
21  Oakland, and DOES 1 THROUGH 200,
    inclusive,
22
                Defendants.
23

24

25        Defendant RAMON J. ALCANTAR ("Ofc. Alcantar") articulates the following

26  objections to Plaintiff's designations of trial testimony of Dr. Sean Haney, MD, in the above-

27  captioned matter, and Ofc. Alcantar's counter designations where appropriate.

28  DEFENDANT RAMON J. ALCANTAR'S                    1                     No. C-07-02659 JCS
    OBJECTIONS TO PLAINTIFF'S
    DESIGNATIONS OF THE TESTIMONY OF DR.
    SEAN HANEY AND COUNTER DESIGNATIONS

| Plaintiff's Designation(s) | Ofc. Alcantar's Objection(s) | Ofc. Alcantar's Counter Designations/Supplemental Designations |
|---|---|---|
| 18:1-25 | 18:20-25: Hearsay *overruled* | |
| 27:3-11 | 27:3-11: Insufficient Foundation (in that designated testimony is an incomplete articulation of Dr. Haney's actual testimony on this issue). | 27:1-28 *OK* |
| | | 30:1-3 (Follow-up testimony regarding lack of scarring on Plaintiff's right wrist at time of first visit). |
| | | 32:19-33:6 (Additional opinion testimony regarding possibility of exacerbation based on Plaintiff's gap in treatment) |
| | | 34:7-19 (Additional opinion testimony regarding cause of injury) |
| | *sustained as to 19-24* | 34:20-35:4 (Testimony regarding scarring not visible at time of first visit) *OK* |
| 36:19-25 | 36:19-25: Hearsay | 36:8-13 *OK* |
| 37:1-19 | 37:12-19: Lacks foundation; Improper hypothetical; | |

DEFENDANT RAMON J. ALCANTAR'S
OBJECTIONS TO PLAINTIFF'S DEPOSITION
DESIGNATIONS OF THE TESTIMONY OF DR.
SEAN HANEY AND COUNTER DESIGNATIONS

2

No. C-07-02659 JCS

| | | |
|---|---|---|
| | Assumes facts not in evidence | |
| 38:2-4 | 38:2-4: Unintelligible— citation contains no testimony | |
| 38:7-23; 38:16-25; 39:1-11 | 38:7-23; 38:16-25; 39:1-11: Lacks foundation; Improper hypothetical; Assumes facts not in evidence | |

DATED:  November 17, 2008                    BURNHAM BROWN

_/s/ James Y. Higa_     11/18/2008
James Y. Higa, Esq.
BURNHAM BROWN
Attorneys for Defendant
OFC. RAMON J. ALCANTAR, individually
and in his capacity as a police officer for the
City of Oakland

900638

DEFENDANT RAMON J. ALCANTAR'S                    3                    No. C-07-02659 JCS
OBJECTIONS TO PLAINTIFF'S DEPOSITION
DESIGNATIONS OF THE TESTIMONY OF DR.
SEAN HANEY AND COUNTER DESIGNATIONS

1

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3
    MIGUEL ORTEGA, et al.,  )
4                           )
        Plaintiffs,  )
5                    )
        vs.          )  No. C07-02659 JCS
6                    )
    CITY OF OAKLAND, et al., )
7                            )
        Defendants.  )
8   _____)

9

10

11

12

13

14        DEPOSITION OF SEAN M. HANEY, M.D.

15        OAKLAND, CALIFORNIA

16        MONDAY, JULY 21, 2008

17

18

19

20

21

22

23   REPORTED BY:

24   Dominique Isabeau

25   CSR No. 7076

6

| | | |
|---|---|---|
| 1 | MONDAY, JULY 21, 2008          10:53 A.M. | |
| 2 | PROCEEDINGS | 09:20:55 |
| 3 | (Whereupon, Deposition Exhibits 1 through | 10:52:00 |
| 4 | 12 were pre-marked for identification.) | 10:52:00 |
| 5 | **THE VIDEOGRAPHER:**     On the record. | 10:52:00 |
| 6 | My name is Stewart Pettigrew. I'm a qualified | 10:52:41 |
| 7 | video technician and a notary public for the County of | 10:52:44 |
| 8 | Alameda, State of California. I'm videotaping on behalf | 10:52:47 |
| 9 | of Televideo Production Services at 3655 Grand Avenue in | 10:52:50 |
| 10 | Oakland, California, 94610. | 10:52:56 |
| 11 | Today's date is July 21st, 2008, and the | 10:52:59 |
| 12 | present time on the monitor is approximately 10:53 a.m. | 10:53:02 |
| 13 | The location of this deposition is Kaiser Medical Center | 10:53:06 |
| 14 | at 235 West MacArthur, Oakland, California. | 10:53:10 |
| 15 | Today's witness is Dr. Sean Haney, M.D., in | 10:53:14 |
| 16 | the case of Miguel Ortega and others versus the City of | 10:53:19 |
| 17 | Oakland and others, Case No. C07-02659 JCS, filed in the | 10:53:24 |
| 18 | United States District Court, Northern District of | 10:53:31 |
| 19 | California. | 10:53:35 |
| 20 | This deposition was noticed by Steven Jacobsen | 10:53:35 |
| 21 | for the defendant. | 10:53:38 |
| 22 | **MR. VOSE:**     No, it was noticed by Charles Vose | 10:53:39 |
| 23 | for defendant. | 10:53:44 |
| 24 | (Discussion off the record.) | 10:53:49 |
| 25 | **THE VIDEOGRAPHER:**     Would counsel for the | 10:53:53 |

U.S. LEGAL SUPPORT

27

| 1 | **Q.** Can you tell anything from these X rays, based | 11:26:22 |
| 2 | on -- you had said his injuries which were his -- I | 11:26:25 |
| 3 | believe you said his ligaments. Can you tell those | 11:26:30 |
| 4 | kinds of injuries from these types of X rays? | 11:26:33 |
| 5 | **A.** You can get a hint. If somebody has got a bad | 11:26:36 |
| 6 | ligament problem, you can see it, distance between two | 11:26:40 |
| 7 | bones increasing, and I don't see that here. And you | 11:26:43 |
| 8 | can see the angles sometimes change, and I don't see | 11:26:45 |
| 9 | that at all. | 11:26:48 |
| 10 | **Q.** Okay. Okay. So, on September 19th, when you | 11:26:50 |
| 11 | saw him the second time, you indicated his cast was | 11:27:18 |
| 12 | removed, that he appeared to be -- I'm not putting words | 11:27:21 |
| 13 | in your mouth, but he was essentially healed, his issues | 11:27:24 |
| 14 | were essentially resolved? | 11:27:27 |
| 15 | **A.** That's what I felt. | 11:27:28 |
| 16 | **Q.** Did you prescribe anything else for him at | 11:27:30 |
| 17 | that time? | 11:27:33 |
| 18 | **A.** A wrist splint. | 11:27:33 |
| 19 | **Q.** What would that be for? | 11:27:37 |
| 20 | **A.** Largely for kind of a transition. When you | 11:27:39 |
| 21 | remove a cast from somebody, sometimes they're stiff. A | 11:27:42 |
| 22 | splint reminds them that something has been going on, | 11:27:44 |
| 23 | gives them some support, reminds them that they had an | 11:27:49 |
| 24 | injury. At the same time, it allows them some freedom | 11:27:57 |
| 25 | to start moving their wrist, in this case. | 11:28:01 |

U.S. LEGAL SUPPORT

|   |   |   | 30 |
|---|---|---|---|
| 1 | **Q.** | Did you notice any scarring or any other type | 11:30:53 |
| 2 | | of visible injury to that area on that day? | 11:30:56 |
| 3 | **A.** | No. | 11:31:00 |
| 4 | Q. | Was there -- I mean, as you sit here today, | 11:31:02 |
| 5 | | was there anything about Mr. Ortega, his demeanor or | 11:31:07 |
| 6 | | affect, that you felt particularly noteworthy on that | 11:31:10 |
| 7 | | first visit that you had with him? | 11:31:13 |
| 8 | A. | Long time ago. | 11:31:17 |
| 9 | Q. | That's fair. Is that a: you don't recall? | 11:31:19 |
| 10 | A. | That's: I don't recall. | 11:31:24 |
| 11 | Q. | Okay. Which is a perfectly acceptable answer | 11:31:25 |
| 12 | | in this deposition. | 11:31:28 |
| 13 | A. | Okay. | 11:31:29 |
| 14 | Q. | You described his injury as being -- I won't | 11:31:33 |
| 15 | | go back over it, but, essentially, it was a ligament | 11:31:37 |
| 16 | | injury and a tissue injury -- | 11:31:40 |
| 17 | A. | Uh-huh. | 11:31:42 |
| 18 | Q. | -- I guess, to the dorsal aspect of his right | 11:31:42 |
| 19 | | hand or wrist area, as well as leading up toward the | 11:31:45 |
| 20 | | thumb. Is that a fairly general reasonable | 11:31:50 |
| 21 | | approximation of what you described? | 11:31:53 |
| 22 | A. | That's correct. | 11:31:54 |
| 23 | Q. | And you've been working with Kaiser in the | 11:31:58 |
| 24 | | orthopedic department for -- I think you said three | 11:32:01 |
| 25 | | years? | 11:32:04 |

U.S. LEGAL SUPPORT

32

| | | |
|---|---|---|
| 1 | Q.      Would you have expect -- strike that. | 11:33:32 |
| 2 | Would you have expected there to be any | 11:33:37 |
| 3 | complaints of pain or discomfort immediately after the | 11:33:43 |
| 4 | accident, based on the description of the injury that -- | 11:33:48 |
| 5 | or the mode of injury that Mr. Ortega gave you? | 11:33:51 |
| 6 | A.      Yes, I would.  I would be surprised if this | 11:33:55 |
| 7 | came on later. | 11:33':57 |
| 8 | Q.      I'm just trying to formulate the question in | 11:34:07 |
| 9 | my mind. | 11:34:10 |
| 10 | What would be the reasons to place Mr. Ortega | 11:34:13 |
| 11 | in a cast, given the injuries that you diagnosed? | 11:34:18 |
| 12 | A.      If you stretch out the ligaments, what you | 11:34:21 |
| 13 | basically want to do is protect them from being further | 11:34:24 |
| 14 | stretched by movement, so you put them in a cast.  They | 11:34:27 |
| 15 | can't move it.  And that way, you decrease the pain | 11:34:31 |
| 16 | somebody feels and you'll also allow these things to | 11:34:34 |
| 17 | kind of become stiff.  And a lot of times, just rest | 11:34:36 |
| 18 | with a cast and people get better. | 11:34:40 |
| 19 | Q.      Would -- you know, this case, I think we | 11:34:43 |
| 20 | discussed the fact that there was a three-month gap | 11:34:46 |
| 21 | between the, I guess, the one visit with a doctor in the | 11:34:50 |
| 22 | Kaiser medical group and then the visit with you in | 11:34:57 |
| 23 | August of 2006.  Would unrestricted movement of the kind | 11:34:59 |
| 24 | that a cast is designed to restrict in that period of | 11:35:05 |
| 25 | time, would that have exacerbated the injury? | 11:35:08 |

33

| | | |
|---|---|---|
| 1 | **A.** For the numbness, no. (Indicating.) Probably | 11:35:13 |
| 2 | not. For the ligaments, kind of -- "exacerbated" is a | 11:35:16 |
| 3 | strong word. Sometimes things percolate a little longer | 11:35:22 |
| 4 | than necessary, but barring any major stuff, usually, | 11:35:26 |
| 5 | you know, if you don't do anything, other trauma, fall | 11:35:29 |
| 6 | off a motorcycle, usually it will get better. | 11:35:34 |
| 7 | MR. HIGA: I think those are all the questions | 11:35:42 |
| 8 | I have. | 11:35:43 |
| 9 | FURTHER EXAMINATION BY MR. VOSE | 11:35:43 |
| 10 | MR. VOSE: Q. I just have one other question | 11:35:44 |
| 11 | and I'll try to formulate it so it makes sense. | 11:35:46 |
| 12 | The type of injury that occurred on -- again, | 11:35:53 |
| 13 | I'm referring to the top of the wrist area. Would that | 11:35:57 |
| 14 | injury be caused or could that injury be caused -- or | 11:36:03 |
| 15 | how would that kind of an injury typically be caused? | 11:36:07 |
| 16 | Let me ask you that, first. | 11:36:09 |
| 17 | A. If it's -- there's two things. So, if it's -- | 11:36:12 |
| 18 | and it's difficult to say for sure, but if you have a | 11:36:14 |
| 19 | retinaculum, soft tissue, you stretch it, it's | 11:36:18 |
| 20 | irritated. Stretch it -- at the same time, you could be | 11:36:21 |
| 21 | stretching out the ligaments. So, either one of these | 11:36:23 |
| 22 | are perfectly plausible injuries, mechanism of injury, | 11:36:25 |
| 23 | can be treated the same way. So, basically, you stretch | 11:36:33 |
| 24 | it and you kind of stretch out the whole tissue, soft | 11:36:36 |
| 25 | tissue, and people feel discomfort, pain, so.... And | 11:36:40 |

34

| | | | |
|---|---|---|---|
| 1 | then, you know, without necessarily tearing it, where | | 11:36:45 |
| 2 | you need to go in to operate or anything like that. | | 11:36:49 |
| 3 | **Q.** So, typically, that type of injury, then, if I | | 11:36:52 |
| 4 | understand, would be caused by a stretching kind of an | | 11:36:55 |
| 5 | action on that ligament? | | 11:36:59 |
| 6 | **A.** Yes, more likely. | | 11:37:02 |
| 7 | **Q.** Now, would -- could that kind of injury be | | 11:37:04 |
| 8 | caused simply by putting pressure, without any movement, | | 11:37:08 |
| 9 | but simply pressure on that injury -- or on that | | 11:37:11 |
| 10 | ligament?  Excuse me. | | 11:37:16 |
| 11 | **A.** A little surprising, just pressure.  And if | | 11:37:17 |
| 12 | you fell -- I've seen people fall and they've done that | | 11:37:19 |
| 13 | (demonstrating), and that's done.  But just pushing on | | 11:37:24 |
| 14 | it.... | | 11:37:26 |
| 15 | **Q.** Is that a "no" or "unlikely"? | | 11:37:30 |
| 16 | **A.** It's unlikely. | | 11:37:33 |
| 17 | **Q.** So it really is a stretching kind of an | | 11:37:35 |
| 18 | injury? | | 11:37:37 |
| 19 | **A.** Yes. | | 11:37:38 |
| 20 | **Q.** Okay.  When you examined Mr. Ortega on August | | 11:37:38 |
| 21 | 29, did you notice any injury to the -- to his skin in | | 11:37:45 |
| 22 | the area of the injury? | | 11:37:54 |
| 23 | **A.** Not -- no.  Typically, we -- we're not | | 11:37:55 |
| 24 | perfect.  We try to write these things down.  But, for | | 11:37:58 |
| 25 | example, I've had patients who see (sic) obvious | | 11:38:01 |

|     |                                                          | 35       |
|-----|----------------------------------------------------------|----------|
| 1   | scarring or it's a fresh injury, then you see these       | 11:38:04 |
| 2   | things. We try to write them down the best we can. I      | 11:38:07 |
| 3   | didn't write any of that down, so my assumption is that   | 11:38:10 |
| 4   | there was no swelling and there was no scarring there.    | 11:38:13 |
| 5   | **MR. VOSE:**      Okay. Okay. That's it for me.          | 11:38:15 |
| 6   | EXAMINATION BY MR. JACOBSEN                                | 11:38:20 |
| 7   | **MR. JACOBSEN:**     Q. Dr. Haney, my name is            | 11:38:21 |
| 8   | Steven Jacobsen. I represent your patient, Benjamin       | 11:38:23 |
| 9   | Ortega. I do have a few questions for you.                | 11:38:27 |
| 10  | Your diagnosis on August 29 was a ligamentous             | 11:38:29 |
| 11  | strain, correct?                                          | 11:38:35 |
| 12  | A.      Right.                                             | 11:38:36 |
| 13  | Q.      But you also had:                                  | 11:38:36 |
| 14  | "Differential diagnosis also includes                     | 11:38:37 |
| 15  | synovial fibrosis/impingement following                   | 11:38:40 |
| 16  | ligamentous injury."                                      | 11:38:53 |
| 17  | A.      Sometimes if you damage the capsule of the        | 11:38:55 |
| 18  | joint, so, for example, if you take an ankle, you can     | 11:38:58 |
| 19  | get -- inside the joint capsule is what we call           | 11:39:02 |
| 20  | synovium. That's where it lines the joint. Sometimes     | 11:39:05 |
| 21  | that tissue can react by getting a little thickened and   | 11:39:08 |
| 22  | irritated and you can get a synovitis. We see a lot       | 11:39:11 |
| 23  | more ankle injuries and that happens. It's not rare.      | 11:39:17 |
| 24  | You do see it a lot in ankle injuries.                    | 11:39:20 |
| 25  | Q.      At the time you saw Mr. Ortega, you felt that     | 11:39:25 |

|    |    |    | 36 |
|----|----|----|----|
| 1 | | that was also a possibility in his case? | 11:39:27 |
| 2 | A. | Uh-huh. | 11:39:30 |
| 3 | Q. | Yes? | 11:39:30 |
| 4 | A. | If I wrote it as part of the differential, | 11:39:31 |
| 5 | | it's out there as a possibility. | 11:39:34 |
| 6 | Q. | When you saw him again on September 19, was | 11:39:36 |
| 7 | | that no longer part of your diagnosis? | 11:39:42 |
| 8 | A. | Essentially, when I saw him on the 19th, he | 11:39:46 |
| 9 | | was significantly better or resolved. So, in essence, | 11:39:49 |
| 10 | | whether it was synovitis or a retinaculitis or a | 11:39:51 |
| 11 | | ligament strain, it's gone. He's better. So, we just | 11:39:57 |
| 12 | | kind of -- we don't go working up what it could have | 11:40:00 |
| 13 | | been if it's all gone. | 11:40:03 |
| 14 | Q. | Now, on the 19th of September, when you saw | 11:40:06 |
| 15 | | him for the second time, your records indicate that your | 11:40:09 |
| 16 | | assessment was "ligamentous strains improved," correct? | 11:40:13 |
| 17 | A. | Uh-huh. | 11:40:18 |
| 18 | Q. | Yes? | 11:40:19 |
| 19 | A. | Yes. | 11:40:19 |
| 20 | Q. | But you didn't say "resolved" at that time, | 11:40:21 |
| 21 | | correct? | 11:40:23 |
| 22 | A. | No, I did not use the word "resolved," but he | 11:40:24 |
| 23 | | had no tenderness over there, so I probably could have | 11:40:26 |
| 24 | | been stronger and said "resolved." | 11:40:29 |
| 25 | Q. | Did he have decreased sensation to light touch | 11:40:32 |

|    |                                                          | 41       |
|----|----------------------------------------------------------|----------|
| 1  | described in which his wrist was bent down by a police    | 11:46:25 |
| 2  | officer?                                                  | 11:46:30 |
| 3  | **A.**      I rely on what people tell me and, you know, I | 11:46:31 |
| 4  | rely on what the patient tells me.                        | 11:46:36 |
| 5  | **Q.**      And given your experience and training, is    | 11:46:41 |
| 6  | that consistent with what he told you?                    | 11:46:43 |
| 7  | **A.**      It goes -- I mean, I wasn't there.  I don't   | 11:46:46 |
| 8  | know how much the wrist was bent, but, theoretically,     | 11:46:48 |
| 9  | yes, it could happen and -- but, you know, it's -- yes.   | 11:46:52 |
| 10 | **MR. JACOBSEN:**      Thank you, Doctor.                 | 11:46:59 |
| 11 | **MR. HIGA:**      I have nothing.                        | 11:47:02 |
| 12 | **THE VIDEOGRAPHER:**      This concludes the             | 11:47:06 |
| 13 | deposition of Dr. Sean Haney, M.D.  The present time is   | 11:47:08 |
| 14 | 11:47.  The electronic record contains one video disk,    | 11:47:11 |
| 15 | the originals to be retained by Televideo Production      | 11:47:18 |
| 16 | Services at 3655 Grand Avenue in Oakland, California,     | 11:47:21 |
| 17 | 94610, phone, (510) 893-0555. Copies are available to    | 11:47:25 |
| 18 | interested parties unless otherwise stipulated.          | 11:47:33 |
| 19 | We're now off the record.                                | 11:47:36 |
| 20 | (Deposition adjourned at 11:47 a.m.)                     | 11:47:38 |
| 21 | --oOo--                                                   |          |
| 22 |                                                          |          |
| 23 |                                                          |          |
| 24 |                                                          |          |
| 25 |                                                          |          |

U.S. LEGAL SUPPORT

1  | STEVEN R. JACOBSEN, BAR NO. 95246
   | srj@theaccidentallawyer.com
2  | BRENDA D. POSADA, BAR NO. 152480
   | bdp@theaccidentallawyer.com
3  | LAW OFFICES OF STEVEN R. JACOBSEN
   | 901 CLAY STREET
4  | OAKLAND, CALIFORNIA 94607
   | TELEPHONE: (510) 465-1500
5  |
   | ATTORNEY FOR PLAINTIFF
6  | BENJAMIN ORTEGA

7

8                    IN THE UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10

11  | MIGUEL ORTEGA, BENJAMIN          ) Case No.: C-07-02659 JCS
    | ORTEGA, A Minor, By And Through  )
12  | His Guardian Ad Litem, ANA ROSA  ) PLAINTIFF'S RESPONSE TO THE
    | ORTEGA,                          ) DEFENDANT ALCANTAR'S OBJECTIONS
13  |                                  ) TO DEPOSITION DESIGNATIONS
    |          Plaintiffs,             ) OF THE TESTIMONY OF DR. SEAN HANEY
14  |                                  )
    |              vs.                 )
15  |                                  )
    | CITY OF OAKLAND, OAKLAND         )          Arulmyr
16  | POLICE DEPARTMENT, CHIEF         )
    | WAYNE TUCKER, In His Capacity As )
17  | The Police Chief Of The City Of  )
    | Oakland, RAMON J. ALCANTAR,      )
18  | Individually And In His Capacity As A ) Trial Date: December 1, 2008
    | Police Officer For The City Of Oakland, )
19  | BERNARD ORTIZ, Individually And In )
    | His Capacity As A Police Officer For )
20  | The City Of Oakland, and Does 1  )
    | through 200,                     )
21  |                                  )
    |          Defendants.
22

23      Plaintiff hereby submits the following response to the objections to the plaintiff's

24  designations of deposition testimony of Dr. Sean Haney who will be appearing by deposition in

25  lieu of live testimony. Plaintiff submits the following designation in conformity with Case

26  Management and Pretrial Order dated November 20, 2007.

27

28
                                          -1-
                        PLAINTIFF'S DEPOSITION DESIGNATIONS
                        OF THE TESTIMONY OF DR. SEAN HANEY
                                 Case No. C-07-02659 JCS

| Ofc. Alcantar's Objections | Ofc. Alcantar's Counter Designations/Supplemental Designations | Plaintiff's Response |
|---|---|---|
| 18:20-25 Hearsay | | Disputed. A non-retained expert may rely on hearsay statements in forming expert opinions.<br>FRE 703 |
| 27:3-11 Insufficient Foundation (in that designated testimony is an incomplete articulation of Dr. Haney's actual testimony on this issue). | 27:1-25 | Undisputed. Plaintiff accepts defendant's counter-designation. |
| | 30:1-3 (Follow-up testimony regarding lack of scarring on plaintiff's right wrist at time of first visit.) | Undisputed. Plaintiff accepts defendant's counter-designation. |
| | 32:19-33:6 (Additional opinion testimony regarding possibility of exacerbation based on Plaintiff's gap in treatment) | Objection. Lacks foundation. Calls for speculation. Assumes facts not in evidence. |
| | 34:7-19 (Additional opinion testimony regarding cause of injury) | Objection. Lacks foundation. Calls for speculation. Assumes facts not in evidence. |
| | 34:20-35:4 (Testimony regarding scarring not visible | Objection. Lacks foundation. Calls for speculation. |

-2-
PLAINTIFF'S DEPOSITION DESIGNATIONS
OF THE TESTIMONY OF DR. SEAN HANEY
Case No. C-07-02659 JCS

| | at time of first visit) | |
|---|---|---|
| 36:19-25 Hearsay | 36:8-13 | Plaintiff does not dispute the objection to 36:19-24 but disputes 36:25. Plaintiff accepts defendant's counter designation of 36:8-13. |
| 37:1-19 Lacks foundation; Improper hypothetical | | Undisputed. Plaintiff accepts defendant's counter-designation. |
| 38:2-4 Unintelligible— citation contains no testimony. | | Undisputed. Plaintiff accepts defendant's counter-designation. |
| 38:7-23; 38:16-25;39:1-11 Lacks foundation; Improper hypothetical; Assumes facts not in evidence | | Undisputed. Plaintiff accepts defendant's counter-designation. |

So submitted.

DATED: November 20, 2008

Respectfully submitted,
LAW OFFICES OF STEVEN R. JACOBSEN

By_____ \s\ _____
    BRENDA D. POSADA
    STEVEN R. JACOBSEN
    Attorneys for Plaintiff Benjamin Ortega

-3-

1  STEVEN R. JACOBSEN, BAR NO. 95246
   srj@theaccidentallawyer.com
2  BRENDA D. POSADA, BAR NO. 152480
   bdp@theaccidentallawyer.com
3  LAW OFFICES OF STEVEN R. JACOBSEN
   901 CLAY STREET
4  OAKLAND, CALIFORNIA 94607
   TELEPHONE: (510) 465-1500
5
   ATTORNEY FOR PLAINTIFF
6  BENJAMIN ORTEGA

7

8              IN THE UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  MIGUEL ORTEGA, BENJAMIN          )  Case No.: C-07-02659 JCS
    ORTEGA, A Minor, By And Through  )
12  His Guardian Ad Litem, ANA ROSA  )  PLAINTIFF'S DEPOSITION DESIGNATIONS
    ORTEGA,                          )  OF THE TESTIMONY OF DR. SEAN HANEY
13                                   )
            Plaintiffs,              )
14                                   )  Cf Reedings
        vs.                          )
15                                   )
    CITY OF OAKLAND, OAKLAND         )
16  POLICE DEPARTMENT, CHIEF         )
    WAYNE TUCKER, In His Capacity As )
17  The Police Chief Of The City Of  )  Trial Date: December 1, 2008
    Oakland, RAMON J. ALCANTAR,      )
18  Individually And In His Capacity As A )
    Police Officer For The City Of Oakland, )
19  BERNARD ORTIZ, Individually And In )
    His Capacity As A Police Officer For The )
20  City Of Oakland, and Does 1 through )
    200,                             )
21          Defendants.              )

22

23      Plaintiff hereby submits the following designations of deposition testimony of Dr. Sean

24  Haney who will be appearing by deposition in lieu of live testimony. Plaintiff submits the

25  following designation in conformity with Case Management and Pretrial Order dated November

26  20, 2007.

27      The following excerpts hereto attached are taken from the transcript of Deposition of

28
                                    -1-

1 | Sean M. Haney, M.D. taken July 21, 2008, specifically:

2 | ~~7:15-18~~

3 | 9:6-25

4 | 10:1-16

5 | 10:23-25

6 | 11:1-2

7 | 11:4-20

8 | 12:6-12

9 | 12:14-25

10 | 13:1-25

11 | 14:1-14

12 | 15:1-2

13 | 17:13-25

14 | 18:1-25

15 | 19:1-3

16 | 19:6-11

17 | 19:18-22

18 | 20:6-23

19 | 21:1-16

20 | 22:22-25

21 | 23:1-25

22 | 24:5-25

23 | 25:1-2

24 | 25:5-25

25 | 26:1-25

26 | 27:3-11

27 | 28:1-25

28 | 29:1-4

-2-

1   29:13-25

2   31:2-17

3   31:19-25

4   33:15-25

5   34:1-6

6   35:10-25

7   36:1-16

8   36:19-25

9   37:1-19

10  38:2-4

11  38:7-13

12  38:16-25

13  39:1-11

14  40:18-25

15  41:1-10

16      The above pages are attached hereto as Exhibit A with objections and certain language

17  interlineated in order to provide for a smooth flow during the re-reading of the testimony at trial.

18

19  DATED: October 31, 2008                    Respectfully submitted,
                                               LAW OFFICES OF STEVEN R. JACOBSEN

20

21                                      By

22                                         BRENDA D. POSADA
                                           STEVEN R. JACOBSEN

23                                         Attorneys for Plaintiff Benjamin Ortega

24

25

26

27

28

-3-

PLAINTIFF'S DEPOSITION DESIGNATIONS
OF THE TESTIMONY OF DR. SEAN HANEY
Case No. C-07-02659 JCS

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL ORTEGA, et al.,          )
                                )
            Plaintiffs,         )
                                )
        vs.                     )    No. C07-02659 JCS
                                )
CITY OF OAKLAND, et al.,        )
                                )
            Defendants.         )
_____)

**CERTIFIED COPY**

DEPOSITION OF SEAN M. HANEY, M.D.

OAKLAND, CALIFORNIA

MONDAY, JULY 21, 2008

REPORTED BY:

Dominique Isabeau

CSR No. 7076



Certified Shorthand Reporters

180 Montgomery Street
Suite 2180
San Francisco, CA 94104

888-575-3376 • Fax 888-963-3376
www.uslegalsupport.com

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

MIGUEL ORTEGA, et al.,      )
4                           )
            Plaintiffs,      )
5                           )
            vs.              )   No. C07-02659 JCS
6                           )
CITY OF OAKLAND, et al.,   )
7                           )
            Defendants.     )
8       _____ )

9

10

11

12

13

14

15          Deposition of SEAN M. HANEY, M.D., taken on

16      behalf of the defendants, at 235 West

17      MacArthur Boulevard, Room 669, Oakland,

18      California 94611, beginning at 10:53 a.m. and

19      ending at 11:47 a.m., on Monday, July 21,

20      2008, before Dominique Isabeau, CSR No. 7076.

21

22

23

24

25

                                                    2

**U.S. LEGAL SUPPORT**

10:53:54 1    parties please identify themselves and for whom they're

10:53:57 2    appearing?

10:53:58 3              MR. VOSE:  Charles Vose, Deputy City Attorney,

10:54:00 4    appearing for the City of Oakland, Oakland Police

10:54:03 5    Department, Chief Wayne Tucker and Sergeant Bernard

10:54:07 6    Ortiz.

10:54:09 7              MR. HIGA:  James Higa appearing on behalf of

10:54:10 8    Officer Ramon Alcantar.

10:54:13 9              MR. JACOBSEN:  Steven Jacobsen appearing on

10:54:14 10   behalf of plaintiffs.

10:54:16 11             THE VIDEOGRAPHER:  Thank you.  Would counsel

10:54:16 12   please state any stipulations or statements they would

10:54:19 13   like on the record at this time?

10:54:21 14             MR. VOSE:  Not at this time.

10:54:23 15             THE VIDEOGRAPHER:  The reporter may now swear

10:54:24 16   the witness.

10:54:27 17                       SEAN M. HANEY, M.D.,

10:54:27 18        having been duly sworn, testified as follows:

10:54:27 19

09:20:55 20                  EXAMINATION BY MR. VOSE

10:54:37 21             MR. VOSE:  Q.  Morning, Dr. Haney.

10:54:38 22        A.    Good morning.

10:54:39 23        Q.    My name is Charles Vose.  I represent the City

10:54:43 24   of Oakland as well as the chief of police and a police

10:54:46 25   sergeant in this matter.

                                                              7

| | |
|---|---|
| 10:55:52 1 | best -- your best estimate regarding something. So, if |
| 10:55:58 2 | I ask a question that asks you to estimate, while your |
| 10:56:02 3 | answer may not be precise, I'm entitled to your best |
| 10:56:05 4 | estimate in that regard. |
| 10:56:07 5 | A.   Uh-huh. |
| 10:56:08 6 | Q.   I wanted to preliminarily go through your |
| 10:56:13 7 | background.  Where did you obtain your medical degree? |
| 10:56:17 8 | A.   From the Karolinska Institute in Stockholm, |
| 10:56:20 9 | Sweden. |
| 10:56:22 10 | Q.   What year was that? |
| 10:56:23 11 | A.   1999. |
| 10:56:25 12 | Q.   Where did you -- following that, you did |
| 10:56:27 13 | work -- residency work? |
| 10:56:28 14 | A.   Yes. |
| 10:56:28 15 | Q.   Where was that? |
| 10:56:29 16 | A.   Mayo -- I did internship at Mayo Clinic and |
| 10:56:33 17 | residency at UCLA. |
| 10:56:35 18 | Q.   UCLA? |
| 10:56:36 19 | A.   Yes. |
| 10:56:36 20 | Q.   Was that residency -- did you specialize in |
| 10:56:39 21 | any particular area? |
| 10:56:40 22 | A.   I specialized in family medicine and I did a |
| 10:56:44 23 | fellowship in sports medicine, essentially, |
| 10:56:46 24 | non-operative orthopedics.  That's what I've been doing |
| 10:56:49 25 | for the last three years here at Kaiser. |

9

**U.S. LEGAL SUPPORT**

```
10:56:52  1         Q.    And so you've worked at Kaiser for three

10:56:53  2   years?

10:56:54  3         A.    Yes.

10:56:54  4         Q.    Is that, all those three years, here in

10:56:57  5   Oakland?

10:56:58  6         A.    Yes.

10:56:59  7         Q.    Now, you said you -- so, you basically

10:57:01  8   specialize in, you said, in orthopedic --

10:57:04  9         A.    Yes.

10:57:05 10         Q.    -- injuries?

10:57:06 11         A.    Yes.

10:57:10 12         Q.    And you brought -- included with the

10:57:12 13   deposition notice today is a subpoena duces tecum for

10:57:16 14   medical records.  You brought those medical records with

10:57:19 15   you?

10:57:20 16         A.    Yes, I did.

10:57:21 17         Q.    Okay.

10:57:24 18               Steve, any questions that you want to ask

10:57:25 19   regarding his background and training before we go

10:57:27 20   forward?

10:57:28 21               MR. JACOBSEN:  No.  Thank you.

10:57:29 22               MR. VOSE:  Okay.

10:57:33 23         Q.    Dr. Haney, when did you first treat Mr.

10:57:37 24   Ortega?  When I say "Mr. Ortega," I'm referring to

10:57:39 25   the one of the plaintiffs in this case, Benjamin
```

                                                                    10

**U.S. LEGAL SUPPORT**

10:57:43  1    Ortega.

10:57:44  2         A.    August 29th, 2006.

10:57:49  3         Q.    And so you were not his -- well, strike that.

10:57:55  4               Why were you assigned to treat Mr. Ortega or

10:58:00  5    how did you come to treat Mr. Ortega?

10:58:02  6         A.    So, basically, he sustained an injury, which

10:58:05  7    pediatrics -- he had come back to pediatrics, and then

10:58:10  8    if somebody has continued orthopedic pain or

10:58:13  9    musculoskeletal pain, they'll refer them to see somebody

10:58:16 10    within the orthopedic department.

10:58:20 11         Q.    So he was a referral to the orthopedic

10:58:23 12    department?

10:58:23 13         A.    Yes.

10:58:25 14         Q.    So you first treated him, you said, on

10:58:27 15    August 29?

10:58:28 16         A.    Yes.  August 29, 2006.

10:58:31 17         Q.    So you were not his treating physician when he

10:58:35 18    initially came to Kaiser for the injury that you

10:58:48 19    ultimately treated him for?

10:58:50 20         A.    No, I was not.

10:58:51 21         Q.    It's important that I get the whole question

10:58:53 22    out.  I know it's a habit, and I do the same thing.

10:58:56 23         A.    Sorry.  In our business, it's, like, you got

10:58:57 24    to -- so, I'll try to do better.

10:59:00 25         Q.    We get you for a whole hour, so just --

                                                                    11

10:59:03  1      ~~A. Sorry.~~

10:59:07  2       Q. ~~Now, prior to treating Mr. Ortega on August~~

10:59:12  3   ~~29th, did you have an occasion to review his medical~~

10:59:16  4   ~~chart related to this injury?~~

10:59:18  5       ~~A. No, I did not.~~

10:59:20  6       ·   Q.    And while you were treating -- so, when you --

10:59:24  7   when the referral came to you, what was the nature of

10:59:27  8   the injury that you were asked to treat Mr. Ortega for?

10:59:31  9       A.    For wrist pain. For wrist pain.

10:59:36 10       Q.    No other injuries?

10:59:38 11       A.    No.

10:59:46 12       Q.    So, when you saw Mr. Ortega on August 29th,

10:59:52 13   ~~what did you do? What did you -- what did you~~

10:59:57 14   ~~determine -- excuse me. Strike that.~~ What did you talk

11:00:00 15   to him about?

11:00:00 16       A.    So, I talked about how this occurred, where he'

11:00:04 17   was hurting, how long has he had the pain, and then that

11:00:09 18   sort of started the visit.

11:00:12 19       Q.    What did he say with respect to how the injury

11:00:14 20   occurred?

11:00:15 21       A.    He said he was cuffed and his hands were in a

11:00:19 22   flexed position.

11:00:26 23       Q.    And when did he indicate that that happened?

11:00:30 24       A.    When I had seen him, approximately three and a

11:00:32 25   half months prior.

12

11:00:43  1    Q.    And what type of pain or ongoing problem did

11:00:48  2    he describe to you?

11:00:49  3    A.    He described some pain on the dorsal aspect of

11:00:53  4    his wrist and some numbness over a certain area of his

11:00:57  5    thumb.

11:00:57  6    Q.    You said the dorsal aspect of his wrist.

11:00:57  7    You're talking about the upper -- the part of his wrist

11:01:00  8    that would be adjacent to the back of his hand?

11:01:02  9    A.    Correct.  Dorsal.

11:01:04 10    Q.    And then also his thumb, you said?

11:01:07 11    A.    He complained of numbness in this area.

11:01:11 12    (Indicating.)

11:01:25 13    Q.    And so you proceeded to do an examination?

11:01:28 14    A.    Correct.

11:01:29 15    Q.    And what constituted your examination of him?

11:01:33 16    A.    Checking out his range of motion, where he

11:01:36 17    hurt, and then determining if he indeed had a decreased

11:01:44 18    sensation over a certain area.

11:01:51 19    Q.    What were your conclusions with regard to that

11:01:55 20    examination that you did?

11:01:56 21    A.    He had some pain over the dorsal aspect of his

11:01:59 22    wrist around this area and he had some decreased

11:02:03 23    sensation to light touch around this area, around the

11:02:08 24    thumb.  (Indicating.)

11:02:09 25    Q.    Now, with respect to the pain, how were you

13

| | |
|---|---|
| 11:02:15  1 | able to determine from your examination that he had pain |
| 11:02:17  2 | in the ~~wwwwww~~ wrist? |
| 11:02:20  3 | A.    Usually it's palpation, so we'll feel, when |
| 11:02:25  4 | somebody complains about pain, we'll feel the area.  And |
| 11:02:27  5 | sometimes we'll do some movements or something to see if |
| 11:02:31  6 | we can reproduce the pain. |
| 11:02:33  7 | Q.    Is that what you did in this case? |
| 11:02:34  8 | A.    Yes, I did. |
| 11:02:36  9 | Q.    ~~So you were able to determine~~ -- when you were |
| 11:02:39 10 | doing that examination, did he react some way? |
| 11:02:42 11 | A.    Yes.  He had some pain with wrist -- resisted |
| 11:02:46 12 | wrist extension, so that seemed to hurt him, and then |
| 11:02:49 13 | this hurt him as well.  (Demonstrating.) |
| 11:03:02 14 | Q.    Do you know about how long your examination of |
| 11:03:04 15 | Mr. Ortega took? |
| 11:03:07 16 | A.    The examination itself or the whole visit? |
| 11:03:10 17 | Q.    Well, the whole visit. |
| 11:03:12 18 | A.    Probably ten to 15 minutes, something like |
| 11:03:14 19 | that. |
| 11:03:16 20 | Q.    And was -- do you remember if Mr. Ortega was |
| 11:03:19 21 | accompanied by anyone? |
| 11:03:22 22 | A.    I think he was there with either his mother or |
| 11:03:25 23 | a girlfriend or something.  I don't remember |
| 11:03:28 24 | specifically.  I think he had company that day, but I |
| 11:03:30 25 | don't remember. |

14

11:03:49  1       Q.    And which hand was this?

11:03:54  2       A.    Right.

11:03:55  3       Q.    His right hand.

11:04:00  4             Now, prior to or during the time that you

11:04:06  5    treated Mr. Ortega, did you have occasion to look at his

11:04:10  6    medical charts, his Kaiser medical records?

11:04:16  7       A.    I looked at some of his records, yes.

11:04:20  8       Q.    Do you remember when that was that you looked

11:04:21  9    at those records?

11:04:22 10       A.    When I saw him initially on the 29th.

11:04:25 11       Q.    So, that day?

11:04:26 12       A.    Yes.

11:04:27 13       Q.    And did you, in reviewing those records, look

11:04:35 14    at records related to an injury that he sustained when

11:04:42 15    he was -- in 1997, when he was about six years old?

11:04:47 16       A.    No.

11:04:59 17       Q.    I'm going to show you -- I guess I'll have

11:05:01 18    these marked.   Let's see.

11:05:31 19             I'm going to have these -- can you mark these

11:05:33 20    as two -- well, why don't you mark them as two separate

11:05:40 21    exhibits.

11:05:40 22             (Whereupon, Deposition Exhibits 13 and 14

11:05:40 23             was marked for identification.)

11:06:00 24             MR. VOSE:   Q.   I'm showing you what's been

11:06:02 25    marked as Exhibits 13 and 14.  And can you take a chance

                                                              15

| | |
|---|---|
| 11:06:06 1 | to review, take a minute to review those records? |
| 11:06:10 2 | A.    (Reviews documents.)  Yes, I can. |
| 11:06:30 3 | Q.    And what do those records talk about? |
| 11:06:36 4 | A.    This indicates that he, as a six-year-old, |
| 11:06:39 5 | fell down and injured his right elbow, Spanish-speaking |
| 11:06:44 6 | gentleman, or six-year-old, that he had some pain, |
| 11:06:47 7 | vascular status was okay, but it looks like, on the |
| 11:06:53 8 | X ray at this time, there was an olecranon fracture. |
| 11:06:57 9 | Q.    What is that? |
| 11:06:58 10 | A.    Right here.  (Indicating.) |
| 11:06:59 11 | Q.    He had a fracture of his right elbow? |
| 11:07:02 12 | A.    Yes.  And that was put in a cast, a long-arm |
| 11:07:05 13 | cast. |
| 11:07:06 14 | Q.    Okay. |
| 11:07:07 15 | A.    And then that's record No. 13. |
| 11:07:10 16 | Fourteen is a follow-up.  It appears he had a |
| 11:07:21 17 | follow-up visit a month later.  And he's got full range |
| 11:07:25 18 | of motion of his elbow with good neurovascular status. |
| 11:07:31 19 | And I can't exactly read what this individual wrote, but |
| 11:07:40 20 | it looks like -- yes. |
| 11:07:44 21 | Q.    Okay.  So, thank you. |
| 11:07:50 22 | So, it appears, if I understand it, that he |
| 11:07:53 23 | broke his right elbow.  The records show that he broke |
| 11:07:56 24 | his right elbow when he was about six? |
| 11:07:59 25 | A.    Correct. |

16

**U.S. LEGAL SUPPORT**

| | |
|---|---|
| 11:07:59 1 | Q. And that about a month later, it appeared to |
| 11:08:01 2 | be healing normally? |
| 11:08:02 3 | A. Yes. |
| 11:08:03 4 | Q. Would that be a normal healing time for that |
| 11:08:06 5 | type of injury? |
| 11:08:07 6 | A. Yes. |
| 11:08:08 7 | Q. And would that injury, since it was on the |
| 11:08:12 8 | same arm as his wrist and hand injury that you saw him |
| 11:08:17 9 | for, would that have any -- would there be any lasting |
| 11:08:23 10 | effects from that elbow break that would have any effect |
| 11:08:28 11 | on the injuries that you saw him for? |
| 11:08:31 12 | A. I don't believe so. |
| 11:08:32 13 | Q. Okay. So, at the conclusion of your initial |
| 11:09:01 14 | visit with Mr. Ortega in August of '06, what was your |
| 11:09:08 15 | prognosis, I guess would be the right word? |
| 11:09:13 16 | A. My prognosis was, I thought he would probably |
| 11:09:16 17 | do well. |
| 11:09:16 18 | Q. What was the injury that he had? |
| 11:09:18 19 | A. I believe his injury was partly to the |
| 11:09:22 20 | ligaments, and there's tissue over the ligaments, the |
| 11:09:25 21 | retinaculum, and then there may have been some pressure |
| 11:09:29 22 | on one of the superficial nerves that innervate this |
| 11:09:32 23 | area. (Indicating.) And, typically, given time and |
| 11:09:35 24 | rest, they can do pretty well. |
| 11:09:38 25 | Q. Is that an injury to -- |

17

**U.S. LEGAL SUPPORT**

11:09:40  1    the muscle or to tendons?

11:09:43  2        A.    It is a -- retinaculum is kind of a tissue

11:09:48  3    that kind of keeps everything in place, and then

11:09:51  4    ligament.  So, the ligaments between the carpals.  So,

11:09:54  5    it's a little bit different than tendon or bone or

11:09:57  6    muscle.

11:09:58  7            And we have the super -- we have nerves, and

11:10:01  8    there's a superficial nerve that innervates this area,

11:10:05  9    and if you put enough pressure on it, it can sometimes

11:10:08 10    kind of not fire properly.  But a lot of times, without

11:10:12 11    a frank injury, cutting or something like that, they can

11:10:15 12    come back, so....

11:10:16 13        Q.    Would the two -- and would it be your

11:10:19 14    conclusion that those two conditions, the condition on

11:10:23 15    the wrist as well as the condition in the thumb area,

11:10:26 16    are related?

11:10:28 17        A.    Related in the sense that he's -- an injury

11:10:32 18    that could have -- yes.  I mean, something -- same thing

11:10:35 19    could have caused it, yes.  Yes.

11:10:39 20        Q.    Did Mr. Ortega, at any time between the time

11:10:44 21    or from the time he says that he was injured and the

11:10:49 22    time that he saw you, did he indicate that he had any

11:10:51 23    other -- anything else that might have happened that

11:10:56 24    could have caused that injury?

11:10:57 25        A.    No.

                                                                18

| | |
|---|---|
| 11:11:00 1 | Q.   Now, so, what treatment did you recommend? |
| 11:11:12 2 | A.   I recommended that he be placed in a cast for |
| 11:11:22 3 | three weeks, a month, something like that. |
| 11:11:25 4 | Q.   So you recommended to place him in a -- |
| 11:11:27 5 | A.   Yes. |
| 11:11:27 6 | Q.   What type of a cast did you recommend that he |
| 11:11:30 7 | be placed in? |
| 11:11:31 8 | A.   A short-arm, a short-arm cast. |
| 11:11:34 9 | Q.   Could you describe what a short-arm cast is? |
| 11:11:36 10 | A.   It basically goes from below the elbow to the |
| 11:11:42 11 | fingers, the palm, about here.  (Indicating.) |
| 11:11:44 12 | Q.   And does that -- is that a permanent cast -- |
| 11:11:47 13 | A.   No. |
| 11:11:47 14 | Q.   -- or is that a cast that can be removed? |
| 11:11:50 15 | A.   It's permanent in the sense that the patient |
| 11:11:52 16 | can't take it off unless they worked hard.  But it's not |
| 11:11:56 17 | permanent.  It's intended for about a month. |
| 11:12:01 18 | Q.   So he would have to wear that for about a |
| 11:12:03 19 | month? |
| 11:12:04 20 | A.   Yes. |
| 11:12:05 21 | Q.   But it's not -- it's not a plaster cast? |
| 11:12:10 22 | A.   It is a plaster cast. |
| 11:12:11 23 | Q.   It is a plaster cast? |
| 11:12:14 24 | A.   Yes.  If I hesitate with "permanent," a month |
| 11:12:18 25 | is not, you know.... |

19

11:12:19  1    Q.   I'm sorry.  That might have been a poor choice

11:12:21  2    of words on my part.  What I was referring to was a cast

11:12:24  3    that could be taken off every night when they're

11:12:27  4    sleeping or showering, something like that.

11:12:29  5         A.   No.

11:12:31  6         Q.   And did you put that cast on him?

11:12:34  7         A.   No, I did not.

11:12:36  8         Q.   Would he be referred to another department at

11:12:38  9    Kaiser for that?

11:12:39 10         A.   No.  It would be done within our department by

11:12:42 11    one of our cast technicians.

11:12:47 12         Q.   And did you recommend any other treatment for

11:12:53 13    him that day?

11:12:54 14         A.   No, I did not.

11:12:56 15         Q.   Did you prescribe any medication for him?

11:13:00 16         A.   I did -- I may have given him Motrin.  Or he

11:13:08 17    had been taking Motrin, which would have been

11:13:11 18    appropriate.

11:13:36 19              Yes, it appears he had a prescription for

11:13:38 20    Motrin prior to seeing me.  And so far as my treatment

11:13:42 21    plan, it was short-arm cast for three weeks and continue

11:13:45 22    taking his Motrin.  Someone else had given him a

11:13:54 23    prescription.

11:13:57 24         Q.   Did he -- I may have asked you this already.

11:14:00 25    If I did, I apologize.  Did he complain of any pain in

                                                                    20

**U.S. LEGAL SUPPORT**

11:14:03  1    any other area of his body?

11:14:06  2        A.    I don't recall.  Usually what would happen, if

11:14:10  3    he did, I would document it.  But I don't see that

11:14:12  4    documented.

11:14:13  5        Q.    So your treatment was only for this just wrist

11:14:15  6    and the hand area?

11:14:17  7        A.    Correct.

11:14:24  8        Q.    Would a cast -- is a cast of this type a

11:14:28  9    normal treatment for this type of injury?

11:14:32 10        A.    For ligamentous injury and -- yes, it is.

11:14:37 11    Basically, you want the patient to kind of take the

11:14:40 12    strain off the ligaments.  So, by moving it, you --

11:14:44 13    there's forces going across these, and by putting them

11:14:49 14    in a cast, you limit somebody's movement and it can help

11:14:52 15    decrease the pain.  It can also help ligaments kind of

11:14:55 16    get stiff.  That's what we do.

11:14:58 17        Q.    Now, you had indicated that when you first saw

11:15:00 18    Mr. Ortega, that he said that the injury had occurred

11:15:03 19    about three or three and a half months prior?  Do you

11:15:07 20    have any way of determining whether or not the injury

11:15:11 21    could have gotten better or worse during that

11:15:15 22    three-and-a-half month period before you first saw him?

11:15:18 23        A.    The way you determine it would be asking the

11:15:22 24    patient: "Is this worse or better?"

11:15:25 25        Q.    So, do you remember if you did ask him that?

                                                                    21

```
11:15:27  1       A.    No, I do not remember if I asked him that.

11:15:33  2       Q.    Your notes don't reflect that?

11:15:35  3       A.    No, they don't.  They don't.

11:15:38  4       Q.    Now, when you -- during your treatment of Mr.

11:15:43  5  Ortega -- and I'm not limiting that to just the date

11:15:45  6  that you saw him -- did you consult with any of his

11:15:49  7  other physicians at Kaiser regarding his injury?

11:15:54  8       A.    I spoke to a hand surgeon regarding the sort

11:16:01  9  of numbness in the area and I believe there was some

11:16:06 10  question about whether he could work or not.  And the

11:16:12 11  hand surgeon basically said those typically, if I recall

11:16:15 12  right, resolve and, yes, there's no problem with working

11:16:20 13  as far as that injury goes.

11:16:23 14       Q.    When you say a problem with him working, are

11:16:26 15  you talking about in the long term or are you talking

11:16:28 16  about during the time that he was being treated?

11:16:32 17       A.    Following the casting.  So, when you're in a

11:16:34 18  cast, you can't do much, but afterwards, for the -- sort

11:16:38 19  of the decreased sensation, his muscle strength is

11:16:42 20  strong for that same nerve, so, yes, there's no reason

11:16:45 21  why he can't lift and do stuff for that part.

11:17:07 22       Q.    Now, you then saw Mr. Ortega a second time; is

11:17:14 23  that correct?

11:17:15 24       A.    That is correct.

11:17:16 25       Q.    And when was that second visit?
```

                                                                  22

| | |
|---|---|
| 11:17:20 1 | A.   September 19th, 2006. |
| 11:17:28 2 | Q.   Was that a routine follow-up appointment? |
| 11:17:31 3 | A.   Correct. |
| 11:17:32 4 | Q.   And what did you do in terms of examining Mr. |
| 11:17:40 5 | Ortega on that day? |
| 11:17:42 6 | A.   I -- well, the cast was removed, and then did |
| 11:17:45 7 | sort of the same thing again, range of motion, palpation |
| 11:17:50 8 | and then light touch and then testing muscle function. |
| 11:17:55 9 | Q.   And what were your conclusions regarding his |
| 11:18:07 10 | condition on September 19th of '06? |
| 11:18:10 11 | A.   It essentially resolved.  He had no -- he had |
| 11:18:13 12 | full range of motion in his wrist, he had no tenderness |
| 11:18:15 13 | to palpation over the ligaments where it had been |
| 11:18:21 14 | tender, and decreased sensation with light touch had |
| 11:18:23 15 | resolved.  He felt things equally on side to side. |
| 11:18:28 16 | Q.   And so he was not -- was no longer complaining |
| 11:18:31 17 | of any ongoing pain? |
| 11:18:34 18 | A.   No.  At that point he was -- he was -- he |
| 11:18:37 19 | was -- you know, when I pressed on him, it didn't hurt, |
| 11:18:40 20 | he had no pain with resistive movement, and that he did |
| 11:18:49 21 | feel things when I touched him. |
| 11:19:07 22 | Q.   I'm going to show you X rays that have been |
| 11:19:10 23 | marked as Exhibits 1 through 12.  I'll give those to you |
| 11:19:24 24 | and if you could take a look at those. |
| 11:19:30 25 | A.   (Reviews X rays.) |

23

| | | |
|---|---|---|
| 11:19:35 | 1 | Q.   If you need to organize them in some way, |
| 11:19:38 | 2 | that's fine.   They're in the order that I received them, |
| 11:19:40 | 3 | but they're not in any special order, so.... |
| 11:19:44 | 4 | A.   Okay.   (Reviews X rays.)   Okay. |
| 11:21:10 | 5 | Q.   Now, are these X rays that you ordered or were |
| 11:21:13 | 6 | they ordered by a different doctor? |
| 11:21:15 | 7 | A.   It seems to be both.  Some of these were taken |
| 11:21:18 | 8 | on May 8th, which is before I saw the patient.  And |
| 11:21:22 | 9 | there appears to be at least one of these -- I have to |
| 11:21:26 | 10 | go back and check these -- from August 29.  This would |
| 11:21:31 | 11 | have been when I saw him. |
| 11:21:32 | 12 | Q.   Do you know which ones were ordered on May |
| 11:21:35 | 13 | 8th? |
| 11:21:36 | 14 | A.   Yes.   Let's pick them out here. |
| 11:22:08 | 15 | These are May 8th. |
| 11:22:09 | 16 | Q.   Now, so, let me ask you first, with regard -- |
| 11:22:11 | 17 | I'm going to just -- for the record, the X rays that are |
| 11:22:15 | 18 | dated May 8th are Exhibits 5, 6, 7, 8, 9, 10 and 11. |
| 11:22:27 | 19 | So, with regard to these exhibits -- excuse |
| 11:22:31 | 20 | me -- these X rays, first, did you look at those X rays |
| 11:22:35 | 21 | at the time that you were treating Mr. Ortega? |
| 11:22:38 | 22 | A.   I believe I did. |
| 11:22:40 | 23 | Q.   And what do these X rays -- or what are these |
| 11:22:44 | 24 | X rays of? |
| 11:22:45 | 25 | A.   These are X rays of a right wrist. |

24

**U.S. LEGAL SUPPORT**

11:22:48 1      Q.   And can you draw any conclusions about Mr.

11:22:53 2   Ortega's condition based on these X rays on May 8?

11:22:58 3      A.   ~~You can say he did not have a fracture and~~

11:23:03 4   ~~let me take that back.~~

11:23:06 5           When I saw him on the 29th -- you can --

11:23:13 6   sometimes a kid can have a fracture on a growth plate

11:23:17 7   which doesn't show up on an X ray.  Having X rays the

11:23:21 8   29th means -- they look exactly the same, growth plate

11:23:27 9   looks fine.  That means essentially that had there been

11:23:30 10  a fracture that was serious and it shifted or moved, you

11:23:37 11  would see that.

11:23:38 12     Q.   ~~So you would be able to tell --~~ so you would

11:23:42 13  be able to tell some difference between his X rays on

11:23:45 14  May 8th and August 29th if there was a fracture?

11:23:49 15     A.   Yes.  What I'm looking for is any change.  And

11:23:52 16  sometimes you have an X ray that's negative and still --

11:23:53 17  a kid can still have a fracture, but....

11:23:57 18     Q.   Now, do these X rays show anything else about

11:24:00 19  his condition other than he doesn't have a fracture?

11:24:04 20     A.   It shows that the ligament -- the bones are in

11:24:10 21  the right place.  Sometimes you have a ligamentous

11:24:15 22  injury and the bones can be out of place, and these

11:24:17 23  appear to be in place.

11:24:18 24     Q.   Can you tell anything about -- from these

11:24:20 25  X rays, again, these May 8 X rays, with regard to the

                                                          25

11:24:25  1    condition that you treated him for, with respect to the

11:24:28  2    injuries to the back of his wrist and his thumb?

11:24:32  3         A.    If I look at both sets of X rays, I can see

11:24:35  4    there was no fracture.  Had there been a fracture, it

11:24:40  5    was not significant at this point.  And that the pattern

11:24:44  6    where the bones are appears exactly the same, so my

11:24:47  7    suspicion, there was any kind of dislocation or any

11:24:51  8    fracture, it was minimal, and there wasn't.

11:24:55  9         Q.    Now, let me -- just for the record, I'm going

11:24:57 10    to show you what's been marked as Exhibits 1, 2, 3, 4

11:25:02 11    and 12.  If you could take a look at those.

11:25:08 12         A.    Sure.  (Reviews X rays.)  Okay.

11:25:48 13         Q.    And these are the X rays that you ordered on

11:25:50 14    August 29?

11:25:51 15         A.    Right.

11:25:52 16         Q.    And so your -- you said that your conclusion

11:25:56 17    is that there was no fracture based on your review of

11:25:59 18    both sets of X rays?

11:26:02 19         A.    Had there been -- sometimes you can't say for

11:26:04 20    sure that there was -- that the pediatric patient didn't

11:26:11 21    have a fracture, but that it was not significant,

11:26:12 22    because here the X rays are exactly the same,

11:26:14 23    three-and-a-half-, four-month interval.  So, there is

11:26:19 24    nothing here that would change what I would do in an

11:26:22 25    extraordinary way.

26

**U.S. LEGAL SUPPORT**

11:26:22  1      Q.  ~~Can you tell~~ anything ~~from these X rays, bas~~ed

11:26:25  2   on ~~-- you had said his injuries which were his -- I~~

11:26:30  3   ~~believe you said his ligaments.~~  Can you tell those

11:26:33  4   kinds of injuries from these types of X rays?

11:26:36  5      A.   You can get a hint.  If somebody has got a bad

11:26:40  6   ligament problem, you can see it, distance between two

11:26:43  7   bones increasing, and I don't see that here.  And you

11:26:45  8   can see the angles sometimes change, and I don't see

11:26:48  9   that at all.

11:26:50 10      Q.   Okay.  Okay.  So, on September 19th, when you

11:27:18 11   saw him the second time, you indicated his cast was

11:27:21 12   removed, that he ~~appeared to be -- I'm not putting words~~

11:27:24 13   ~~in your mouth, but he was essentially healed,~~ his issues

11:27:27 14   were essentially resolved?

11:27:28 15      A.   That's what I felt.

11:27:30 16      Q.   Did you prescribe anything else for him at

11:27:33 17   that time?

11:27:33 18      A.   A wrist splint.

11:27:37 19      Q.   What would that be for?

11:27:39 20      A.   Largely for kind of a transition.  When you

11:27:42 21   remove a cast from somebody, sometimes they're stiff.  A

11:27:44 22   splint reminds them that something has been going on,

11:27:49 23   gives them some support, reminds them that they had an

11:27:57 24   injury.  At the same time, it allows them some freedom

11:28:01 25   to start moving their wrist, in this case.

27

**U.S. LEGAL SUPPORT**

| | |
|---|---|
| 11:28:04 1 | Q.    And a splint would be something that someone |
| 11:28:07 2 | could take on and off at their -- by themselves? |
| 11:28:10 3 | A.    Absolutely. |
| 11:28:12 4 | Q.    And how long did you indicate to Mr. Ortega he |
| 11:28:14 5 | should use a wrist splint? |
| 11:28:16 6 | A.    I believe I said two to three weeks.  It's |
| 11:28:19 7 | typically what we would do for something like this. |
| 11:28:26 8 | Q.    What was your prognosis of his injury on |
| 11:28:32 9 | September 19? |
| 11:28:33 10 | A.    ~~I thought he would do~~ I thought he |
| 11:28:36 11 | essentially had resolved. |
| 11:28:38 12 | Q.    ~~Did you so,~~ did you schedule a follow-up -- |
| 11:28:43 13 | A.    No, I did not. |
| 11:28:44 14 | Q.    Okay.  And so you never saw him again after |
| 11:28:47 15 | September 19? |
| 11:28:48 16 | A.    No, I did not. |
| 11:28:52 17 | Q.    At any point did you note anything else in his |
| 11:28:57 18 | medical records that could have been a contributing |
| 11:28:59 19 | cause to his injuries besides what he said caused the |
| 11:29:03 20 | injury? |
| 11:29:05 21 | A.    No.  But for an injury, ~~something like this,~~ a |
| 11:29:07 22 | ~~lot of times we don't --~~ we do a very focused workup, so |
| 11:29:11 23 | we kind of focus on what's going on.  And my judgment, |
| 11:29:16 24 | given what I saw on the X rays, there probably would be |
| 11:29:22 25 | low yield looking for -- particularly after somebody is |

28

**U.S. LEGAL SUPPORT**

| | |
|---|---|
| 11:29:25 1 | better, you casted them, they're fine, there's no point |
| 11:29:29 2 | looking further for other reasons when somebody is |
| 11:29:31 3 | better.  It just doesn't make sense.  We have time |
| 11:29:35 4 | constraints in what we do. |
| 11:29:38 5 | Q.   Okay. |
| 11:29:53 6 | In the interest of time, could I take a look |
| 11:29:55 7 | at his records here?  And, Jim, do you want -- do you |
| 11:29:59 8 | have any follow-up questions? |
| 11:30:01 9 | MR. HIGA:  Yes, I have a few, but not very |
| 11:30:03 10 | many. |
| 11:30:07 11 | (Discussion off the record.) |
| 11:30:07 12 | EXAMINATION BY MR. HIGA |
| 11:30:11 13 | MR. HIGA:  Q.   Good morning, Doctor.  My name |
| 11:30:13 14 | again is James Higa.  I represent one of the other |
| 11:30:15 15 | defendants in this case, Officer Ramon Alcantar.  And I |
| 11:30:20 16 | just have some follow-up questions. |
| 11:30:23 17 | Back to the first visit that you had with |
| 11:30:26 18 | Benjamin Ortega in August of 2006, did you recall seeing |
| 11:30:33 19 | any swelling in his right wrist or thumb area as you |
| 11:30:39 20 | described? |
| 11:30:39 21 | A.   No. |
| 11:30:40 22 | Q.   Did you recall seeing any other discoloration |
| 11:30:43 23 | in those areas you described? |
| 11:30:45 24 | A.   I would have to look, but if I -- my |
| 11:30:48 25 | recollection is, no, there wasn't.  There was none. |

29

**U.S. LEGAL SUPPORT**

11:32:04  1      A.    That's correct.

11:32:05  2      Q.    Is this pattern of injury, taken in totality,

11:32:09  3   is this something that you commonly see in your practice

11:32:14  4   over the past three years?

11:32:15  5      A.    I mean, I see a lot of ligamentous injury,

11:32:18  6   yes.

11:32:20  7      Q.    Now, drawing on your experience over the past

11:32:22  8   three years, based on the description of how this injury

11:32:27  9   occurred that Mr. Ortega gave you, is that a -- is that

11:32:32 10   a common scenario for injuries of this type, in your

11:32:36 11   experience over the past three years?

11:32:39 12      A.    It's -- yes.  Anytime you stretch a joint

11:32:41 13   enough, you can stretch the ligaments and capsules, so,

11:32:45 14   yes.

11:32:45 15      Q.    And his particular injury as you described it,

11:32:53 16   is there anything about his description of that injury,

11:32:56 17   you know, as you did your testing on his wrist, is

11:33:03 18   that -- was that consistent with the injury that he --

11:33:06 19   excuse me.  Was that consistent with the mode of injury

11:33:10 20   that he described?

11:33:12 21      A.    Yes.  It's not inconsistent.  I put it that

11:33:15 22   way.  We rely on what people tell us when they come in.

11:33:19 23   But if you stretch an ankle or a wrist far enough, you

11:33:22 24   can stretch out the ligaments and sometimes it takes a

11:33:25 25   little time for those to tighten up.  Yes.

31

11:35:13  1      A.   For the numbness, no.   (Indicating.)   Probably

11:35:16  2   not.  For the ligaments, kind of -- "exacerbated" is a

11:35:22  3   strong word.  Sometimes things percolate a little longer

11:35:26  4   than necessary, but barring any major stuff, usually,

11:35:29  5   you know, if you don't do anything, other trauma, fall

11:35:34  6   off a motorcycle, usually it will get better.

11:35:42  7           MR. HIGA:   I think those are all the questions

11:35:43  8   I have.

11:35:43  9           FURTHER EXAMINATION BY MR. VOSE

11:35:44 10           MR. VOSE:   Q.   I just have one other question

11:35:46 11   and I'll try to formulate it so it makes sense.

11:35:53 12           The type of injury that occurred on -- again,

11:35:57 13   I'm referring to the top of the wrist area.  Would that

11:36:03 14   injury be caused or could that injury be caused -- or

11:36:07 15   how would that kind of an injury typically be caused?

11:36:09 16   Let me ask you that, first.

11:36:12 17      A.   If it's -- there's two things.  So, if it's --

11:36:14 18   and it's difficult to say for sure, but if you have a

11:36:18 19   retinaculum, soft tissue, you stretch it, it's

11:36:21 20   irritated.  Stretch it -- at the same time, you could be

11:36:23 21   stretching out the ligaments.  So, either one of these

11:36:25 22   are perfectly plausible injuries, mechanism of injury,

11:36:33 23   can be treated the same way.  So, basically, you stretch

11:36:36 24   it and you kind of stretch out the whole tissue, soft

11:36:40 25   tissue, and people feel discomfort, pain, so....  And

                                                                    33

| | |
|---|---|
| 11:36:45 1 | then, you know, without necessarily tearing it, where |
| 11:36:49 2 | you need to go in to operate or anything like that. |
| 11:36:52 3 | Q.  So, typically, that type of injury, then, if I |
| 11:36:55 4 | understand, would be caused by a stretching kind of an |
| 11:36:59 5 | action on that ligament? |
| 11:37:02 6 | A.  Yes, more likely. |
| 11:37:04 7 | Q.  Now, would -- could that kind of injury be |
| 11:37:08 8 | caused simply by putting pressure, without any movement, |
| 11:37:11 9 | but simply pressure on that injury -- or on that |
| 11:37:16 10 | ligament?  Excuse me. |
| 11:37:17 11 | A.  A little surprising, just pressure.  And if |
| 11:37:19 12 | you fell -- I've seen people fall and they've done that |
| 11:37:24 13 | (demonstrating), and that's done.  But just pushing on |
| 11:37:26 14 | it.... |
| 11:37:30 15 | Q.  Is that a "no" or "unlikely"? |
| 11:37:33 16 | A.  It's unlikely. |
| 11:37:35 17 | Q.  So it really is a stretching kind of an |
| 11:37:37 18 | injury? |
| 11:37:38 19 | A.  Yes. |
| 11:37:38 20 | Q.  Okay.  When you examined Mr. Ortega on August |
| 11:37:45 21 | 29, did you notice any injury to the -- to his skin in |
| 11:37:54 22 | the area of the injury? |
| 11:37:55 23 | A.  Not -- no.  Typically, we -- we're not |
| 11:37:58 24 | perfect.  We try to write these things down.  But, for |
| 11:38:01 25 | example, I've had patients who see (sic) obvious - |

34

**U.S. LEGAL SUPPORT**

| | |
|---|---|
| 11:38:04 1 | ~~scarring or it's a fresh injury, then you see these~~ |
| 11:38:07 2 | ~~things.   We try to write them down the best we can.   I~~ |
| 11:38:10 3 | ~~didn't write any of that down, so my assumption is that~~ |
| 11:38:13 4 | ~~there was no swelling and there was no scarring there.~~ |
| 11:38:15 5 | ~~MR. VOSE:   Okay.   Okay.   That's it for me.~~ |
| 11:38:20 6 | ~~EXAMINATION BY MR. JACOBSEN~~ |
| 11:38:21 7 | ~~MR. JACOBSEN:   Q.   Dr. Haney, my name is~~ |
| 11:38:23 8 | ~~Steven Jacobsen.   I represent your patient, Benjam~~in |
| 11:38:27 9 | ~~Ortega.   I do have a few questions for you.~~ |
| 11:38:29 10 | Your diagnosis on August 29 was a ligamentous |
| 11:38:35 11 | strain, correct? |
| 11:38:36 12 | A.   Right. |
| 11:38:36 13 | Q.   But you also had: |
| 11:38:37 14 | "Differential diagnosis also includes |
| 11:38:40 15 | synovial fibrosis/impingement following |
| 11:38:53 16 | ligamentous injury." |
| 11:38:55 17 | A.   Sometimes if you damage the capsule of the |
| 11:38:58 18 | joint, so, for example, if you take an ankle, you can |
| 11:39:02 19 | get -- inside the joint capsule is what we call |
| 11:39:05 20 | synovium.   That's where it lines the joint.   Sometimes |
| 11:39:08 21 | that tissue can react by getting a little thickened and |
| 11:39:11 22 | irritated and you can get a synovitis.   We see a lot |
| 11:39:17 23 | more ankle injuries and that happens.   It's not rare. |
| 11:39:20 24 | You do see it a lot in ankle injuries. |
| 11:39:25 25 | Q.   At the time you saw Mr. Ortega, you felt that |

35

11:39:27  1    that was also a possibility in his case?

11:39:30  2         A.    Uh-huh.

11:39:30  3         Q.    Yes?

11:39:31  4         A.    If I wrote it as part of the differential,

11:39:34  5    it's out there as a possibility.

11:39:36  6         Q.    When you saw him again on September 19, was

11:39:42  7    that no longer part of your diagnosis?

11:39:46  8         A.    Essentially, when I saw him on the 19th, he

11:39:49  9    was significantly better or resolved.  So, in essence,

11:39:51 10    whether it was synovitis or a retinaculitis or a

11:39:57 11    ligament strain, it's gone.  He's better.  So, we just

11:40:00 12    kind of -- we don't go working up what it could have

11:40:03 13    been if it's all gone.

11:40:06 14         Q.    Now, on the 19th of September, when you saw

11:40:09 15    him for the second time, your records indicate that your

11:40:13 16    assessment was "ligamentous strains improved," correct?

11:40:18 17         ~~A.    Uh-huh.~~

11:40:19 18         ~~Q.    Yes?~~

11:40:19 19         A.    Yes.

11:40:21 20         Q.    But you didn't say "resolved" at that time,

11:40:23 21    correct?

11:40:24 22         A.    No, I did not use the word "resolved," but he

11:40:26 23    had no tenderness over there, so I probably could have

11:40:29 24    been stronger and said "resolved."

11:40:32 25         Q.    Did he have decreased sensation to light touch

                                                              36

11:40:37 1    when you saw him for the second time?

11:40:39 2        A.    I believe not.  If I look at the assessment,

11:40:42 3    when it says "gross sensation intact," I think what you

11:40:46 4    see above that, "decreased light touch over dorsal

11:40:54 5    aspect of radius," I think that is a typo.  Sometimes

11:40:57 6    we, you know -- the most accurate thing is the

11:41:02 7    assessment and plan.  Sometimes in the history, people

11:41:05 8    occasionally forget to change things.  But when I do my

11:41:09 9    assessment and plan, I wrote "gross sensation intact,

11:41:12 10   muscle strength 5 out of 5," so my assumption is, that

11:41:16 11   had resolved.

11:41:19 12       Q.    Is there a certain percentage of patients with

11:41:22 13   this type of ligamentous strain whose injuries do not

11:41:27 14   fully resolve?

11:41:31 15       A.    I'm sure there is, but I don't -- it depends

11:41:33 16   on a lot of things.  If you, you know, if you come down

11:41:37 17   on a motorcycle and turn, that's one thing.  You've got

11:41:42 18   to always think about how much trauma is involved and

11:41:45 19   then how they, you know, how they are.

11:41:48 20           I mean, I have a hard time understanding why,

11:41:51 21   if you're better here, then why it gets worse again.  If

11:41:55 22   this was not going to resolve, my expectation is, when I

11:41:58 23   saw him on the follow-up, he would still be really

11:42:01 24   tender over his ligaments.  I've had that before, in

11:42:05 25   which case we work it up further.  He didn't at the

                                                                    37

.:42:08 1  ~~time.~~

.:42:08 2      Q.   Now, you're comparing this injury to an injury

.:42:11 3  that would be suffered by someone who, for example, had

l:42:14 4  fallen off a motorcycle, correct?

l:42:17 5      A.   Uh-huh.

l:42:17 6     ~~Q.   Yes?~~

l:42:17 7      A.   Yes.

l:42:19 8      Q.   In this case, if the injury were sustained not

l:42:23 9  due to a fall or an accident, but merely by having

l:42:27 10  someone bend the wrist down, would there have to be a

l:42:35 11  large amount of force applied to the wrist to achieve

l:42:38 12  this type of injury similar to what would occur in a

l:42:42 13  fall from a motorcycle?

l:42:44 14      ~~MR. HIGA: Objection; incomplete hypothetical.~~

l:42:46 15  ~~You can go ahead and answer.~~

l:42:48 16      THE WITNESS:  You would have to have a lot of

l:42:49 17  force to do it.  I guess the question is, you know, if

l:42:51 18  you can get that force not from a motorcycle, yes. ~~I~~

l:42:56 19  ~~mean, force is, yes, it's force, but, you know....~~

1:43:00 20      MR. JACOBSEN:  Q.  How would you describe the

1:43:02 21  amount of force that would be necessary to cause this

1:43:05 22  type of injury?

1:43:07 23      A.   I, you know, I have a hard time saying exactly

1:43:15 24  how much force is necessary.  We rely on what the

1:43:18 25  patient tells us.  We rely on how they do.

38

11:43:21 1          So, for example, here, he had pain, simple

11:43:26 2    casting, pain went away.  Tells me that there probably

11:43:31 3    wasn't as much force as a, you know, a -- somebody on a

11:43:35 4    motorcycle coming down on their wrist, or I had a

11:43:41 5    patient very similar who had wrist problems.  He was

11:43:43 6    riding his bike and, you know, 30 miles an hour, hit a

11:43:47 7    car door.  That's a lot of force.

11:43:49 8          So, I mean, I don't know.  I don't know how

11:43:52 9    much force anyone -- the police officers did on him, but

11:43:55 10   he's clearly better three weeks later from simply

11:43:58 11   casting.  So, I don't know what to say, how much force.

11:44:08 12        Q.   Now, if the patient still has symptoms with

11:44:13 13   activity now, two years post-incident, would you expect

11:44:22 14   that those symptoms would be continuing?

11:44:25 15             MR. HIGA:  Objection; incomplete hypothetical,

11:44:26 16   lacks foundation, assumes facts not in evidence.

11:44:31 17             MR. JACOBSEN:  Q.   Absent any other additional

11:44:33 18   trauma.

11:44:34 19        A.   I would have a hard time understanding --

11:44:36 20   again, if you're better here, my expectation is you're

11:44:41 21   better.  It's a little bit more mechanically hard to

11:44:45 22   understand, you know, a significant tear that gets

11:44:47 23   better and then is suddenly worse again.

11:44:51 24          If it was a significant strain or tear, my

11:44:53 25   expectation was, at follow-up, it still would have been

39

11:44:57 1   ~~painful. That's my expectation.~~

11:45:00 2       ~~Q.    What I'm asking you, Doctor, is to assume for~~

11:45:02 3   purposes of this question that with activity, Mr. Ortega

11:45:05 4   continues to experience some pain in his wrist.

11:45:08 5   Assuming that to be true, would you expect his injuries

11:45:11 6   to spontaneously resolve or would you expect him to

11:45:15 7   continue?

11:45:17 8       ~~MR. HIGA:   Same objections~~.

11:45:19 9       THE WITNESS:   If he's -- if it's still going

11:45:21 10  on, you know, two years after I had seen him, it's hard

11:45:28 11  to say.   I mean, somebody needs to take a look at this.

11:45:31 12  So, for me to say my -- I don't know.   I mean, you would

11:45:37 13  have to take a look at him, you have to maybe do an exam

11:45:40 14  and give another test or something.   If it shows reason

11:45:44 15  that -- for the continuing pain, that might be helpful.

11:45:48 16  If it doesn't show anything, then, medically, it's

11:45:52 17  ~~difficult to say why.~~

11:45:53 18      MR. JACOBSEN:   Q.   Are you aware of any

11:45:56 19  problems that Mr. Ortega had with his right wrist prior

11:46:00 20  to the incident of May 7th, 2006?

11:46:03 21      A.    No, I'm not.

11:46:07 22      Q.    Given the history that you're aware of with

11:46:10 23  Mr. Ortega and your observations and your review of the

11:46:14 24  records, is it your opinion that the problems for which

11:46:21 25  you saw him were caused by the incident that he

40

11:46:25  1 described in which his wrist was bent down by a police

11:46:30  2 officer?

11:46:31  3  A. I rely on what people tell me and, you know, I

11:46:36  4 rely on what the patient tells me.

11:46:41  5  Q. And given your experience and training, is

11:46:43  6 that consistent with what he told you?

11:46:46  7  A. It goes -- I mean, I wasn't there.  I don't

11:46:48  8 know how much the wrist was bent, but, theoretically,

11:46:52  9 yes, it could happen and -- but, you know, it's -- yes.

11:46:59 10    MR. JACOBSEN:  Thank you, Doctor.

11:47:02 11    MR. HIGA:  I have nothing.

11:47:06 12    THE VIDEOGRAPHER:  This concludes the

11:47:08 13 deposition of Dr. Sean Haney, M.D.  The present time is

11:47:11 14 11:47.  The electronic record contains one video disk,

11:47:18 15 the originals to be retained by Televideo Production

11:47:21 16 Services at 3655 Grand Avenue in Oakland, California,

11:47:25 17 94610, phone, (510) 893-0555.  Copies are available to

11:47:33 18 interested parties unless otherwise stipulated.

11:47:36 19    We're now off the record.

11:47:38 20    (Deposition adjourned at 11:47 a.m.)

21      --oOo--

22

23

24

25

41

CERTIFICATE OF WITNESS

    I, SEAN M. HANEY, M.D., do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct..

    EXECUTED this_____day of_____,

2008, at_____, _____.
                (City)                  (State)

                        _____

                        SEAN M. HANEY, M.D.

42

1  STATE OF CALIFORNIA      ) ss.

2  COUNTY OF SAN MATEO      )

3

4      I, Dominique Isabeau, CSR No. 7076, a Certified

5  Shorthand Reporter in and for the State of California

6  and disinterested person, do hereby certify that prior

7  to being examined, the witness named in the foregoing

8  deposition was by me duly sworn to testify the truth,

9  the whole truth, and nothing but the truth, in the

10  within entitled cause; that said deposition was taken

11  before me at the time and place therein stated and was

12  thereafter transcribed into typewriting under my

13  direction; that the foregoing pages are a true record of

14  all proceedings and testimony as reported to the best of

15  my ability; that the witness was given an opportunity to

16  read, correct and sign the deposition transcript.

17      I further certify that I am not related to any

18  party or counsel or attorney for any of the parties in

19  the foregoing deposition or in any way interested in the

20  outcome of the action herein.

21

22             _D. Isabeau_

23      DOMINIQUE ISABEAU, CSR No. 7076

24      DATED: July 23, 2008

25

**U.S. LEGAL SUPPORT**

U.S. Legal Support, Inc.          **AUG 0 1 2008**
180 Montgomery Street, Suite 2180
San Francisco, California 94104

Sean M. Haney, M.D.
Kaiser Permanente Medical Center
235 West MacArthur Boulevard, Room 669
Oakland, California 94611

Re:   Miguel Ortega, et al., v. City of Oakland,
      et al.
Date of deposition:   July 21, 2008

Dear Dr. Haney:

    The original transcript of your deposition taken in
the above-referenced matter is available for reading,
correcting and signing at the San Francisco office of
U.S. Legal Support, Inc.

    If it is more convenient to read a copy of the
transcript and waive signature of the original
transcript, please notify said office by letter sent
certified or registered mail of any changes made.

    In the event you do not sign your deposition
transcript within thirty (30) days of receipt of this
letter, it may be used with the full force and effect as
though it had been read, corrected and signed.

    If you wish to arrange an appointment to review
the original transcript, please contact U.S. Legal
Support at (415) 362-4346.

                    Sincerely,

                    Dominique Isabeau
                    CSR No. 7076

cc:   Steven R. Jacobsen, Attorney at Law
      Charles Vose, Attorney at Law
      James Y. Higa, Attorney at Law
      The deponent

original:   Original transcript

                                              44

**U.S. LEGAL SUPPORT**

PROOF OF SERVICE BY FAX & MAIL

I declare under penalty of perjury, under the laws of the State of California, that:  I am employed in the County of Alameda; I am over the age of eighteen years and not a party to the within action; my business address is 901 Clay Street, Oakland, California 94607; on the date below written I served a copy of the attached

PLAINTIFF'S DEPOSITION DESIGNATIONS
OF THE TESTIMONY OF DR. SEAN HANEY

inn respondent City of Oakland by placing true copies thereof in sealed envelopes, with postage fully prepaid, in the United States mail at Oakland, California, addressed and by facsimile transmission to the facsimile numbers  listed below:

John J. Verber, Esq.
James Higa                                        Counsel for defendant
BURHAN BROWN                          RAMON J. ALCANTAR
1901 Harrison St., 11th Floor
Oakland, CA 94612
Facsimile No. (510) 835-6666


        Executed at Oakland, California on November 5, 2008.


_____
                    BRENDA D. POSADA




PROOF OF SERVICE

1 | John J. Verber, State Bar No. 139917
2 | James Y. Higa, State Bar No. 225683
   | **BURNHAM BROWN**
   | A Professional Law Corporation
3 | P.O. Box 119
   | Oakland, California 94604
4 | ---
   | 1901 Harrison Street, 11th Floor
5 | Oakland, California 94612
   | Telephone:    (510) 444-6800
6 | Facsimile:    (510) 835-6666
   | Email:    jverber@burnhambrown.com
7 |          jhiga@burnhambrown.com

8 | Attorneys for Defendant
   | RAMON J. ALCANTAR individually and in his capacity as
9 | a police officer for the City of Oakland

10 |

11 | UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | MIGUEL ORTEGA, BENJAMIN ORTEGA,    No. C-07-02659 JCS
   | a minor, by and through his Guardian Ad
14 | Litem, ANA ROSA ORTEGA    **DEFENDANT RAMON J. ALCANTAR'S**
   |     **APPENDIX A:  JOINT EXHIBIT LIST**
15 |     Plaintiff,

16 | v.

17 | CITY OF OAKLAND, OAKLAND POLICE
   | DEPARTMENT, WAYNE TUCKER, in his
18 | capacity as the Police Chief of the City of
   | Oakland, RAMON J. ALCANTAR
19 | individually and in his capacity as a police
   | officer for the City of Oakland, and DOES 1
20 | THROUGH 200, inclusive,

21 |     Defendants.

22 |

23 | **APPENDIX A: JOINT EXHIBIT LIST**

24 |

| EXH# | Description | Bates | When Offered | When Received | Limitations |
|------|-------------|-------|--------------|---------------|-------------|
| 1 | Oakland Police Department Use of Force Policy Handbook, Effective Date February | ALC000001-ALC000053 | | | |

DEF RAMON J. ALCANTAR'S APPENDIX A: JOINT    1                                    No. C-07-02659 JCS
EXHIBIT LIST

| | | 17, 2006 | | | | |
|---|---|---|---|---|---|---|
| | 2 | Oakland Police Department Use of Force Policy Handbook, Effective Date August 1, 2007 | ALC000054-ALC000141 | | | |
| | 3 | Photographs of Plaintiff BENJAMIN ORTEGA, taken May 7, 2006 | ALC000142-ALC000144 | | | |
| | 4 | Internal Affairs Complaint Investigation Report 06-0902 | ALC000145-ALC000164 | | | |
| | 5 | Kaiser Permanente Medical Records | ORT000165-ORT000177 | | | |
| | 6 | Documents summarizing medical records and determining reasonable value from G.O.A.L | ORT000178-ORT000179 | | | |
| | 7 | Roger Clark's Expert Report and attachments | ORT000180-ORT000200 | | | |
| | 8 | Roger Clark's Curriculum Vitae | ORT000201-ORT000206 | | | |
| | 9 | OPD General Order K-4.1 "Force Review Board" | ORT000207-ORT000224 | | | |
| | 10 | CAD Purge Printout | ORT000225-ORT000234 | | | |
| | 11 | CD copy of radio transmissions for the subject incident | | | | |
| | 12 | OPD Report Writing Manual (dated December, 1993) | ORT000236-ORT000478 | | | |
| | 13 | Defendant Ramon Alcantar's Response to Request for Production of Documents, Set No.1 | ORT000479-ORT000484 | | | |
| | 14 | Defendant Ramon Alcantar's Response to Interrogatories Set One | ORT000485-ORT000494 | | | |
| | 15 | All exhibits to the Depositions transcript of Roger A. Clark | ORT000495-ORT000626 | | | |
| | 16 | Maps and satellite views of the incident scene | ORT000627-ORT000630 | | | |
| | | POST training Domain #1: History, | ORT000631-ORT000729 | | | |

DEF RAMON J. ALCANTAR'S APPENDIX A: JOINT    2
EXHIBIT LIST

No. C-07-02659 JCS

| | | | | | | |
|---|---|---|---|---|---|---|
| 17 | Professionalism and Ethics | | | | | |
| 18 | POST training Domain #2: Criminal Justice System | ORT000730-ORT000787 | | | | |
| 19 | POST training Domain #11: Juvenile Law and Procedure | ORT000788-ORT000855 | | | | |
| 20 | POST training Domain #15: Laws of Arrest | ORT000856-ORT000998 | | | | |
| 21 | POST training Domain #18: Investigative Report Writing | ORT000999-ORT001126 | | | | |
| 22 | POST training Domain #20: Use of Force | ORT001127-ORT001241 | | | | |
| 23 | POST training Domain #21: Patrol Techniques | ORT001242-ORT001342 | | | | |
| 24 | POST training Domain #24: Handling Disputes/Crowd Control | ORT001343-ORT001481 | | | | |
| 25 | POST training Domain #33: Arrest Methods/Defensive Tactics | ORT001482-ORT001618 | | | | |
| 26 | POST training Domain #42: Cultural Diversity/Discrimination | ORT001619-ORT001754 | | | | |

903288

DEF RAMON J. ALCANTAR'S APPENDIX A: JOINT   3
EXHIBIT LIST

No. C-07-02659 JCS